OGDEN, Plaintiff in Error, *against* SAUNDERS, Defendant in Error.

The power of Congress " to establish uniform laws on the subject of bankruptcies throughout the United States," does not exclude the right of the States to legislate on the same subject, except when the power is actually exercised by Congress, and the State laws conflict with those of Congress.

A bankrupt or insolvent law of any State, which discharges both the person of the debtor, and his future acquisitions of property, is not " a law impairing the obligation of contracts," so far as respects debts contracted subsequent to the passage of such law.

But a certificate of discharge, under such a law, cannot be pleaded in bar of an action brought by a citizen of another State, in the Courts of the United States, or of any other State than that where the discharge was obtained.

ERROR to the District Court of Louisiana.

This was an action of assumpsit, brought in the Court be-

low by the defendant in error, Saunders, a citizen of Kentucky, against the plaintiff in error, Ogden, a citizen of Louisiana. The plaintiff below declared upon certain bills of exchange, drawn on the 30th of September, 1806, by one Jordan, at Lexington, in the State of Kentucky, upon the defendant below, Ogden, in the city of New-York, (the defendant then being a citizen and resident of the State of New-York,) accepted by him at the city of New-York, and protested for non-payment.

The defendant below pleaded several pleas, among which was a certificate of discharge under the act of the legislature of the State of New-York, of April 3d, 1801, for the relief of insolvent debtors, commonly called the *three-fourths act.*

The jury found the facts in the form of a special verdict, on which the Court rendered a judgment for the plaintiff below, and the cause was brought by writ of error before this Court. The question, which arose under this plea as to the validity of the law of New-York as being repugnant to the constitution of the United States, was argued at February term, 1824, by Mr. *Clay,* Mr. *D. B. Ogden,* and Mr. *Haines,* for the plaintiff in error, and by Mr. *Webster* and Mr. *Wheaton,* for the defendant in error, and the cause was continued for advisement until the present term. It was again argued at the present term, (in connexion with several other causes standing on the calendar, and involving the general question of the validity of the State bankrupt, or insolvent laws,) by Mr. *Webster* and Mr. *Wheaton,* against the validity, and by the *Attorney General,* Mr. *E. Livingston,* Mr. *D. B. Ogden,* Mr. *Jones,* and Mr. *Sampson,* for the validity.

*Feb. 19th, 20th, 21st, 22d.*

The editor has endeavoured to incorporate the substance both of the former and the present argument, into the following summaries.

Mr. *Wheaton* argued, that the State laws now in question were repugnant to the constitution of the United States, upon two grounds:

1st. That the power of establishing " uniform laws on

the subject of bankruptcies throughout the United States," <span>1827.</span>
was exclusively vested in Congress.

2d. That the State laws in question were " laws impairing the obligation of contracts," the power of passing which was expressly prohibited to the States.

1. The State laws, the validity of which is now drawn in question, are, the act of the legislature of New-York of the 3d of April, 1801, for the relief of insolvent debtors on the application of three fourths of their creditors, by discharging their persons, and future property, from liability for their debts, upon a *cessio bonorum*, and the act of the 3d of April, 1813, granting the same relief upon the application of two thirds of the creditors. The judgment of one of the learned judges of this Court, in the case of *Golden* v. *Prince*, was referred to in this part of the argument, and its reasoning relied upon, to show that the power of establishing uniform laws on the subject of bankruptcies throughout the Union was, from its nature, an exclusive power, and that the exercise of a similar power on the part of the States was inconsistent.[a]

2. These legislative acts are laws impairing the obligation of contracts. That they are such, in respect to contracts in existence when the laws are passed, has already been determined by the Court upon solemn argument.[b] It was also supposed to have been decided, that, in such a case, it was immaterial whether the contract was made before or after the passage of the law.[c] But the whole question might now be considered as open for discussion.

To determine it, the nature and terms of the constitutional prohibition must be examined. "*No State,*" &c. "*shall* coin money, emit bills of credit, make any thing but gold and silver coin a tender in the payment of debts, *pass any* bill of attainder, *ex post facto* law, or *law impairing the obligation of contracts.*" These are comprehensive terms, studiously designed to restrain the State legislatures from

a 5 *Hall's Law Journ.* 502. 503.

b Sturges v. Crowninshield, 4 *Wheat. Rep.* 122. Farmers' and Mechanics' Bank v Smith, 6 *Wheat. Rep.* 131.

c M'Millan v. M'Niell, 4 *Wheat. Rep.* 209.

1827.

Ogden
v.
Saunders.

acts of injustice, both in criminal and civil matters. And (1.)
the prohibition of issuing *bills of credit*, or making any thing
but *gold and silver coin* a tender in the payment of debts,
was intended to cut up paper money by the roots. The
commercial credit of the nation had severely suffered from
this fatal scourge; and the anxiety to be relieved from it,
was one of the most pressing motives which induced the for-
mation of the new constitution. It might, perhaps, be
doubted, whether the power of coining money, which was
given to Congress, and denied to the States, taken in con-
nexion with the prohibition to them to emit bills of credit,
or make any thing but gold and silver coin a tender in the
payment of debts, was not intended to give to Congress the
exclusive power of regulating the whole currency of the
country; although the framers of the constitution probably
did not foresee how completely this provision would be
evaded by the multiplication of banking corporations in the
different States. The term "bills of credit," alone, would
reach the ordinary case of paper money; but the prohibi-
tion of tender laws was meant to expand the same thought
so as to reach valuation and appraisement laws, and all that
prolific brood of similar pernicious enactments which dis-
figure the pages of our history from the peace of 1783 until
the establishment of the present constitution in 1789.
(2.) " Bills of attainder, and *ex post facto* laws," were pro-
hibited, in order to restrain the State legislatures from op-
pressing individuals by arbitrary sentences, clothed with the
forms of legislation, and from making retrospective laws ap-
plicable to criminal matters.[a]    (3.) The prohibition of
" laws impairing the obligation of contracts," was intended
to prevent the remaining mischiefs which experience had
shown to flow from legislative interferences with contracts,
and to establish a great conservative principle, under which
they might be protected from unjust acts of legislation in
any form.

To give complete effect to this last salutary prohibition,
the Court has constantly given it an interpretation sufficiently
broad and liberal to accomplish the ends which the framers

---

[a] Calder *et ux.* v. Bull, 3 *Dall. Rep.* 386.

of the constitution had in view.  For this purpose the pro-
hibition has been considered as extending to contracts *exe-
cuted*, as well as *executory*; to conveyances of land, as well
as commercial contracts ;  to public grants from the State to
corporations and individuals, as well as private contracts be-
tween citizens ;  to grants and charters in existence when
the constitution was adopted, as well as those existing pre-
viously, and even before the revolution ; and to compacts
between the different States themselves.[a]   In most of these
cases, the impairing act was applied to a specific contract
or grant, and affected only the rights of particular indivi-
duals.   But the principles laid down by the Court apply to
whole classes of contracts ;  and surely it will not be pre-
tended, that a law repealing all charters of a certain descrip-
tion, or impairing a general description of contracts, or
abolishing all debts of a certain nature, would not be reach-
ed by the prohibition.   The constitution necessarily dealt
in general terms ;  and such is the intrinsic ambiguity of all
human language, that it could not entirely avoid difficulties
of interpretation.   But the fault of tautology has never
been imputed to this instrument, and terms of such signifi-
cant import would hardly have been added to this clause, if
it had been intended merely to repeat and amplify the same
thought which had already been expressed in the prohibi-
tion of paper money, and other tender laws.   On the other
hand, if it had been intended merely to prohibit those par-
ticular species of laws impairing the obligation of contracts,
which the history of the times shows to have been the object
of peculiar censure, they would have been mentioned by
name.   Paper money and tender laws may be, and undoubt-
edly are, laws impairing the obligation of contracts ; but
they were such notorious and flagrant evils, that it was
deemed necessary to prohibit them expressly, and by name.
But the Convention would have stopped there, had they not

a Fletcher  v.  Peck.  6 *Cranch*, 87.  New Jersey  v.  Wilson,
7 *Cranch*, 164.   Terrett v. Taylor, 9 *Cranch*, 43.   Town of Powlet
v. Clark, 9 *Cranch*, 292. Dartmouth College v. Woodward, 4 *Wheat.
Rep.* 518.  Society, &c. v. New-Haven, 8 *Wheat. Rep.* 464. 481.
Green v. Biddle, 8 *Wheat. Rep.* 1.

1827.

Ogden
v.
Saunders.

1827.

Ogden
v.
Saunders.

intended to include any, and every law, impairing the obligation of contracts. And if they had intended to include only such as instalment and suspension laws, they would have mentioned them specifically. It is believed that the reasoning of the Court in *Sturges* v. *Crowninshield*, is conclusive on this head. This reasoning receives confirmation from the historical fact, that in the original draughts of the proposed constitution, this prohibition of laws impairing the obligation of contracts was not included, although the other prohibitions were contained both in Mr. C. Pinckney's draught, and in that of the Committee of Nine. The prohibition now in question was subsequently added in the revised draught, which shows, at least, that it was studiously inserted.[b]

Since, then, the Convention intended to prohibit every possible mode in which the obligation of contracts might be violated by State legislation, the question recurs, are State bankrupt laws within the prohibition? The clause must be construed in connexion with other parts of the constitution, and must be considered with reference to those extrinsic circumstances in the then condition of the country which affect the question. One of the great objects of the constitution was to restore violated faith, and to raise the country from that state of distress and degradation into which it had been plunged by the want of a regular administration of justice in the relation of debtor and creditor. The motives for giving the power of establishing bankrupt laws to Congress are explained in the cotemporaneous expositions of the constitution.[c] Had not this power been granted to the Union, it might have been argued with more show of reason, that the States were not meant to be prohibited from exercising the power so as to impair the obligation of contracts. In enumerating the prohibitions to the States, each particular class of laws was not specified, for the reasons before mentioned. The plan of the framers of the constitution excluded this prolixity of detail. Even in

a *Journ. Fed. Convention*, 79. 227. 359.
b *Federalist*, No. 42.

the *Federalist*, the authors have only commented upon such parts as were subjected at the time to popular discussion. Their observations upon the present subject are very general and concise; not, as has been supposed, because the concession by the States was not so extensive as we now contend, but because it was almost universally regarded as indispensably necessary.

It is said, in a learned judgment delivered from a tribunal entitled to great respect, that all contracts are to be construed and executed according to the *lex loci contractus*, and the obligation of the contract is what the law of the place makes it. Hence it is inferred, that the insolvent laws of the State in which any contract is made, form a part of the obligation of the contract.[a]

The principle may be admitted without conceding the inference. It is sought to be illustrated by supposing the law incorporated into the agreement of the parties. But it is only to suppose the clause of the constitution now in question to be also inserted in their agreement, and it will be seen that this imaginary reference of the contracting parties to any particular law, leaves the question just where it found it. To this reasoning may be opposed the authority of another learned judge of the same State, who, though he expresses an opinion that the prohibition ought to be applied to retrospective laws only, repudiates this argument. " For," (says he,) " if parties are to be presumed to contract with reference to existing laws, they must be presumed to mean *laws made in pursuance of the constitution*."[b] And it may be added, that the same argument would apply with equal force to a law making paper money, or any thing else but gold and silver coin, a tender in the payment of debts. But it will hardly be pretended, that the existence of such a law at the time and place where the debt was contracted, would prevent the creditor from recovering it in specie.

It may, indeed, be admitted, that there is a difficulty in distinguishing between the obligation of a contract, and the remedy given by the law to enforce it. It may be admitted,

<div style="text-align: right">1827.

Ogden
v.
Saunders.</div>

a Mather v. Bush, 16 *Johns. Rep.* 233. 249. Per Spencer, Ch. J

b Per Kent, Ch. 7 *Johns. Ch. Rep.* 376.

1827.

Ogden
v.
Saunders.

that the States have a right to modify the remedy, so far as respects their own Courts; that the *lex fori* may be changed in many respects; that the process for the collection of debts may be altered; still it does not follow, that a law taking away all remedy whatever, and, in effect, abolishing the debt, would be a valid act. Unless such an act be a law impairing the obligation of contracts, it is difficult to conceive of such a law. Wherever there is a right, there must be a remedy.[a] The remedy may be modified, but it may not be so modified as to impair or destroy the obligation. A discharge of the person only, upon a *cessio bonorum*, under a State insolvent law, may not impair the obligation of his contracts, and may be effectual within the territory of the State, and in the State Courts. But a discharge of the person, and the future acquisitions of property of the debtor, under a State bankrupt law, absolutely extinguishes the debt, and cannot, therefore, be valid in any place where the authority of the constitution of the United States extends. The distinction between bankrupt and insolvent laws is sufficiently clear for all practical purposes. Both in Great Britain and on the European continent, the bankrupt laws are limited to merchants and traders, and the discharge is absolute. On the other hand, both by the insolvent system of England, and the *cessio bonorum* of the countries governed by the Roman civil law, the benefit of the cession is extended to all classes of persons; but it discharges the person only, leaving the subsequent acquisitions of the debtor liable to the demands of his creditors.[b] The *cessio bonorum* does not, therefore, impair the obligation of the contract. It only suspends and modifies the remedy. "Neither a civil nor a natural obligation (says Ayliffe) is dissolved by a *cessio bonorum*; though it produces a good exception in law, and suspends the force of an obligation for a time; the extinguishment of an obligation being one thing, and the ces-

a 3 *Bl. Comm.* 23.

b *Inst. de Act.* s. 40. *Dig.* l. 4. *De cessione bonorum.* 3 *Pothier. Pandect. Just. in Nov. Ord. Dig.* 174. B. 42. *Encyclop. Meth.* art. Jurisprudence, *Cession. Code du Commerce*, art. 568. *Kent's Comm.* vol. 1. p. 396. 16 *Johns. Rep.* 244, 245. note (*a*) (*b.*)

sation of it another; for, when an obligation is once extinct, it never revives again."[a]

Supposing, then, that the prohibition ought to be construed as extending to State bankrupt laws, what reason is there to believe that the Convention meant to restrict it to laws operating upon existing contracts only? They had already expressly prohibited retrospective laws in criminal matters; and retrospective laws, applicable to civil cases, hardly required any positive and express prohibition. In every system of jurisprudence such laws are considered as contrary to the first principles of natural justice; and even in those countries where the Courts do not feel themselves at liberty to disobey the will of the legislature when clearly expressed, however unreasonable or unjust, they will not give effect to it unless it is thus expressed.[b] Had retrospective laws, affecting vested rights acquired under contracts, been alone intended, more appropriate and restrictive terms would have been used. But, thus limited in its operation, the prohibition would have been wholly ineffectual. The prohibition of paper money, and tender laws, was certainly meant to apply to prospective, as well as retrospective acts. To prohibit debts from being compulsively satisfied with any thing but gold and silver coin, and yet to permit the States to make laws for discharging debts without payment of any kind, is an absurdity of which the Convention cannot be suspected. It is universally admitted, that the prohibition covers instalment and suspension laws. These confessedly involve all the mischiefs meant to be corrected; and yet we are told the States may pass them *ad libitum*, provided they only make them prospective in their operation. The history of the times will show that many of the laws which the Convention must have had in their eye, were prospective, either in effect, or in express terms.[c]

a *Ayliffe's Civ. Law*, l. 4. tit. 1.

b *Bracton*, l. 4. fol. 228  *Dig.* 50. 17. 75. *Code Napoléon*, art. 2. Dash v. Van Kleeck, 7 *Johns. Rep.* 477. 500. *Kent's Comm.* vol. 1. part 3. lect. 20.

c *State Papers*, vol. 1. p. 23. Mr. Hammond's correspondence with Mr. Jefferson.

1827.

Ogden
v.
Saunders.

The prohibition is associated in the same clause with other prohibitions, all intended to promote the same object, that of securing the observance of good faith in matters of contract. " No State shall make any thing but gold and silver coin a tender in the payment of *debts*," or " pass any law impairing the obligation of *contracts*." What *debts ? All* debts, both those contracted before and after the passage of the tender law. What *contracts ? All* contracts, both those made before, and those made after the impairing law.

What is this " *obligation* of contracts," which is prohibited from being impaired by any act of State legislation? We answer, it is the civil obligation, the binding efficacy, the coercive power, the legal duty of performing the contract. The constitution meant to preserve the inviolability of contracts, as secured by those eternal principles of equity and justice which run throughout every civilized code, which form a part of the law of nature and nations, and by which human society, in all countries and all ages, has been regulated and upheld. It is said that the obligation of contracts is derived from the municipal law alone : *Obligatio est juris vinculum, quo necessitate astringimur alicujus rœi solvendœ secundum nostrœ civitatis jure.*[a] This is what we deny. It springs from a higher source : from those great principles of universal law, which are binding on societies of men as well as on individuals. The writers on natural law are full of this subject.[b] And the Court itself has given a practical

a *Just. Inst.* l. 3. tit. 14.

b *Grotius,* (*De J. B de P.*). "On this subject we are supplied with noble arguments from the divine oracles, which inform us that God himself, who can be limited by no established rules of law, would act contrary to his own nature, if he did not perform his promises. From whence it follows, that the obligation to perform promises, springs from the nature of that unchangeable justice, which is an attribute of God, and common to all who bear his image in the use of reason." (B. 2. ch. 11. s. 1 ) "It is a most sacred command of nature, and guides the whole order of human life, that every man fulfil his contracts." (B. 3. ch. 4. s. 2.)

*Burlamaqui.* " It is as ridiculous to assert that before the establishment of civil laws and society, there was no rule of justice to which mankind were subject, as to pretend that truth and rectitude depend on the will of men, and not on the nature of things." (Vol. 2. p. 158.)

*Vattel, Droit des Gens.* " It is shown by the law of nature, that

exposition to the clause, which cannot be reconciled to the supposition, that the obligation of contracts depends alone on the municipal laws of the States. In the case of *Green* v. *Biddle,*[a] it was determined, that certain acts of Kentucky were repugnant to the constitution of the United States, as impairing the obligation of the compact of 1789, between the States of Virginia and Kentucky, respecting the titles to land in the latter State. Here the contract was a treaty between two sovereign States of the Union. Whence was its obligation derived but from the law of nature and nations?

When it is contended that the obligation of contracts depends upon universal law, it is not meant to assert that the State legislatures may not change their present municipal codes. But it is denied that they may change them so as to affect that "*great principle* which the Convention intended to establish *that contracts should be inviolable.*" Many perplexing cases may be imagined, where it would be difficult to ascertain the precise extent of the constitutional limitation upon the power of the States. In a new system of government, so complicated as ours, it will not be easy, nor is it necessary, to adjust by anticipation the precise limits of its conflicting authorities. "Moral lines are strong and broad," and it is not possible to mark them with mathema-

<div style="margin-left:2em;">
1827.

*Ogden*
v.
Saunders.
</div>

---

he who has made a promise to any one, has conferred on him a true right to require the thing promised; and that, consequently, not to keep a perfect promise, is to violate the right of another, and is as manifest an injustice as that of depriving a person of his property. There would be no more security, no longer any commerce between mankind, did they not believe themselves obliged to preserve their faith and to keep their word. This obligation is then as necessary, as natural, and indubitable, between the nations that live together in a state of nature, and acknowledge no superior on earth, to maintain order and peace in their society." (B. 2. ch. 12. s. 163.)

*Pothier, des Obligations.* "Natural law is the cause, mediately at least, of all obligations; for if contracts, torts, and quasi torts, produce obligations, it is because the natural law ordains that every one should perform his promises, and repair the wrongs he has committed." (Pt. 1. ch. 1.)

a 8 *Wheat. Rep.* 1.

b Sturges v. Crowninshield, 4 *Wheat. Rep.* 200.

1827.

Ogden
v.
Saunders.

tical precision. What we insist upon is, that the prohibition was designed to guarantee to the people of the whole Union, of each State, and to foreigners, the inviolability of contracts, the impartial administration of civil justice, the observance of good faith, that ligament of the social union, so as to enforce the execution of agreements in some effectual mode. The prohibition is universal. All manner of contracts are included in it, and their obligation is forbidden from being impaired by any legislative act whatsoever. " No State shall pass *any law* impairing the obligation of contracts." It is not merely any law impairing a particular contract, but it is any law impairing the *obligation*, or binding efficacy of contracts in general. It is any such law, general or special, applicable to a specific contract, or to all contracts, or to a particular class of contracts ; to contracts made between citizens of the same State, or with citizens of different States, or aliens ; between the State and individuals or corporations, and between the States themselves ; whether the contract was in existence when the constitution was adopted, or subsequently made ; and (as we contend) whether the law was made subsequent to the contract, or the contract to the law. It has, indeed, been attempted to carve out of the universality of the prohibition, an implied exception of such laws as were in existence when the constitution was formed, or which the States had been accustomed to pass in the ordinary course of their domestic legislation. But nothing can be more arbitrary than this distinction. It is said, that insolvent laws were in existence when the constitution was formed and adopted, and had existed from very early colonial times. So were paper money and tender laws, instalment and suspension laws. Yet these are confessedly meant to be prohibited ; and whenever such laws have been inadvertently or designedly passed by any State since the adoption of the constitution, no care has been taken to make them prospective only in their operation. If it be said that paper money and tender laws are *expressly* prohibited, the answer is, that the extent of the prohibition does not depend upon the particular kind of law being specified ; but that, if it is once ascertained that any law falls within the general prohibition, its being limited to future cases only will not rescue

it from the grasp of that prohibition. The general legislative power of the States over contracts is left untouched by the clause in question. The States may still provide what shall, and what shall not, be the lawful subject of contracts; in what form they shall be made, and whether in writing, under seal, or by parol; and by what solemnities they shall be attested; who may contract, and who are disabled from contracting; what contracts are forbidden by the policy of the State, either as respects its internal commerce, its police, its health, its finances, its morals. In short, the dominion of the States over the entire field of civil legislation is complete, except so far as it has been surrendered, expressly, or by fair implication, to the national government, or as its exercise is expressly prohibited to the States. But still the question recurs, how far has it been surrendered, and how far has its exercise been thus prohibited? The States may enact laws forbidding certain kinds of contracts from being made: or any contract being made by certain individuals; or requiring them to be made in certain prescribed forms, and attested with certain solemnities, and proved by certain species of testimony. Contracts made contrary to these regulations may be void in their inception, and never have a legal obligation; or those which are permitted to be made, may be discharged by performance, by payment, or by prescription and the presumption arising from the lapse of time as a rule of evidence. The States may make any and all regulations respecting contracts, provided they do not include among these regulations a provision that lawful contracts shall have no obligation. The constitution makes the binding obligation an inseparable incident to the contract. Without doubt, the supreme power of the nation may make laws impairing the obligation of contracts. Congress, not being prohibited in the constitution, may make laws having that effect, wherever it is a necessary consequence of the exercise of any legislative power given by the constitution. Thus, the war-making power necessarily involves in its exercise the dissolution of contracts of affreightment, and charter party, of insurance, and partnership, and other conventions connected with a commercial intercourse with the public enemy. But the radical vice of the opposite argument consists in assu-

1827.

Ogden
v.
Saunders

ming that the States are supreme in respect to this matter. They have parted with the power of making all laws impairing the obligation of contracts, and they have given the power to Congress, so far as it is involved in the enactment of bankrupt laws, or of any other law which Congress has authority to make.

As to what may be said in respect to the consequences of the decision the Court is called upon to pronounce, they have been very much exaggerated in all the discussions which have taken place on this subject. Few of the States have ever had bankrupt laws. Most of them have confined their regulations to a discharge of the person only. Others have already modified their insolvent laws, and conformed them to the recent decisions of this Court. There is a general disposition to acquiesce in those decisions. The person of the debtor is every where free. The statute of limitations is fast obliterating stale demands : and it is consolatory to believe, that although the perseverance of this high tribunal, in its former resolutions, might be attended with some temporary and partial evils, they would soon find their appropriate remedy in the exertion of the constitutional power of Congress. Whatever difficulties may attend the question, relating to a uniform code of bankrupt laws, they must ultimately be overcome by the legislative wisdom of the country. The establishment of such a code is imperiously demanded by our peculiar situation as a confederacy of numerous States, closely connected by an active commercial intercourse. with various partial and conflicting regulations concerning the relation of debtor and creditor ; by the policy of reciprocating the laws of foreign countries upon the same subject ; and by the general interests of commerce, interwoven as they are with our grandeur and power as a nation, and with all the sources of public and private prosperity.

The *Attorney General*, Mr. *E. Livingston*, Mr. *Clay*, Mr. *D. B. Ogden*, Mr. *Jones*, Mr. *Sampson*, and Mr. *Haines*, argued, contra, (1.) that the power of establishing "uniform laws on the subject of bankruptcies throughout the United States," as given to Congress in the constitution, was not exclusive of the States over the same subject. (2.) That the laws of the

State of New-York, now in question, were not laws " impairing the obligation of contracts," in the sense of the constitution.

[The Editor regrets that, from the number of counsel who argued on this side of the question, and the great variety of topics insisted on by them, he has been obliged to condense the whole argument into the following summary, which he hopes will be found to contain the substance of their reasoning, although it does not distinctly assign to each his appropriate portion of the argument, and is far from doing justice to the learning, eloquence, and ability, with which the subject was discussed.]

1. It was stated to be the settled doctrine of this Court, that any State of the Union has a right to pass a bankrupt law, provided such law does not impair the obligation of contracts, and provided there be no act of Congress in force to establish a uniform system of bankruptcy conflicting with such law. Although some of the powers of Congress are exclusive, from their nature, without any express prohibition of the exercise of the same powers by the States, the power of establishing bankrupt laws is not of this description.[a] The Court had determined that the right of the several States to pass bankrupt laws is not extinguished by the enactment of a uniform bankrupt law throughout the Union by Congress. but only suspended so far as the two laws conflict.[b] One of the laws of New-York, now in question, was originally passed on the 21st of March, 1788, was re-enacted in 1801, among the revised laws of that year, and continued in force until long after the discharge of the plaintiff in error was obtained. And although a uniform bankrupt law of Congress was in force during a part of this period, it was repealed before the discharge ; and, consequently, supposing the State insolvent law did conflict in any respect with the bankrupt law of Congress, it was only, so far, suspended in its operation, and upon the repeal of the law of Congress, was revived in all its effects. The other act, that of 1813, was

Sturges v. Crowninshield. 4 Wheat. Rep. 192.      b Ibid.

passed after the repeal of the bankrupt law of Congress of 1800.

But supposing this to be an open question, in order to determine it, it was said to be necessary to look, not merely at the great federal objects for which the constitution was ordained, but to the antecedent condition of the parties to the compact. They were sovereign States, with all the powers of municipal government, which they had long exercised; and with regard to this particular power of passing insolvent and bankrupt laws, they had been in the actual exercise of it for many years before the adoption of the constitution, and even from the earliest colonial times. The English bankrupt laws, and the temporary acts which were occasionally passed by the British Parliament for the relief of insolvent debtors, were not extended to the colonies. The several States had insolvent laws in force at the adoption of the constitution, and they continued, after the adoption, to alter, revise, and re-enact those laws, manifestly unconscious that they had parted with this power. This was, indeed, no proof that they had not parted with it, if there was any other party having at once a right and an interest to make the objection. But the people of the Union, represented in Congress, so far from contesting the power of the States over this matter, had never exercised the power of making bankrupt laws, except in a single instance, and then with an express saving of the State insolvent laws.[a] So, the people of the several States, represented in their respective local legislatures, had all exercised this power. Here, then, was a significant declaration of the people that they had not parted with this power in their State capacities; and that the grant of a similar authority, in their new capacity of a federal union, did not, by the mere grant of it, exclude the exercise of it by them in their State capacities, at least until superseded by a general and permanent law of Congress. Cotemporaneous construction had always been considered as of great weight in matters of constitutional law; and in the question relating to the power of Congress

a Bankr. Law of 1800, ch. 173. s. 61

to establish such corporations as the Bank of the United States, was considered as decisive. There are only three cases in which the States are excluded from the exercise of any power antecedently possessed by them (1.) When a power is granted to Congress in exclusive terms. (2.) When the States are expressly prohibited from exercising it in a specific form. (3.) When a power is granted to Congress, the cotemporaneous exercise of which by the States would be incompatible. It was not asserted on the other side, that the power now in question falls under either of the two first heads; nor could it, by any fair course of reasoning, be shown to fall under the third head, of being an incompatible power, except when the incompatibility arises from its actual exercise by Congress. The grant of the power of establishing " a uniform rule of naturalization," and " uniform laws on the subject of bankruptcies," being contained in the same clause, and expressed in similar terms, had justly been considered as subject to the same interpretation. Before the adoption of the constitution, the States had various incongruous rules of naturalization, and laws on the subject of bankruptcies, some of which discharged the person only of the debtor, and others his future acquisitions of property. Then came this provision of the constitution, which manifestly looks to the antecedent condition of things existing in the several States. The word *uniform* was significantly used as applicable to that condition of things. In any other view, the expression has no peculiar meaning, and does not qualify the general grant of power; for all the laws of Congress, on general subjects, are necessarily " *uniform* throughout the United States." The censure of the State regulations, implied in the terms in which the power to correct them is given to Congress, was pointed against their want of uniformity. The policy and necessity both of bankrupt and naturalization laws, was clearly recognised. The sole object of granting to Congress any power over these subjects, was to secure that uniformity which the conflicting regulations of the different States could not attain. But the terms in which the grant is conceived were not *mandatory*. Congress was left free to exercise it, or not, at its discretion; and the onl

1827.

Ogden
v.
Saunders.

consequence of an actual exercise of the power by Congress, was to supersede, during such exercise, the State laws, so far as they conflict with the laws of Congress.[a]

2. The clause relied upon as virtually abolishing this power, is found in a subsequent and remote section of the constitution, wherein, after an enumeration of certain specified laws which the States may not pass, it is added, "nor any law impairing the obligation of contracts." From this it was inferred, that the States cannot pass bankrupt laws, although the power is not exclusive in Congress. The States may pass bankrupt laws, it had been said, provided they do not impair the obligation of contracts. But all bankrupt laws do impair the obligation of contracts ; i. e. they discharge the debtor from his debts without payment ; and, therefore, the States cannot pass them, even when the power is not actually exercised by Congress. It had, however, been conceded, that they may pass insolvent laws which discharge the person only, because these do not impair the obligation, but only affect the remedy. It had been said they affect the remedy only, because they still leave the obligation entire to be enforced against the future property of the debtor. But suppose the State law should deny the creditor any power of coercion whatever, whether against the body or the estate of the debtor, it would still act upon the remedy only, and yet would strip the contract of all its binding efficacy, except merely that moral obligation, that *scintilla juris*, which, though it might form a sufficient consideration for a new promise, was in itself no ground of action. As the obligation of the contract does not depend upon municipal law, the withdrawal of all the means of coercion which that law

---

*a* " It may be exercised or declined as the wisdom of that body shall decide. If, in the opinion of Congress, uniform laws on the subject of bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that State legislation on the subject must cease. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the States. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts."—Sturges v. Crowninshield, 4 *Wheat. Rep.* 196.

gives, cannot impair the obligation, since it only takes away
the remedy. Thus, according to this distinction between
the *right* and the *remedy*, creditors are left completely at the
mercy of State legislation, notwithstanding the boasted ef-
ficacy of this constitutional prohibition.

But (it was asked) what is the true import of this clause,
forbidding the States from passing " any law impairing the
obligation of contracts ?" A contract is not merely that
which the parties expressly stipulate. It is that also which
the existing laws of the country where the contract is made
annex as conditions to it at the time when it is formed. It
had been admitted, that a State might prohibit contracts al-
together. If so, it may permit them, *sub modo*, with such
conditions as it thinks fit to annex ; and the parties who make
a contract in that State, make it subject to the conditions.
These conditions enter into the contract, and form a part of
it as completely as if they had been expressly stipulated by
the parties themselves. These conditions are sometimes
beneficial to one party, sometimes to the other: sometimes
they add to the contract, sometimes they diminish it. But
in every instance they receive the tacit assent of the parties,
and are not considered as impairing the obligation of the
contract. A. gives B. a bond for 1000 dollars, payable on
demand. There is no stipulation for interest. But the law
annexes the tacit condition that the obligee shall receive in-
terest, and that at a certain fixed rate. So in the contract
of exchange, the drawer of a bill does not stipulate to pay
it if the drawee refuses. In the same manner, the liability of
the endorser to the holder is implied by the law, and cannot
be collected from the bill itself. Still less, is his right to be
discharged for want of due notice of the dishonour of the bill
to be found in the written contract. But the law implies
it, and, therefore, it might be said to impair the obligation
of the actual contract between the parties, which con-
tained no such condition. How did it happen that this
was not considered a violation of the constitution? It
could only be because the law of the place has annexed
that condition to the contract, and made it as much a part of
the contract as if the parties had expressed it. The same
principle applies to the custom of adding days of grace to

1827.

Ogden
v.
Saunders.

the specified time of payment in bills and notes, which are various in different countries, and make the contract of the parties, whatever the law of the place where the payment is to be made, says shall be the contract.[a]    So, where the law of the place gives a peculiar remedy to the creditor on a bill or note, more summary and strict than in ordinary cases, the party shall be intended to have renounced the benefit of the ordinary law, and to have submitted himself to the extraordinary process provided for the particular case.[b]   And so of many other cases, in which whatever is considered as discharging the contract by the law of the place where it was made, or with a view to which it is made, is considered as discharging it every where else, in whatever jurisdiction the creditor may attempt to enforce it, although no such condition is expressed in the terms of the contract itself.[c] This proceeds, not upon the idea that the foreign law can impair the obligation of the contract, or the foreign Court refuse to execute it, but that they will give the same effect to it which is given by the law and the Courts of the country where it is made; they will regard that as the contract of the parties which the *lex loci* declares to be the contract of the parties.[d]   So, in the present case, the contract being made in a State, where the local law, existing at the time, annexed to the contract the condition that, in certain events, beyond the control of the contracting parties, the contract should be discharged, the parties contracting in the place of the law, and with a knowledge of the law, are presumed to assent to it.

But, it had been said, that if the local law be a part of the contract, so also in the constitution.   This might be admitted, without in any manner affecting the question. The constitution does not define " the obligation of contracts."    It does not say that the *express* stipulations of the

<hr>

a  Renner v. The Bank of Columbia, 9 *Wheat. Rep.* 556.

b  The Bank of Columbia v. Oakley, 4 *Wheat. Rep.* 235.

c  2 *Str.* 733.   *Cooke's Bankrupt Law*, 314.   5 *East's Rep.* 124, 3 *Term Rep.* 609.   1 *East's Rep* 6.   1 *Dall.* 188. 229.

d  3 *Ves jun.* 449.   1 *Bl. Rep.* 257.   2 *Burr.* 1077.   1 *Bos. & Pull.* 138.   16 *Johns. Rep.* 233. 250.   *Huberus Prælect.* tom. 2. lib. 1. tit. 3., *De Conflictu Legum,* cited in note to 3 *Dall.* 370.

parties alone shall form the contract. The contract is
formed of express and implied consent, of convention, and
of law. The constitution contemplates it in its legal sense,
and in all its parts. If, then, the local laws in force when
the contract is made, form a part of the contract, this is the
contract which the constitution says shall not be impaired.
So that it was not the plaintiff in error who sought to impair
the obligation of his contract. It was the creditor who would
impair the obligation, by striking out of the contract one of
the conditions annexed to it by the law of the place.

Admitting, then, that the States could not pass bankrupt
laws which shall discharge antecedent contracts, it did not
follow that they might not pass bankrupt laws under which
debts subsequently contracted might be discharged. In the
latter case, the law annexes conditions to the express con-
tract of the parties, to which it implies their assent. All
the different restraints on State legislation which are asso-
ciated in the same prohibitory clause, were intended to pre-
vent certain unjust, oppressive, and impolitic laws, both in
civil and criminal matters. It had not been denied on the
other side, that the prohibition of bills of attainder, and *ex
post facto* laws, were exclusively aimed at acts retrospec-
tive, partial, and unjust in their operation; and it would not
be difficult to show, that none of the other prohibitions
were intended to affect the sovereign power of the States
over their civil and criminal codes, when exercised, as all
legislative power ought to be exercised, by general, impar-
tial, and prospective regulations. The history of the times,
and the cotemporaneous expositions of the clause, at the
formation and adoption of the constitution, together with
the subsequent judicial interpretations of it in cases which
had since arisen, all concurred to prove, that the evils com-
plained of, and the remedies meant to be applied for their
correction, exclusively referred to legislative acts affecting
vested rights, or past transactions.[a] The history of the le-

a 5 *Marsh. Life of Washington*, 75. 85. 89. 259. 3 *Ramsay's
Univ. Hist.* 46. 77. 2 *Ramsay's Hist. of South Carolina*, 440. 483.
*Journ. Fed. Convention*, 79. 227. 359. *Virginia Debates*, 339. 3 *Dall*,

gislation of the State whose acts were now under consideration, would afford a strong illustration of this topic of argument. A system of insolvent laws had existed in that State, with some short interruptions, for sixty years past; and subsequent to the adoption of the constitution, such laws had repeatedly passed the scrutiny of the Council of Revision, always composed of able statesmen and learned jurists, and, in some instances, of those who had taken an active part in the formation of the constitution, without even a suggestion that these acts were prohibited by the clause in question.[a] In every instance in which this Court had hitherto applied the prohibition to a State law, it was to some act operating upon antecedent existing contracts. Such, too, was the plain and obvious meaning of the words of the prohibition. How could any law be said to impair the obligation of a contract not in existence when the law was passed? The obligation must first be contracted before it can be impaired. Some right must be vested under a contract, before any party can have a right to complain of a law impairing its obligation. The party, who supposes himself to be injured, cannot complain of a law in existence when his contract was made, because (as had been shown) the law formed a part of that contract, and, therefore, could not impair its obligation.

It was asked, what is the contract, and what the obligation of the contract? And it was answered, that the contract was what the parties understood it to be, and they understood it as the law declares it to be. Whatever is expected on one side, and known to be expected on the other, is a part or condition of the contract.[b] The obligation of the contract is not the contract itself, but something arising out of it. The moral obligation is that which binds the conscience only. The legal obligation is that which the law imposes.

390.  1 *Tuck. Bl.* 312 Appendix, part I.  *The Federalist,* No. 44. 1 *State Papers,* 252.  *Secret Debates,* 70.  5 *Hall's Law Journ.* 506. 530. 552. 6 *Hall's Law Journ.* 474  5 *Binn. Rep.* 362 364. 13 *Mass. Rep.* 16.  3 *Johns. Rep.* 74.  16 *Johns. Rep.* 233.  7 *Johns. Ch. Rep.* 376.

a 16 *Johns. Rep.* 234. note (a.)

b *Paley's Mor. Phil.* 92. 106.

It binds the contracting party to do that which the law says he shall do, under certain contingencies which may arise. There is nothing of mere human institution (and it is with this that the constitution deals) whic' binds to the performance of any contract, except the laws under which that contract is made, and the remedies provided by them to enforce its execution. The insolvent acts form a part of those laws, and of the remedies provided to enforce the contract. The obligation of a contract may be impaired by interference in favour of the creditor, as well as in favour of the debtor. But here the existing remedies secured to both by the law (which is a part of the contract) are preserved with integrity, and there is consequently no violation of the constitutional provision, which was intended equally to protect the rights of both debtor and creditor. Indeed, the proceedings under some of these laws are compulsory against the debtor, and force him to make a surrender and assignment of his property for the benefit of his creditors, on their application. Bankrupt and insolvent laws have existed, in various forms, in every age and every civilized and commercial country, as one of the means of securing a fair and impartial distribution of the effects of insolvents among all their creditors, or as a relief which society has found it necessary to extend to the honest debtor, who has become unable from misfortune to satisfy the demands of his creditors. The States have, therefore, the same right to pass these laws, (supposing the power not to be exclusively vested in Congress,) which they have to pass laws of limitation, or usury, or divorce, or any other ordinary regulation respecting contracts All these laws might be said to have the effect of impairing the obligations of contracts, since they alter, increase, lessen, or diminish what would otherwise be the effect of the agreement of the parties, by annexing conditions other and different from those expressed by the parties. If it were possible to suppose a commercial contract made independent of any of of those regulations which the municipal code of every civilized country prescribes, it would be stripped of all these conditions, and reduced to the mere naked agreement of the parties, without any means of enforcing its performance. But the municipal law gives effect to the actual contract of

1827
Ogden
v.
Saunders.

the parties, by implying a multitude of clauses and conditions not expressed by them, and by providing adequate means to enforce it. Every municipal code contains a provision determining at what age a person shall be deemed capable of contracting, and the period of majority is different under different systems of law. This is a positive rule of society. In a state of nature, there is no definite age at which an individual becomes capable of contracting. Is not the whole of this subject under the control of State legislation; and would a law, extending the period of minority, be said to be a law impairing the obligation of contracts? So, also, the power of contracting which is permitted to a married woman is more or less limited under different systems of jurisprudence, and there is nothing in which the positive institutions of society are more diversified. And the contract of marriage itself is subject to be dissolved by the laws of the different States of the Union, under various circumstances and conditions. The policy of some States had made absolute divorces extremely difficult to be obtained, others had granted them with more facility. But could it be said that these laws, or any alteration of these laws, impaired the obligation of the contract of marriage? Was it not a constituent part of this contract, that it should be subject to be dissolved under the circumstances and according to the conditions prescribed in the laws of the State in force at the time when the marriage took place? In most of the States, the policy of the English statute of frauds and registry acts had been adopted, and certain contracts and conveyances were required to be in writing, and others to be registered. Might not the States require it as an essential condition to the validity of all contracts and all conveyances, that they should be in writing, and should be registered; and could this condition, annexed by the law to the contract of the parties, be said to impair its obligation? In short, it was insisted that the argument on the other side, when pushed to its legitimate consequences, would go to restrain State legislation upon almost every subject of property and internal police, and to fasten upon the States, against their sovereign will, immutable codes of civil jurisprudence, the inconvenience and mischiefs of which could not be corrected by any means

within the constitutional power of Congress. On most of the subjects of ordinary civil legislation, Congress had no power at all; and on this particular subject of bankruptcy, there was little hope of its being exercised. So, that if the Court should pronounce the State bankrupt codes invalid, and Congress should refuse to supply their place by the establishment of uniform laws throughout the Union, the country would present the extraordinary spectacle of a great commercial nation, without laws on the subject of bankruptcy.

Mr. *Webster*, in reply.

The question arising in this case is not more important, nor so important even, in its bearing on individual cases of private right, as in its character of a public political question. The constitution was intended to accomplish a great political object. Its design was not so much to prevent injustice or injury in one case, or in successive single cases, as it was to make general salutary provisions, which, in their operation, should give security to all contracts, stability to credit, uniformity among all the States, in those things which materially concerned the foreign commerce of the country, and their own credit, trade, and intercourse among themselves. The real question is, therefore, a much broader one than has been argued. It is this, whether the constitution has not, for general political purposes, ordained that bankrupt laws should be established only by national authority? We contend that such was the intention of the constitution; an intention, as we think, plainly manifested by a consideration of its several provisions.

The act of New-York, under which this question arises, provides, that a debtor may be discharged from all his debts, upon assigning his property to trustees for the use of his creditors. When applied to the discharge of debts, contracted before the date of the law, this Court has decided that the act is invalid.[a] The act itself makes no distinction between past and future debts, but provides for the discharge of both in the same manner. In the case, then, of a debt

[a] Sturges v. Crowninshield. 4 *Wheat. Rep.* 122.

already existing, it is admitted, that the act does impair the obligation of contracts. We wish the full extent of this decision to be well considered. It is not, merely, that the legislature of the State cannot interfere, by law, in the particular case of A. or B., to injure or impair rights which have become vested under contracts ; but it is, that they have no power, by general law, to regulate the manner in which all debtors may be discharged from subsisting contracts ; in other words, they cannot pass general bankrupt laws, to be applied *in presenti.* Now, it is not contended that such laws are unjust, and ought not to be passed by any legislature. It is not said they are unwise or impolitic. On the contrary, we know the general experience is, that when bankrupt laws are established, they make no distinction between present and future debts. While all agree that special acts, made for individual cases, are unjust, all admit that a general law, made for all cases, may be both just and politic. The question, then, which meets us in the threshold, is this : if the constitution meant to leave the States the power of establishing systems of bankruptcy to act upon future debts, what great or important object, of a political nature, was answered, by denying the power of making such systems applicable to existing debts ?

The argument used in *Sturges* v. *Crowninshield,* was, at least, a plausible and consistent argument. It maintained, that the prohibition of the constitution was levelled only against interferences in individual cases, and did not apply to general laws, whether those laws were retrospective or prospective in their operation. But the Court rejected that conclusion. It decided, that the constitution was intended to apply to general laws. or systems of bankruptcy ; that an act, providing that all debtors might be discharged from all creditors, upon certain conditions, was of no more validity than an act, providing that a particular debtor, A., should be discharged on the same conditions from his particular creditor, B.

It being thus decided that general laws are thus within the prohibition of the constitution, it is for the plaintiff in error now to show, on what ground, consistent with the general objects of the constitution, he can establish a distinction.

which can give effect to those general laws in their application to future debts, while it denies them effect in their application to subsisting debts. The words are, that " *no State shall pass any law impairing the obligation of contracts.*" The general operation of all such laws is, to impair that obligation; that is, to discharge the obligation without fulfilling it. This is admitted; and the only ground taken for the distinction to stand on is, that when the law was in existence, at the time of the making the contract, the parties must be supposed to have reference to it, or, as it is usually expressed, the law is made a part of the contract. Before considering what foundation there is for this argument, it may be well to inquire, what is that obligation of contracts of which the constitution speaks, and whence is it derived?

The definition given by the Court in *Sturges* v. *Crowninshield*, is sufficient for our present purpose. " A contract," say the Court, " is an agreement to do some particular thing; the law binds the party to perform this agreement, and this is the obligation of the contract."

It may, indeed, probably, be correct to suppose the constitution used the words in somewhat of a more popular sense. We speak, for example, familiarly of a usurious contract, and yet we say, speaking technically, that a usurious agreement is no contract.

By the obligation of a contract, we should understand the constitution to mean, the duty of performing a legal agreement. If the contract be lawful, the party is bound to perform it. But bound by what? What is it that binds him? And this leads to what we regard as a principal fallacy in the argument on the other side. That argument supposes, and insists, that the whole obligation of a contract has its origin in the municipal law. This position we controvert. We do not say that it is that obligation which springs from conscience merely; but we deny that it is only such as springs from the particular law of the place where the contract is made. It must be a lawful contract, doubtless; that is, permitted and allowed; because society has a right to prohibit all such contracts, as well as all such actions, as it deems to be mischievous or injurious. But if the contract be such as the law of society tolerates

in other words, if it be lawful, then we say, the duty of performing it springs from universal law. And this is the concurrent sense of all the writers of authority.

The duty of performing promises is thus shown to rest on universal law; and if, departing from this well established principle, we now follow the teachers who instruct us that the obligation of a contract has its origin in the law of a particular State, and is, in all cases, what that law makes it, and no more, and no less, we shall probably find ourselves involved in inexplicable difficulties. A man promises, for a valuable consideration, to pay money in New-York; is the obligation of that contract created by the laws of that State? or does it subsist independent of those laws? We contend that the obligation of a contract, that is, the duty of performing it, is not created by the law of the particular place where it is made, and dependent on that law for its exitence; but that it may subsist, and does subsist, without that law, and independent of it. The obligation is in the contract itself, in the assent of the parties, and in the sanction of universal law. This is the doctrine of *Grotius*, *Vattel*, *Burlemaqui*, *Pothier*, and *Rutherforth*. The contract, doubtless, is necessarily to be enforced by the municipal law of the place where performance is demanded. The municipal law acts on the contract after it is made, to compel its execution, or give damages for its violation. But this is a very different thing from the same law, being the origin or fountain of the contract. Let us illustrate this matter by an example. Two persons contract together in New-York for the delivery, by one to the other, of a domestic animal or utensil of husbandry, or a weapon of war. This is a lawful contract, and while the parties remain in New-York, it is to be enforced by the laws of that State. But if they remove with the article to Pennsylvania or Maryland, there a new law comes to act upon the contract, and to apply other remedies if it be broken. Thus far the remedies are furnished by the laws of society. But suppose the same parties to go together to a savage wilderness, or a desert island, beyond the reach of the laws of any society; the obligation of the contract still subsists, and is as perfect as ever, and is now to be enforced by another law. that is, the

law of nature, and the party to whom the promise was made, has a right to take by force the animal, the utensil, or the weapon, that was promised to him. The right is as perfect here, as it was in Pennsylvania, or even in New-York; but this could not be so if the obligation were created by the law of New-York, or were dependent on that law for its existence, because the laws of that State can have no operation beyond its territory. Let us reverse this example. Suppose a contract to be made between two persons cast ashore on an uninhabited territory, or in a place over which no law of society extends. There are such places, and contracts have been made there by individuals casually there, and these contracts have been enforced in Courts of law in civilized communities. Whence do such contracts derive their obligation, if not from universal law?

If these considerations show us that the obligation of a lawful contract does not derive its force from the particular law of the place where made, but may exist where that law does not exist, and be enforced where that law has no validity, then it follows, we contend, that any statute which diminishes or lessens its obligation, does impair it, whether it precedes or succeeds the contract in date. The contract having an independent origin, whenever the law comes to exist together with it, and interferes with it, it lessens, we say, and impairs its own original and independent obligation. In the case before the Court, the contract did not owe its existence to the particular law of New-York; it did not depend on that law, but could be enforced without the territory of that State, as well as within it. Nevertheless, though legal, though thus independently existing, though thus binding the party every where, and capable of being enforced every where, yet, the statute of New-York says, that it shall be discharged without payment. This, we say, impairs the obligation of that contract. It is admitted to have been legal in its inception, legal in its full extent, and capable of being enforced by other tribunals according to its terms. An act, then, purporting to discharge it without payment, is, as we contend, an act impairing its obligation.

Vol. XII.

<div align="right">
1827.

Ogden
v.
Saunders.
</div>

But here we meet the opposite argument, stated on diffe-- rent occasions in different terms, but usually summed up in this, that the law itself is a part of the contract, and, there- fore, cannot impair it.    What does this mean ?   Let us seek for clear ideas.    It does not mean that the law gives any particular construction to the terms of the contract, or that it makes the promise, or the consideration, or the time of performance, other than they are expressed in the instru- ment itself.    It can only mean, that it is to be taken as a part of the contract, or understanding of the parties, that the contract itself shall be enforced by such laws and regu- lations, respecting remedy, and for the enforcement of con- tracts, as are in being in the State where it is made at the time of entering into it.   This is meant, or nothing very clearly intelligible is meant, by saying the law is part of the contract.

There is no authority in adjudged cases, for the plaintiff in error, but the State decisions which have been cited, and, as has already been stated, they all rest on this reason, that the law is part of the contract.

Against this we contend,

1st.  That if the proposition were true, the consequence would not follow.

2d.  That the proposition itself cannot be maintained.

1.  If it were true that the law is to be considered as part of the contract, the consequence contended for would not follow ; because, if this statute be part of the contract, so is every other legal or constitutional provision existing at the time which affects the contract, or which is capable of affect- ing it ; and especially this very article of the constitution of the United States is part of the contract.    The plaintiff in error argues in a complete circle.    He supposes the par- ties to have had reference to it because it was a binding law, and yet he proves it to be a binding law only upon the ground that such reference was made to it.    We come be- fore the Court alleging the law to be void as unconstitution- al ; they stop the inquiry by opposing to us the law itself. Is this logical ?    Is it not precisely *objectio ejus, cujus disso- lutio petitur ?*    If one bring a bill to set aside a judgment, is that judgment itself a good plea in bar to the bill ?   We pro-

pose to inquire if this law is of force to control our contract, or whether, by the constitution of the United States, such force be not denied to it. The plaintiff in error stops us by saying that it does control the contract, and so arrives shortly at the end of the debate. Is it not obvious, that supposing the act of New-York to be a part of the contract, the question still remains as undecided as ever. What is that act? Is it a *law*, or is it a nullity? A thing of force, or a thing of no force? Suppose the parties to have contemplated this act, what did they contemplate? its words only, or its legal effect? its words, or the force which the constitution of the United States allowed to it? If the parties contemplated any law, they contemplated all the law that bore on their contract, the aggregate of all the statute and constitutional provisions. To suppose that they had in view one statute, without regarding others, or that they contemplated a statute without considering that paramount constitutional provisions might control or qualify that statute, or abrogate it altogether, is unreasonable and inadmissible. " This contract," says one of the authorities relied on, " is to be construed as if the law were specially recited in it." Let it be so for the sake of argument. But it is also to be construed as if the prohibitory clause of the constitution were recited in it, and this brings us back again to the precise point from which we departed.

The constitution always accompanies the law, and the latter can have no force which the former does not allow to it. If the reasoning were thrown into the form of special pleading, it would stand thus: the plaintiff declares on his debt; the defendant pleads his discharge under the law; the plaintiff alleges the law unconstitutional; but the defendant says, you knew of its existence; to which the answer is obvious and irresistible, I knew its existence on the statute book of New-York, but I knew, at the same time, it was null and void under the constitution of the United States.

The language of another leading decision is, " a law in force at the time of making the contract does not violate that contract;" but the very question is, whether there be any such law " *in force*;" for if the States have no authority

to pass such laws, then no such law can be in force. The constitution is a part of the contract as much as the law, and was as much in the contemplation of the parties. So that the proposition, if it be admitted, that the law is part of the contract, leaves us just where it found us, that is to say, under the necessity of comparing the law with the constitution, and of deciding by such comparison whether it be valid or invalid. If the law be unconstitutional, it is void, and no party can be supposed to have had reference to a void law. If it be constitutional, no reference to it need be supposed.

2. But the proposition itself cannot be maintained. The law is no part of the contract. What part is it? the promise? the consideration? the condition? Clearly, it is neither of these. It is no term of the contract. It acts upon the contract only when it is broken, or to discharge the party from its obligation after it is broken. The municipal law is the force of society employed to compel the performance of contracts. In every judgment in a suit on contract, the damages are given, and the imprisonment of the person or sale of goods awarded, not in performance of the contract, or as part of the contract, but as an indemnity for the breach of the contract. Even interest, which is a strong case, where it is not expressed in the contract itself, can only be given as damages. It is nearly absurd to say that a man's goods are sold on a *fieri facias*, or that he himself goes to gaol, in pursuance of his contract. These are the penalties which the law inflicts for the breach of his contract. Doubtless, parties, when they enter into contracts, may well consider both what their rights and what their liabilities will be by the law, if such contracts be broken; but this contemplation of consequences which can ensue only when the contract is broken, is no part of the contract itself. The law has nothing to do with the contract till it be broken; how then can it be said to form a part of the contract itself?

But there are other cogent and more specific reasons against considering the law as part of the contract. (1.) If the law be part of the contract, it cannot be repealed or altered; because, in such case, the repealing or modifying law itself would impair the obligation of the contract. The insolvent law of New-York, for example, authorizes the dis-

charge of a debtor on the consent of two-thirds of his credi- 1827.
tors. A subsequent act requires the consent of three-fourths;
but if the existing law be part of the contract, this latter law
would be void. In short, whatever is part of the contract Saunders.
cannot be varied but by consent of the parties; therefore the
argument runs *in absurdum ;* for it proves that no laws for
enforcing the contract or giving remedies upon it, or any way
affecting it, can be changed or modified between its creation
and its end. If the law in question binds one party on the
ground of assent to it, it binds both, and binds them until
they agree to terminate its operation. (2.) If the party be
bound by an implied assent to the law, as thereby making
the law a part of the contract, how would it be if the parties
had expressly dissented, and agreed that the law should
make no part of the contract? Suppose the promise to have
been, that the promissor would pay at all events, and not
take advantage of the statute ; still, would not the statute
operate on the whole, on this particular agreement and all?
and does not this show that the law is no part of the contract,
but something above it? (3.) If the law of the place be part
of the contract, one of its terms and conditions, how could
it be enforced, as we all know it might be, in another jurisdic-
tion, which should have no regard to the law of the place?
Suppose the parties, after the contract, to remove to another
State, do they carry the law with them as part of their con-
tract? We all know they do not. Or take a common case ;
some States have laws abolishing imprisonment for debt;
these laws, according to the argument, are all parts of the
contract; how then can the party, when sued in another
State, be imprisoned contrary to the terms of his contract?
(4.) The argument proves too much, inasmuch as it applies
as strongly to prior as to subsequent contracts. It is found-
ed on a supposed assent to the exercise of legislative au-
thority, without considering whether that exercise be legal
or illegal. But it is equally fair to found the argument on an
implied assent to the potential exercise of that authority.
The implied reference to the control of legislative power, is
as reasonable and as strong when that power is dormant, as
while it is in exercise. In one case, the argument is, "the
law existed, you knew it, and acquiesced." In the other, it

1827.

Ogden
v.
Saunders.

is, " the power to pass the law existed, you knew it, and took your chance." There is as clear an assent in the one instance as in the other. Indeed, it is more reasonable and more sensible, to imply a general assent to all the laws of society, present and to come, from the fact of living in it, than it is to imply a particular assent to a particular existing enactment. The true view of the matter is, that every man is presumed to submit to all power which may be lawfully exercised over him, or his right, and no one should be presumed to submit to illegal acts of power, whether actual or contingent. (5.) But a main objection to this argument is, that it would render the whole constitutional provision idle and inoperative; and no explanatory words, if such words had been added in the constitution, could have prevented this consequence. The law, it is said, is part of the contract; it cannot, therefore, impair the contract, because a contract cannot impair itself. Now, if this argument be sound, the case would have been the same, whatever words the constitution had used. If, for example, it had declared that no State should pass any law impairing contracts *prospectively* or *retrospectively*; or law impairing contracts, whether existing or future; or whatever terms it had used to prohibit precisely such a law as is now before the Court, the prohibition would be totally nugatory if the law is to be taken as part of the contract; and the result would be, that, whatever may be the laws which the States by this clause of the constitution are prohibited from passing, yet, if they in fact do pass such laws, those laws are valid, and bind parties by a supposed assent.

But further, this idea, if well founded, would enable the States to defeat the whole constitutional provision by a general enactment. Suppose a State should declare, by law, that all contracts entered into therein, should be subject to such laws as the legislature, at any time, or from time to time, might see fit to pass. This law, according to the argument, would enter into the contract, become a part of it, and authorize the interference of the legislative power with it, for any and all purposes, wholly uncontrolled by the constitution of the United States.

So much for the argument that the law is a part of the

contract. We think it is shown to be not so; and, if it were, the expected consequence would not follow.

The inquiry, then, recurs, whether the law in question be such a law as the legislature of New-York had authority to pass. The question is general. We differ from our learned adversaries on general principles. We differ as to the main scope and end of this constitutional provision. They think it entirely remedial : we regard it as preventive. They think it adopted to secure redress for violated private rights : to us it seems intended to guard against great public mischiefs. They argue it, as if it were designed as an indemnity or protection for injured private rights, in individual cases of *meum* and *tuum :* we look upon it as a great political provision, favourable to the commerce and credit of the whole country. Certainly we do not deny its application to cases of violated private right. Such cases are clearly and unquestionably within its operation. Still, we think its main scope to be general and political. And this, we think, is proved by reference to the history of the country, and to the great objects which were sought to be obtained by the establishment of the present government: Commerce, credit, and confidence, were the principal things which did not exist under the old confederation, and which it was a main object of the present constitution to create and establish. A vicious system of legislation, a system of paper money and tender laws, had completely paralyzed industry, threatened to beggar every man of property, and ultimately to ruin the country. The relation between debtor and creditor, always delicate, and always dangerous whenever it divides society, and draws out the respective parties into different ranks and classes, was in such a condition in the years 1787, '88, and '89, as to threaten the overthrow of all government ; and a revolution was menaced, much more critical and alarming than that through which the country had recently passed. The object of the new constitution was to arrest these evils ; to awaken industry by giving security to property ; to establish confidence, credit, and commerce, by salutary laws, to be enforced by the power of the whole community. The revolutionary war was over. the country had peace, but little domestic tranquillity :

liberty. but few of its enjoyments, and none of its security.
The States had struggled together; but their union was imperfect.    They had freedom, but not an established course
of justice.    The constitution was therefore framed, as it
professes, " to form a more perfect union, to establish justice, to secure the blessings of liberty, and to insure domestic tranquillity."

It is not pertinent to this occasion, to advert to all the
means by which these desirable ends were to be obtained.
Some of them, closely connected with the subject now under consideration, are obvious and prominent.    The objects
were, commerce, credit. and mutual confidence in matters of
property ; and these required, among other things, a uniform
standard of value, or medium of payments.    One of the
first powers given to Congress, therefore, is that of
coining money, and fixing the value of foreign coins ;
and one of the first restraints imposed on the States, is
the total prohibition to coin money.    These two provisions are industriously followed up and completed, by
denying to the States all power of emitting bills of credit, or of making any thing but gold and silver a tender
in the payment of debts.    The whole control, therefore,
over the standard of value, and medium of payments, is
vested in the general government.    And here the question
instantly suggests itself, why should such pains be taken to
confide in Congress alone this exclusive power of fixing on
a standard value, and of prescribing the medium in which
debts shall be paid, if it is, after all, to be left to every State
to declare that debts may be discharged, and to prescribe
how they may be discharged, without any payment at all ?
Why say that no man shall be obliged to take in discharge
of a debt paper money issued by the authority of a State,
and yet say, that by the same authority the debt may be discharged without any payment whatever ?

We contend, that the constitution has not left its work
thus unfinished. We contend, that, taking its provisions together, it is apparent it was intended to provide for two things,
intimately connected with each other.

1   A uniform medium for the payment of debts.

1827.

Ogden
v.
Saunders.

2. A uniform manner of discharging debts when they are to be discharged without payment.

The arrangement of the grants and prohibition contained in the constitution, are fit to be regarded on this occasion. The grant to Congress, and the prohibition on the States, though they are certainly to be construed together, are not contained in the same clauses. The powers granted to Congress are enumerated one after another in the eighth section; the principal limitations on those powers, in the ninth section; and the prohibitions to the States, in the tenth section. Now, in order to understand whether any particular power be exclusively vested in Congress, it is necessary to read the terms of the grant, together with the terms of the prohibition. Take an example from that power of which we have been speaking, the coinage power. Here the grant to Congress is, "To coin money, regulate the value thereof, and of foreign coins." Now, the correllative prohibition on the States, though found in another section, is, undoubtedly, to be taken in immediate connexion with the foregoing, as much so as if it had been found in the same clause. The only just reading of these provisions, therefore, is this: "*Congress shall have power to coin money, regulate the value thereof, and of foreign coin; but no State shall coin money, emit bills of credit, or make any thing but gold and silver coin a tender in payment of debts.*"

These provisions respect the medium of payment, or standard of value, and, thus collated, their joint result is clear and decisive. We think the result clear also, of those provisions which respect the discharge of debts without payment. Collated in like manner, they stand thus: "*Congress shall have power to establish uniform laws on the subject of bankruptcies throughout the United States; but no State shall pass any law impairing the obligation of contracts.*" This collocation cannot be objected to if they refer to the same subject matter; and that they do refer to the same subject matter, we have the authority of this Court for saying, because this Court solemnly determined, in *Sturges* v. *Crowninshield*, that this prohibition on the States did apply to systems of bankruptcy. It must be now

taken, therefore, that State bankrupt laws were in the mind of the Convention when the prohibition was adopted, and, therefore, the grant to Congress on the subject of bankrupt laws, and the prohibition to the State on the same subject, are properly to be taken and read together; and being thus read together, is not the intention clear to take away from the States the power of passing bankrupt laws, since, while enacted by them, such laws would not be uniform, and to confer the power exclusively on Congress, by whom uniform laws could be established?

Suppose the order of arrangement in the constitution had been otherwise than it is, and that the prohibitions to the States had preceded the grants of power to Congress, the two powers, when collated, would then have read thus: "*No State shall pass any law impairing the obligation of contracts; but Congress may establish uniform laws on the subject of bankruptcies.*" Could any man have doubted, in that case, that the meaning was, that the States should not pass laws discharging debts without payment, but that Congress might establish uniform bankrupt acts? and yet this inversion of the order of the clauses does not alter their sense. We contend, that Congress alone possesses the power of establishing bankrupt laws; and although we are aware, that in *Sturges* v. *Crowninshield*, the Court decided, that such an exclusive power could not be inferred from the words of the grant in the seventh section, we yet would respectfully request the bench to reconsider this point. We think it could not have been intended that both the States and general government should exercise this power; and, therefore, that a grant to one implies the prohibition on the other. But not to press a topic which the Court has already had under its consideration, we contend, that even without reading the clauses of the constitution in the connexion which we have suggested, and which is believed to be the true one, the prohibition in the tenth section, taken by itself, does forbid the enactment of State bankrupt laws, as applied to future, as well as present debts. We argue this from the words of the prohibition; from the association they are found in, and from the objects intended.

1. The words are general. The States can pass no law

impairing contracts; that is, any contract. In the nature of things a law may impair a future contract, and, therefore, such contract is within the protection of the constitution. The words being general, it is for the other side to show a limitation; and this, it is submitted, they have wholly failed to do, unless they shall have established the doctrine that the law itself is part of the contract. It may be added, that the particular expression of the constitution is worth regarding. The thing prohibited is called a *law*, not an *act;* a law, in its general acceptation, is a rule prescribed for future conduct, not a legislative interference with existing rights. The framers of the constitution would hardly have given the appellation of *law* to violent invasions of individual right, or individual property, by acts of legislative power. Although, doubtless, such acts fall within this prohibition, yet they are prohibited also by general principles, and by the constitutions of the States, and, therefore, further provision against such acts was not so necessary as against other mischiefs.

2. The most conclusive argument, perhaps, arises from the connexion in which the clause stands. The words of th. prohibition, so far as it applies to civil rights, or rights of property, are, " that no State shall coin money, emit bills of credit, make any thing but gold and silver coin a tender in the payment of debts, or pass any law impairing the obligation of contracts." The prohibition of attainders, and *ex post facto* laws, refer entirely to criminal proceedings, and, therefore, should be considered as standing by themselves; but the other parts of the prohibition are connected by the subject matter, and ought, therefore, to be construed together. Taking the words thus together, according to their natural connexion, how is it possible to give a more limited construction to the term " contracts," in the last branch of the sentence, than to the word " debts," in that immediately preceding? Can a State make any thing but gold and silver a tender in payment of future debts? This nobody pretends. But what ground is there for a distinction? No State shall make any thing but gold and silver a tender in the payment of debts, nor pass any law impairing the obligation of contracts. Now, by what reasoning is it made

1827.

Ogden
v.
Saunders.

out that the debts here spoken of, are any debts, either ex-
isting or future ; but that the contracts spoken of are sub-
sisting contracts only? Such a distinction seems to us
wholly arbitrary. We see no ground for it. Suppose the
article, where it uses the word *debts*, had used the word
*contracts*. The sense would have been the same then, as
it now is ; but the identity of terms would have made the
nature of the distinction now contended for somewhat more
obvious. Thus altered, the clause would read, that no
State should make any thing but gold and silver a tender
in discharge of *contracts*, nor pass any law impairing the
obligation of *contracts ;* yet the first of these expressions
would have been held to apply to all contracts, and the last
to subsisting contracts only. This shows the consequence
of what is now contended for in a strong light. It is cer-
tain that the substitution of the word *contracts*, for *debts*,
would not alter the sense ; and an argument that could not be
sustained if such substitution were made, cannot be sustain-
ed now. We maintain, therefore, that if tender laws may
not be made for future debts, neither can bank rupt laws be
made for future contracts. All the arguments    ed here may
be applied with equal force to tender laws for future debts.
It may be said, for instance, that when it speaks of *debts*, the
constitution means existing debts, and not mere possibilities
of future debt ; that the object was to preserve vested
rights ; and that if a man, after a tender law had passed, had
contracted a debt, the manner in which that tender law au-
thorized that debt to be discharged, became part of the con-
tract, and that the whole debt, or whole obligation was thus
qualified by the pre-existing law, and was no more than a
contract to deliver so much paper money, or of whatever
other article which might be made a tender, as the original
bargain expressed. Arguments of this sort will not be found
wanting in favour of tender laws, if the Court yield to si-
milar arguments in favour of bankrupt laws.

These several prohibitions of the constitution stand in the
same paragraph ; they have the same purpose, and were in-
troduced for the same object ; they are expressed in words
of similar import, in grammar, and in sense ; they are sub-
ject to the same construction, and, we think, no reason has

yet been given for imposing an important restriction on one part of them, which does not equally show, that the same restriction might be imposed also on the other part.

We have already endeavoured to maintain, that one great political object, intended by the constitution, would be defeated, if this construction were allowed to prevail. As an object of political regulation, it was not important to prevent the States from passing bankrupt laws applicable to present debts, while the power was left to them in regard to future debts; nor was it at all important, in a political point of view, to prohibit tender laws as to future debts, while it was yet left to the States to pass laws for the discharge of such debts, which, after all, are little different, in principle, from tender laws. Look at the law before the Court in this view. It provides that if the debtor will surrender, offer, or *tender* to trustees, for the benefit of his creditors, all his estate and effects, he shall be discharged from all his debts. If it had authorized a tender of any thing but money to any one creditor, though it were of a value equal to the debt, and thereupon provided for a discharge, it would have been clearly invalid. Yet it is maintained to be good, merely because it is made for all creditors. and seeks a discharge from all debts; although the thing tendered may not be equivalent to a shilling in the pound of those debts. This shows, again, very clearly how the constitution has failed of its purpose, if, having in terms prohibited all tender laws, and taken so much pains to establish a uniform medium of payment, it has yet left the States the power of discharging debts, as they may see fit, without any payment at all.

To recapitulate, what has been said, we maintain; first, that the constitution, by its grants to Congress, and its prohibitions on the States, has sought to establish one uniform standard of value, or medium of payment. Second, that, by like means, it has endeavoured to provide for one uniform mode of discharging debts, when they are to be discharged without payment. Third, that these objects are connected, and that the first loses much of its importance, if the last, also, be not accomplished. Fourth, that reading the grant to Congress and the prohibition on the States together, the inference is strong that the constitution intended to confer

an exclusive power to pass bankrupt laws on Congress. Fifth, that the prohibition, in the tenth section, reaches to all *contracts* existing or future, in the same way as the other prohibition in the same section extends to all *debts* existing or future. Sixthly, and that, upon any other construction, one great political object of the constitution will fail of its accomplishment.

*Feb. 19th.* The learned judges delivered their opinions as follows:

Mr. Justice WASHINGTON. The first and most important point to be decided in this cause turns essentially upon the question, whether the obligation of a contract is impaired by a State bankrupt or insolvent law, which discharges the person and the future acquisitions of the debtor from his liability under a contract entered into in that State after the passage of the act?

This question has never before been distinctly presented to the consideration of this Court, and decided, although it has been supposed by the judges of a highly respectable State Court, that it was decided in the case of *M‘Millan* v. *M‘Niel*, (4 *Wheat. Rep.* 209.) That was the case of a debt contracted by two citizens of South Carolina, in that State, the discharge of which had a view to no other State. The debtor afterwards removed to the territory of Louisiana, where he was regularly discharged, as an insolvent, from all his debts, under an act of the legislature of that State, passed prior to the time when the debt in question was contracted. To an action brought by the creditor in the District Court of Louisiana, the defendant plead in bar his discharge, under the law of that territory, and it was contended by the counsel for the debtor in this Court, that the law under which the debtor was discharged, having passed before the contract was made, it could not be said to impair its obligation. The cause was argued on one side only, and it would seem from the report of the case, that no written opinion was prepared by the Court. The Chief Justice stated that the circumstance of the State law, under which the debt was attempted to be discharged, having been passed before the debt was contracted, made no difference in the application of the principle, which had been asserted by the

Court in the case of *Sturges* v. *Crowninshield.* The correctness of this position is believed to be incontrovertible. The principle alluded to was, that a State bankrupt law, which impairs the obligation of a contract, is unconstitutional in its application to such contract. In that case, it is true, the contract preceded in order of time the act of assembly, under which the debtor was discharged, although it was not thought necessary to notice that circumstance in the opinion which was pronounced. The principle, however, remained in the opinion of the Court, delivered in *M'Millan* v. *M'Niel,* unaffected by the circumstance that the law of Louisiana preceded a contract made in another State, since that law, having no extra-territorial force, never did at any time govern or affect the obligation of such contract. It could not, therefore, be correctly said to be prior to the contract, in reference to its obligation, since if, upon legal principles, it could affect the contract, that could not happen until the debtor became a citizen of Louisiana, and that was subsequent to the contract. But I hold the principle to be well established, that a discharge under the bankrupt laws of one government, does not affect contracts made or to be executed under another, whether the law be prior or subsequent in the date to that of the contract; and this I take to be the only point really decided in the case alluded to. Whether the Chief Justice was correctly understood by the Reporter, when he is supposed to have said, " that this case was not distinguishable in principle from the preceding case of *Sturges* v. *Crowninshield,*" it is not material at this time to inquire, because I understand the meaning of these expressions to go no farther than to intimate, that there was no distinction between the cases as to the constitutional objection, since it professed to discharge a debt contracted in another State, which, at the time it was contracted, was not within its operation, nor subject to be discharged by it. The case now to be decided, is that of a debt contracted in the State of New-York, by a citizen of that State, from which he was discharged, so far as he constitutionally could be, under a bankrupt law of that State, in force at the time when the debt was contracted. It is a case, therefore, that bears no resemblance to the one just noticed

I come now to the consideration of the question, which, for the first time, has been directly brought before this Court for judgment. I approach it with more than ordinary sensibility, not only on account of its importance, which must be acknowledged by all, but of its intrinsic difficulty, which every step I have taken in arriving at a conclusion with which my judgment could in any way be satisfied, has convinced me attends it. I have examined both sides of this great question with the most sedulous care, and the most anxious desire to discover which of them, when adopted, would be most likely to fulfil the intentions of those who framed the constitution of the United States. I am far from asserting that my labours have resulted in entire success. They have led me to the only conclusion by which I can stand with any degree of confidence; and yet, I should be disingenuous were I to declare, from this place, that I embrace it without hesitation, and without a doubt of its correctness. The most that candour will permit me to say upon the subject is, that I see, or think I see, my way more clear on the side which my judgment leads me to adopt, than on the other, and it must remain for others to decide whether the guide I have chosen has been a safe one or not.

It has constantly appeared to me, throughout the different investigations of this question, to which it has been my duty to attend, that the error of those who controvert the constitutionality of the bankrupt law under consideration, in its application to this case, if they be in error at all, has arisen from not distinguishing accurately between a law which impairs a contract, and one which impairs its obligation. A contract is defined by all to be an agreement to do, or not to do, some particular act; and in the construction of this agreement, depending essentially upon the will of the parties between whom it is formed, we seek for their intention with a view to fulfil it. Any law, then, which enlarges, abridges, or in any manner changes this intention, when it is discovered, necessarily impairs the contract itself, which is but the evidence of that intention. The manner, or the degree, in which this change is effected, can in no respect influence this conclusion; for whether the law affect the validity, the construction, the duration, the mode of dis-

charge, or the evidence of the agreement, it impairs the contract, though it may not do so to the same extent in all the supposed cases. Thus, a law which declares that no action shall be brought whereby to charge a person upon his agreement to pay the debt of another, or upon an agreement relating to lands, unless the same be reduced to writing, impairs a contract made by parol, whether the law precede or follow the making of such contract; and, if the argument that this law also impairs, in the former case, the obligation of the contract, be sound, it must follow, that the statute of frauds, and all other statutes which in any manner meddle with contracts, impair their obligation, and are, consequently, within the operation of this section and article of the constitution. It will not do to answer, that, in the particular case put, and in others of the same nature, there is no contract to impair, since the pre-existing law denies all remedy for its enforcement, or forbids the making of it, since it is impossible to deny that the parties have expressed their will in the form of a contract, notwithstanding the law denies to it any valid obligation.

This leads us to a critical examination of the particular phraseology of that part of the above section which relates to contracts. It is a law which impairs the obligation of contracts, and not the contracts themselves, which is interdicted. It is not to be doubted, that this term, *obligation*, when applied to contracts, was well considered and weighed by those who framed the constitution, and was intended to convey a different meaning from what the prohibition would have imported without it. It is this meaning of which we are all in search.

What is it, then, which constitutes the obligation of a contract? The answer is given by the Chief Justice, in the case of *Sturges* v. *Crowninshield*, to which I readily assent now, as I did then; it is the law which binds the parties to perform their agreement. The law, then, which has this binding obligation, must govern and control the contract in every shape in which it is intended to bear upon it, whether it affect its validity, construction, or discharge.

But the question, which law is referred to in the above

definition, still remains to be solved. It cannot, for a mo-
ment, be conceded that the mere moral law is intended,
since the obligation which that imposes is altogether of the
imperfect kind, which the parties to it are free to obey, or
not, as they please. It cannot be supposed, that it was with
this law the grave authors of this instrument were dealing.

The universal law of all civilized nations, which declares
that men shall perform that to which they have agreed, has
been supposed by the counsel who have argued this cause
for the defendant in error, to be the law which is alluded to;
and I have no objection to acknowledging its obligation,
whilst I must deny that it is that which exclusively governs
the contract. It is upon this law that the obligation which
nations acknowledge to perform their compacts with each
other is founded, and I, therefore, feel no objection to an-
swer the question asked by the same counsel—what law it
is which constitutes the obligation of the compact between
Virginia and Kentucky? by admitting, that it is this common
law of nations which requires them to perform it. I admit
further, that it is this law which creates the obligation of a
contract made upon a desert spot, where no municipal law
exists, and (which was another case put by the same counsel)
which contract, by the tacit assent of all nations, their tribu-
nals are authorized to enforce.

But can it be seriously insisted, that this, any more than
the moral law upon which it is founded, was exclusively in
the contemplation of those who framed this constitution?
What is the language of this universal law? It is simply
that all men are bound to perform their contracts. The in-
junction is as absolute as the contracts to which it applies.
It admits of no qualification, and no restraint, either as to its
validity, construction, or discharge, further than may be ne-
cessary to develope the intention of the parties to the con-
tract. And if it be true, that this is exclusively the law to
which the constitution refers us, it is very apparent, that the
sphere of State legislation upon subjects connected with the
contracts of individuals, would be abridged beyond what it
can for a moment be believed the sovereign States of this Union
would have consented to; for it will be found, upon exami-
nation, that there are few laws which concern the general

police of a state, or the government of its citizens, in their intercourse with each other, or with strangers, which may not in some way or other affect the contracts which they have entered into, or may thereafter form. For what are laws of evidence, or which concern remedies—frauds and perjuries—laws of registration, and those which affect landlord and tenant, sales at auction, acts of limitation, and those which limit the fees of professional men, and the charges of tavern keepers, and a multitude of others which crowd the codes of every State, but laws which may affect the validity, construction, or duration, or discharge of contracts? Whilst I admit, then, that this common law of nations, which has been mentioned, may form in part the obligation of a contract, I must unhesitatingly insist, that this law is to be taken in strict subordination to the municipal laws of the land where the contract is made, or is to be executed. The former can be satisfied by nothing short of performance; the latter may affect and control the validity, construction, evidence, remedy, performance and discharge of the contract. The former is the common law of all civilized nations, and of each of them; the latter is the peculiar law of each, and is paramount to the former whenever they come in collision with each other.

It is, then, the municipal law of the State, whether that be written or unwritten, which is emphatically the law of the contract made within the State, and must govern it throughout, wherever its performance is sought to be enforced.

It forms, in my humble opinion, a part of the contract, and travels with it wherever the parties to it may be found. It is so regarded by all the civilized nations of the world, and is enforced by the tribunals of those nations according to its own forms, unless the parties to it have otherwise agreed, as where the contract is to be executed in, or refers to the laws of, some other country than that in which it is formed, or where it is of an immoral character, or contravenes the policy of the nation to whose tribunals the appeal is made; in which latter cases, the remedy which the comity of nations affords for enforcing the obligation of contracts wherever formed, is denied. Free from these objections, this law, which accompanies the contract as forming a part of

1827.
Ogden
v.
Saunders.

it, is regarded and enforced every where, whether it affect the validity, construction, or discharge of the contract. It is upon this principle of universal law, that the discharge of the contract, or of one of the parties to it, by the bankrupt laws of the country where it was made, operates as a discharge every where.

If then, it be true, that the law of the country where the contract is made, or to be executed, forms a part of that contract, and of its obligation, it would seem to be somewhat of a solecism to say, that it does, at the same time, impair that obligation.

But, it is contended, that if the municipal law of the State where the contract is so made, form a part of it, so does that clause of the constitution which prohibits the States from passing laws to impair the obligation of contracts; and, consequently, that the law is rendered inoperative by force of its controlling associate. All this I admit, provided it be first proved, that the law so incorporated with, and forming a part of the contract, does, in effect, impair its obligation; and before this can be proved, it must be affirmed, and satisfactorily made out, that if, by the terms of the contract, it is agreed that, on the happening of a certain event, as, upon the future insolvency of one of the parties, and his surrender of all his property for the benefit of his creditors, the contract shall be considered as performed and at an end, this stipulation would impair the obligation of the contract. If this proposition can be successfully affirmed, I can only say, that the soundness of it is beyond the reach of my mind to understand.

Again; it is insisted, that if the law of the contract forms a part of it, the law itself cannot be repealed without impairing the obligation of the contract. This proposition I must be permitted to deny. It may be repealed at any time at the will of the legislature, and then it ceases to form any part of those contracts *which may afterwards be entered into.* The repeal is no more void than a new law would be which operates upon contracts to affect their validity, construction, or duration. Both are valid, (if the view which I take of this case be correct,) as they may affect contracts afterwards formed; but neither are so, if they bear upon existing contracts; and, in the former case, in which the re-

peal contains no enactment, the constitution would forbid the application of the repealing law to past contracts, and to those only.

To illustrate this argument, let us take four laws, which, either by new enactments, or by the repeal of former laws, may affect contracts as to their validity, construction, evidence, or remedy.

Laws against usury are of the first description.

A law which converts a penalty, stipulated for by the parties, as the only atonement for a breach of the contract, into a mere agreement for a just compensation, to be measured by the legal rate of interest, is of the second.

The statute of frauds, and the statute of limitations, may be cited as examples of the two last.

The validity of these laws can never be questioned by those who accompany me in the view which I take of the question under consideration, unless they operate, by their express provisions, upon contracts previously entered into; and even then they are void only so far as they do so operate, because, in that case, and in that case only, do they impair the obligation of those contracts. But if they equally impair the obligation of contracts subsequently made, which they must do if this be the operation of a bankrupt law upon such contracts, it would seem to follow, that all such laws, whether in the form of, new enactments, or of repealing laws, producing the same legal consequences, are made void by the constitution; and yet the counsel for the defendants in error have not ventured to maintain so alarming a proposition.

If it be conceded that *those laws* are not repugnant to the constitution, so far as they apply to subsequent contracts, I am yet to be instructed how to distinguish between those laws, and the one now under consideration. How has this been attempted by the learned counsel who have argued this cause upon the ground of such a distinction?

They have insisted, that the effect of the law first supposed, is to annihilate the contract in its birth, or rather to prevent it from having a legal existence, and, consequently, that there is no obligation to be impaired. But this is clearly not so, since it may legitimately avoid all contracts after-

1827.

Ogden
v.
Saunders.

wards entered into, which reserve to the lender a higher rate of interest than this law permits.

The validity of the second law is admitted, and yet this can only be in its application to subsequent contracts; for it has not, and I think it cannot, for a moment, be maintained, that a law which, in express terms, varies the construction of an existing contract, or which, repealing a former law, is made to produce the same effect, does not impair the obligation of that contract.

The statute of frauds, and the statute of limitations, which have been put as examples of the third and fourth classes of laws, are also admitted to be valid, because they merely concern the modes of proceeding in the trial of causes. The former, supplying a rule of evidence, and the latter, forming a part of the remedy given by the legislature to enforce the obligation, and likewise providing a rule of evidence.

All this I admit. But how does it happen that these laws, like those which affect the validity and construction of contracts, are valid as to subsequent, and yet void as to prior and subsisting contracts ? For we are informed by the learned judge who delivered the opinion of this Court in the case of *Sturges* v. *Crowninshield*, that, " if, in a State where six years may be pleaded in bar to an action of assumpsit, a law should pass, declaring that contracts already in existence, not barred by the statute, should be construed within it, there could be little doubt of its unconstitutionality."

It is thus most apparent, that, which ever way we turn, whether to laws affecting the validity, construction, or discharges of contracts, or the evidence or remedy to be employed in enforcing them, we are met by this overruling and admitted distinction, between those which operate retrospectively, and those which operate prospectively. In all of them, the law is pronounced to be void in the first class of cases, and not so in the second.

Let us stop, then, to make a more critical examination of the act of limitations, which, although it concerns the remedy, or, if it must be conceded, the evidence, is yet void or otherwise, as it is made to apply retroactively, or prospectively, and see if it can, upon any intelligible principle, be distin-

guished from a bankrupt law, when applied in the same manner? What is the effect of the former? The answer is, to discharge the debtor and all his future acquisitions from his contract; because he is permitted to plead it in bar of any remedy which can be instituted against him, and consequently in bar or destruction of the obligation which his contract imposed upon him. What is the effect of a discharge under a bankrupt law? I can answer this question in no other terms than those which are given to the former question. If there be a difference, it is one which, in the eye of justice at least, is more favourable to the validity of the latter than of the former; for in the one, the debtor surrenders every thing which he possesses towards the discharge of his obligation, and in the other, he surrenders nothing, and sullenly shelters himself behind a legal objection with which the law has provided him, for the purpose of protecting his person, and his present, as well as his future acquisitions, against the performance of his contract.

It is said that the former does not discharge him absolutely from his contract, because it leaves a shadow sufficiently substantial to raise a consideration for a new promise to pay. And is not this equally the case with a certificated bankrupt, who afterwards promises to pay a debt from which his certificate had discharged him? In the former case, it is said, the defendant must plead the statute in order to bar the remedy, and to exempt him from his obligation. And so, I answer, he must plead his discharge under the bankrupt law, and his conformity to it, in order to bar the remedy of his creditor, and to secure to himself a like exemption. I have, in short, sought in vain for some other grounds on which to distinguish the two laws from each other, than those which were suggested at the bar. I can imagine no other, and I confidently believe that none exist which will bear the test of a critical examination.

To the decision of this Court, made in the case of *Sturges* v. *Crowninshield*, and to the reasoning of the learned Judge who delivered that opinion, I entirely submit; although I did not then, nor can I now bring my mind to concur in that part of it which admits the constitutional power of the State legislatures to pass bankrupt laws, by which I understand, those laws which discharge the person and the future

acquisitions of the bankrupt from his debts.    I have always thought that the power to pass such a law was exclusively vested by the constitution in the legislature of the United States.    But it becomes me to believe that this opinion was, and is incorrect, since it stands condemned by the decision of a majority of this Court, solemnly pronounced.

After making this acknowledgment, I refer again to the above decision with some degree of confidence, in support of the opinion to which I am now inclined to come, that a bankrupt law, which operates prospectively, or in so far as it does so operate, does not violate the constitution of the United States.    It is there stated, " that, until the power to pass uniform laws on the subject of bankruptcies be exercised by Congress, the States are not forbidden to pass a bankrupt law, provided it contain no principle which violates the tenth section of the first article of the constitution of the United States."    The question in that case was, whether the law of New York, passed on the third of April, 1811, which liberates, not only the person of the debtor, but discharges him from all liability for any debt contracted previous, as well as subsequent to his discharge, on his surrendering his property for the use of his creditors, was a valid law under the constitution in its application to a debt contracted prior to its passage?    The Court decided that it was not, upon the single ground that it impaired the obligation of that contract.    And if it be true, that the States cannot pass a similar law to operate upon contracts subsequently entered into, it follows inevitably, either that they cannot pass such laws at all, contrary to the express declaration of the Court, as before quoted, or that such laws do not impair the obligation of contracts subsequently entered into ; in fine, it is a self-evident proposition, that every contract that can be formed, must either precede, or follow, any law by which it may be affected.

I have, throughout the preceding part of this opinion, considered the municipal law of the country where the contract is made, as incorporated with the contract, whether it affects its validity, construction, or discharge.    But I think it quite immaterial to stickle for this position, if it be conceded to me. what can scarcely be denied, that this munich

pal law constitutes the law of the contract so formed, and must govern it throughout. I hold the legal consequences to be the same, in which ever view the law, as it affects the contract, is considered.

I come now to a more particular examination and construction of the section under which this question arises; and I am free to acknowledge, that the collocation of the subjects for which it provides, has made an irresistible impression upon my mind, much stronger, I am persuaded, than I can find language to communicate to the minds of others.

It declares, that "no State shall coin money, emit bills of credit, make any thing but gold and silver coin a tender in payment of debts." These prohibitions, associated with the powers granted to Congress " to coin money, and to regulate the value thereof, and of foreign coin," most obviously constitute members of the same family, being upon the same subject, and governed by the same policy.

This policy was, to provide a fixed and uniform standard of value throughout the United States, by which the commercial and other dealings between the citizens thereof, or between them and foreigners, as well as the monied transactions of the government, should be regulated. For it might well be asked, why vest in Congress the power to establish a uniform standard of value by the means pointed out, if the States might use the same means, and thus defeat the uniformity of the standard, and, consequently, the standard itself? And why establish a standard at all, for the government of the various contracts which might be entered into, if those contracts might afterwards be discharged by a different standard, or by that which is not money, under the authority of State tender laws? It is obvious, therefore, that these prohibitions, in the 10th section, are entirely homogeneous, and are essential to the establishment of a uniform standard of value, in the formation and discharge of contracts. It is for this reason, independent of the general phraseology which is employed, that the prohibition, in regard to State tender laws, will admit of no construction which would confine it to State laws which have a retrospective operation.

The next class of prohibitions contained in this section, consists of bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts.

Here, too, we observe, as I think, members of the same family brought together in the most intimate connexion with each other. The States are forbidden to pass any bill of attainder or *ex post facto* law, by which a man shall be punished criminally or penally, by loss of life, of his liberty, property, or reputation, for an act which, at the time of its commission, violated no existing law of the land. Why did the authors of the constitution turn their attention to this subject, which, at the first blush, would appear to be peculiarly fit to be left to the discretion of those who have the police and good government of the State under their management and control? The only answer to be given is, because laws of this character are oppressive, unjust, and tyrannical; and, as such, are condemned by the universal sentence of civilized man. The injustice and tyranny which characterizes *ex post facto* laws, consists altogether in their retrospective operation, which applies with equal force, although not exclusively, to bills of attainder.

But if it was deemed wise and proper to prohibit State legislation as to retrospective laws, which concern, almost exclusively, the citizens and inhabitants of the particular State in which this legislation takes place, how much more did it concern the private and political interests of the citizens of all the States, in their commercial and ordinary intercourse with each other, that the same prohibition should be extended civilly to the contracts which they might enter into?

If it were proper to prohibit a State legislature to pass a retrospective law, which should take from the pocket of one of its own citizens a single dollar, as a punishment for an act which was innocent at the time it was committed; how much more proper was it to prohibit laws of the same character precisely, which might deprive the citizens of other States, and foreigners, as well as citizens of the same State, of thousands, to which, by their contracts, they were justly entitled, and which they might possibly have realized but for such State interference? How natural, then, was it, under

the influence of these considerations, to interdict similar 1827.
legislation in regard to contracts, by providing, that no State
should pass laws impairing the obligation of past contracts? Ogden
It is true, that the two first of these prohibitions apply to v.
laws of a criminal, and the last to laws of a civil character; Saunders.
but if I am correct in my view of the spirit and motives of
these prohibitions, they agree in the *principle* which sug-
gested them. They are founded upon the same reason, and
the application of it is at least as strong to the last, as it is to
the two first prohibitions.

But these reasons are altogether inapplicable to laws of a
prospective character. There is nothing unjust or tyran-
nical in punishing offences prohibited by law, and commit-
ted in violation of that law. Nor can it be unjust, or op-
pressive, to declare by law, that contracts subsequently en-
tered into, may be discharged in a way different from that
which the parties have provided, but which they know, or
may know, are liable, under certain circumstances, to be dis-
charged in a manner contrary to the provisions of their
contract.

Thinking, as I have always done, that the power to pass
bankrupt laws was intended by the authors of the constitu-
tion to be exclusive in Congress, or, at least, that they ex-
pected the power vested in that body would be exercised,
so as effectually to prevent its exercise by the States, it is
the more probable that, in reference to all other interfe-
rences of the State legislatures upon the subject of con-
tracts, retrospective laws were alone in the contemplation
of the Convention.

In the construction of this clause of the tenth section of
the constitution, one of the counsel for the defendant supposed
himself at liberty so to transpose the provisions contained in
it, as to place the prohibition to pass laws impairing the obli-
gation of contracts in juxtaposition with the other prohibi-
tion to pass laws making any thing but gold and silver coin
a tender in payment of debts, inasmuch as the two provi-
sions relate to the *subject of contracts*.

That the derangement of the words, and even sentences
of a law, may sometimes be tolerated, in order to arrive at
the apparent meaning of the legislature, to be gathered from

other parts, or from the entire scope of the law, I shall not deny. But I should deem it a very hazardous rule to adopt in the construction of an instrument so maturely considered as this constitution was by the enlightened statesmen who framed it, and so severely examined and criticised by its opponents in the numerous State conventions which finally adopted it. And if, by the construction of this sentence, arranged as it is, or as the learned counsel would have it to be, it could have been made out that the power to pass prospective laws, *affecting contracts*, was denied to the States, it is most wonderful that not one voice was raised against the provision, in any of those conventions, by the jealous advocates of State rights, nor even an amendment proposed, to explain the clause, and to exclude a construction which trenches so extensively upon the sphere of State legislation.

But, although the transposition which is contended for may be tolerated in cases where the obvious intention of the legislature can in no other way be fulfilled, it can never be admitted in those where consistent meaning can be given to the whole clause as its authors thought proper to arrange it, and where the only doubt is, whether the construction which the transposition countenances, or that which results from the reading which the legislature has thought proper to adopt, is most likely to fulfil the supposed intention of the legislature. Now, although it is true, that the prohibition to pass tender laws of a particular description, and laws impairing the obligation of contracts, relate, both of them, to contracts, yet, the principle which governs each of them, clearly to be inferred from the subjects with which they stand associated, is altogether different; that of the first forming part of a system for fixing a uniform standard of value, and, of the last, being founded on a denunciation of retrospective laws. It is, therefore, the safest course, in my humble opinion, to construe this clause of the section according to the arrangement which the Convention has thought proper to make of its different provisions. To insist upon a transposition, with a view to warrant one construction rather than the other, falls little short, in my opinion, of a begging of the whole question in controversy.

But why, it has been asked, forbid the States to pass laws making any thing but gold and silver coin a tender in payment of debts, contracted subsequent, as well as prior, to the law which authorizes it; and yet confine the prohibition to pass laws impairing the obligation of contracts to past contracts, or in other words, to future bankrupt laws, when the consequence resulting from each is the same, the latter being considered by the counsel as being, in truth, nothing less than tender laws in disguise.

An answer to this question has, in part, been anticipated by some of the preceding observations. The power to pass bankrupt laws having been vested in Congress, either as an exclusive power, or under the belief that it would certainly be exercised, it is highly probable that State legislation, upon that subject was not within the contemplation of the convention; or, if it was, it is quite unlikely that the exercise of the power by the State legislatures, would have been prohibited by the use of terms which, I have endeavoured to show, are inapplicable to laws intended to operate prospectively. For had the prohibition been to pass laws *impairing contracts*, instead of the obligation of contracts, I admit, that it would have borne the construction which is contended for, since it is clear that the agreement of the parties in the first case, would be impaired as much by a prior as it would be by a subsequent bankrupt law. It has, besides, been attempted to be shown, that the limited restriction upon State legislation, imposed by the former prohibition, might be submitted to by the States, whilst the extensive operation of the latter would have *hazarded*, to say the least of it, the adoption of the constitution by the State conventions.

But an answer, still more satisfactory to my mind, is this: Tender laws, of the description stated in this section, are always unjust; and, where there is an existing bankrupt law at the time the contract is made, they can seldom be useful to the honest debtor. They violate the agreement of the parties to it, without the semblance of an apology for the measure, since they operate to discharge the debtor from his undertaking, upon terms variant from those by which he bound himself, to the injury of the creditor, and unsupport-

ed, in many cases, by the plea of necessity. They extend relief to the opulent debtor, who does not stand in need of it; as well as to the one who is, by misfortunes, often unavoidable, reduced to poverty, and disabled from complying with his engagements. In relation to subsequent contracts, they are unjust when extended to the former class of debtors, and useless to the second, since they may be relieved by conforming to the requisitions of the State bankrupt law, where there is one. Being discharged by this law from all his antecedent debts, and having his future acquisitions secured to him, an opportunity is afforded him to become once more a useful member of society.

If this view of the subject be correct, it will be difficult to prove, that a prospective bankrupt law resembles, in any of its features, a law which should make any thing but gold and silver coin a tender in payment of debts.

I shall now conclude this opinion, by repeating the acknowledgment which candour compelled me to make in its commencement, that the question which I have been examining is involved in difficulty and doubt. But if I could rest my opinion in favour of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favour of its validity, until its violation of the constitution is proved beyond all reasonable doubt. This has always been the language of this Court, when that subject has called for its decision; and I know that it expresses the honest sentiments of each and every member of this bench. I am perfectly satisfied that it is entertained by those of them from whom it is the misfortune of the majority of the Court to differ on the present occasion, and that they feel no reasonable doubt of the correctness of the conclusion to which their best judgment has conducted them.

My opinion is, that the judgment of the Court below ought to be reversed, and judgment given for the plaintiff in error.

Mr. Justice JOHNSON. This suit was instituted in Louisiana, in the Circuit Court of the United States, by Saunders, the defendant here, against Ogden, upon certain bills of exchange. Ogden, the defendant there, pleads, in bar to the action, a discharge obtained, in due form of law, from the Courts of the State of New-York, which discharge purports to release him from all debts and demands existing against him on a specified day. This demand is one of that description, and the act under which the discharge was obtained, was the act of New-York of 1801, a date long prior to that of the cause of action on which this suit was instituted. The discharge is set forth in the plea, and represents Ogden as " an insolvent debtor, being, on the day and year therein after mentioned, in prison, in the city and county of New-York, on execution issued against him on some civil action," &c. It does not appear that any suit had ever been instituted against him by this party, or on this cause of action, prior to the present. The cause below was decided upon a special verdict, in which the jury find,

1st. That the acceptance of the bills on which the action was instituted, was made by Ogden, in the city of New-York, on the days they severally bear date, the said defendant then residing in the city of New York, and continuing to reside there until a day not specified.

2d. That under the laws of the State of New-York, in such case provided, and referred to in the discharge, (which laws are specially found, &c. meaning the State law of 1801,) application was made for, and the defendant obtained, the discharge hereunto annexed.

3d. That, by the laws of New-York, actions on bills of exchange, and acceptances thereof, are limited to the term of six years; and,

4th. That at the time the said bills were drawn and accepted, the drawee and the drawer of the same, were residents and citizens of the State of Kentucky.

On this state of facts the Court below gave judgment against Ogden, the discharged debtor.

We are not in possession of the grounds of the decision below; and it has been argued here, as having been given upon the general nullity of the discharge, on the ground of its unconstitutionality. But, it is obvious, that it might also have

proceeded upon the ground of its nullity, as to citizens of other States, who have never, by any act of their own, submitted themselves to the *lex fori* of the State that gives the discharge—considering the right given by the constitution to go into the Courts of the United States upon any contracts, whatever be their *lex loci*, as modifying and limiting the general power which States are acknowledged to possess over contracts formed under control of their peculiar laws.

This question, however, has not been argued, and must not now be considered as disposed of by this decision.

The abstract question of the general power of the States to pass laws for the relief of insolvent debtors, will be alone considered. And here, in order to ascertain with precision what we are to decide, it is first proper to consider what this Court has already decided on this subject. And this brings under review the two cases of *Sturges* v. *Crowninshield*, and *M'Millan* v. *M'Neal*, adjudged in the year 1819, and contained in the 4th vol. of the Reports. If the marginal note to the report, or summary of the effect of the case of *M'Millan* v. *M'Neal*, presented a correct view of the report of that decision, it is obvious, that there would remain very little, if any thing, for this Court to decide. But by comparing the note of the Reporter with the facts of the case, it will be found that there is a generality of expression admitted into the former, which the case itself does not justify. The principle recognised and affirmed in *M'Millan* v. *M'Neal*, is one of universal law, and so obvious and incontestible that it need be only understood to be assented to. It is nothing more than this; " *that insolvent laws have no extra-territorial operation upon the contracts of other States ; that the principle is applicable as well to the discharges given under the laws of the States, as of foreign countries ; and that the anterior or posterior character of the law under which the discharge is given, with reference to the date of the contract, makes no discrimination in the application of that principle.*"

The report of the case of *Sturges* v. *Crowninshield* needs also some explanation. The Court was, in that case, greatly divided in their views of the doctrine, and the judgment partakes as much of a compromise, as of a legal adjudica-

tion. The minority thought it better to yield something than risk the whole. And, although their course of reasoning led them to the general maintenance of the State power over the subject, controled and limited alone by the oath administered to all their public functionaries to maintain the constitution of the United States, yet, as denying the power to act upon anterior contracts, could do no harm, but, in fact, imposed a restriction conceived in the true spirit of the constitution, they were satisfied to acquiesce in it, provided the decision were so guarded as to secure the power over posterior contracts, as well from the positive terms of the adjudication, as from inferences deducible from the reasoning of the Court.

The case of *Sturges* v. *Crowninshield*, then, must, in its authority, be limited to the terms of the certificate, and that certificate affirms two propositions.

1. That a State has authority to pass a bankrupt law, provided such law does not impair the obligation of contracts within the meaning of the constitution, and provided there be no act of Congress in force to establish an uniform system of bankruptcy, conflicting with such law.

2. That a law of this description, acting upon prior contracts, is a law impairing the obligation of contracts within the meaning of the constitution.

Whatever inferences or whatever doctrines the opinion of the Court in that case may seem to support, the concluding words of that opinion were intended to control and to confine the authority of the adjudication to the limits of the certificate.

I should, therefore, have supposed, that the question of exclusive power in Congress to pass a bankrupt law was not now open; but it has been often glanced at in argument, and I have no objection to express my individual opinion upon it. Not having recorded my views on this point in the case of *Crowninshield*, I avail myself of this occasion to do so.

So far, then, am I from admitting that the constitution affords any ground for this doctrine, that I never had a doubt, that the leading object of the constitution was to bring in aid of the States a power over this subject, which their individual powers never could attain to; so far from limiting, mo-

difying, and attenuating legislative power in its known and ordinary exercise in favour of unfortunate debtors, that its sole object was to extend and perfect it, as far as the combined powers of the States, represented by the general government, could extend it. Without that provision, no power would have existed that could extend a discharge beyond the limits of the State in which it was given, but with that provision it might be made co-extensive with the United States. This was conducing to one of the great ends of the constitution, one which it never loses sight of in any of its provisions, that of making an American citizen as free in one State as he was in another. And when we are told that this instrument is to be construed with a view to its federative objects, I reply that this view alone of the subject is in accordance with its federative character.

Another object in perfect accordance with this, may have been that of exercising a salutary control over the power of the States, whenever that power should be exercised without due regard to the fair exercise of distributive justice. The general tendency of the legislation of the States at that time to favour the debtor, was a consideration which entered deeply into many of the provisions of the constitution. And as the power of the States over the law of their respective forums remained untouched by any other provision of the constitution; when vesting in Congress the power to pass a bankrupt law, it was worthy of the wisdom of the Convention to add to it the power to make that system uniform and universal. Yet, on this subject, the use of the term *uniform*, instead of *general*, may well raise a doubt whether it meant more than that such a law should not be *partial*, but have an equal and *uniform* application in every part of the Union. This is in perfect accordance with the spirit in which various other provisions of the constitution are conceived.

For these two objects there appears to have been much reason for vesting this power in Congress ; but for extending to the grant the effect of *exclusiveness* over the power of the States, appears to me not only without reason, but to be repelled by weighty considerations.

1. There is nothing which, on the face of the constitution, bears the semblance of direct prohibition on the States to

exercise this power; and it would seem strange that, if such a prohibition had been in the contemplation of the Convention, when appropriating an entire section to the enumeration of prohibitions on the States, they had forgotten this, if they had intended to enact it.

The antithetical language adopted in that section, as to every other subject to which the power of Congress had been previously extended, affords a strong reason to conclude, that some direct and express allusion to the power to pass a bankrupt law would have been here inserted also, if they had not intended that this power should be concurrently, or, at least, subordinately exercised by the States. It cannot be correct reasoning, to rely upon this fact as a ground to infer that the prohibition must be found in some provision not having that antithetical character, since this supposes an intention to insert the prohibition, which intention can only be assumed. Its omission is a just reason for forming no other conclusion than that it was purposely omitted. But,

2. It is insisted, that, though not express, the prohibition is to be inferred from the grant to Congress to establish uniform laws on the subject of bankruptcies throughout the United States; and that this grant, standing in connexion with that to establish an uniform rule of naturalization, which is, in its nature, exclusive, must receive a similar construction.

There are many answers to be given to this argument; and the first is, that a mere grant of a State power does not, in itself, necessarily imply an abandonment or relinquishment of the power granted, or we should be involved in the absurdity of denying to the States the power of taxation, and sundry other powers ceded to the general government. But much less can such a consequence follow from vesting in the general government *a power which no State possessed*, and which, all of them combined, could not exercise to meet the end proposed in the constitution. For, if every State in the Union were to pass a bankrupt law in the same unvarying words, although this would, undoubtedly, be an *uniform* system of bankruptcy in its literal sense, it would be very far from answering the grant to Congress. There would still need some act of Congress, or some treaty

under sanction of an act of Congress, to give discharges in one State a full operation in the other. Thus, then, the inference which we are called upon to make, will be found not to rest upon any actual cession of State power, but upon the creation of a new power which no State ever pretended to possess; a power which, so far from necessarily diminishing, or impairing the State power over the subject, might find its full exercise in simply recognising as valid, in every State, all discharges which shall be honestly obtained under the existing laws of any State.

Again; the inference proposed to be deduced from this grant to Congress, will be found much broader than the principle in which the deduction is claimed. For, in this, as in many other instances in the constitution, the grant implies only *the right to assume and exercise a power over the subject.* Why, then, should the State powers cease before Congress shall have acted upon the subject? or why should that be converted into a present and absolute relinquishment of power, which is, in its nature, merely potential, and dependent on the discretion of Congress whether, and when, to enter on the exercise of a power that may supersede it?

Let any one turn his eye back to the time when this grant was made, and say if the situation of the people admitted of an abandonment of a power so familiar to the jurisprudence of every State; so universally sustained in its reasonable exercise, by the opinion and practice of mankind, and so vitally important to a people overwhelmed in debt, and urged to enterprise by the activity of mind that is generated by revolutions and free governments.

I will with confidence affirm, that the constitution had never been adopted, had it then been imagined that this question would ever have been made, or that the exercise of this power in the States should ever have depended upon the views of the tribunals to which that constitution was about to give existence. The argument proposed to be drawn from a comparison of this power with that of Congress over naturalization, is not a fair one, for the cases are not parallel; and if they were, it is by no means settled that the States would have been precluded from this power.

if Congress had not assumed it.   But. admitting. *argumenti* <span>1827.</span>
*gratia*, that they would, still there are considerations bear-
ing upon the one power, which have no application to the <span>Ogden</span>
other.   Our foreign intercourse being exclusively commit- <span>v.</span>
ted to the general government, it is peculiarly their pro- <span>Saunders.</span>
vince to determine who are entitled to the privileges of
American citizens, and the protection of the American go-
vernment.   And the citizens of any one State being enti-
tled by the constitution to enjoy the rights of citizenship in
every other State, that fact creates an interest in this par-
ticular in each other's acts, which does not exist with regard
to their bankrupt laws ; since State acts of naturalization
would thus be *extra-territorial* in their operation, and have
an influence on the most vital interests of other States.

On these grounds, State laws of naturalization may be
brought under one of the four heads or classes of powers
precluded to the States, to wit : that of incompatibility ; and
on this ground alone, if any, could the States be debarred
from exercising this power, had Congress not proceeded to
assume it.   There is, therefore, nothing in that argument.

The argument deduced from the commercial character of
bankrupt laws is still more unfortunate.   It is but necessary
to follow it out, and the inference, if any, deducible from it,
will be found to be direct and conclusive in favour of the
State rights over this subject.   For if, in consideration of
the power vested in Congress over foreign commerce, and
the commerce between the States, it was proper to vest a
power over bankruptcies that should pervade the States ; it
would seem, that by leaving the regulation of internal com-
merce in the power of the States, it became equally proper
to leave the exercise of this power within their own limits
unimpaired.

With regard to the universal understanding of the Ameri-
can people on this subject, there cannot be two opinions.   If
ever contemporaneous exposition, and the clear understand-
ing of the contracting parties, or of the legislating power.
(it is no matter in which light it be considered,) could be re-
sorted to as the means of expounding an instrument, the con-
tinuing and unimpaired existence of this power in the States.
ught never to have been controverted.   Nor was it con-

troverted until the repeal of the bankrupt act of 1800, or until a state of things arose in which the means of compelling a resort to the exercise of this power by the United States became a subject of much interest. Previously to that period, the States remained in the peaceable exercise of this power, under circumstances entitled to great consideration. In every State in the Union was the adoption of the constitution resisted by men of the keenest and most comprehensive minds; and if an argument, such as this, so calculated to fasten on the minds of a people, jealous of State rights, and deeply involved in debt, could have been imagined, it never would have escaped them. Yet no where does it appear to have been thought of; and, after adopting the constitution, in every part of the Union, we find the very framers of it every where among the leading men in public life, and legislating or adjudicating under the most solemn oath to maintain the constitution of the United States, yet no where imagining that, in the exercise of this power, they violated their oaths, or transcended their rights. Every where, too, the principle was practically acquiesced in, *that taking away the power to pass a law on a particular subject was equivalent to a repeal of existing laws on that subject.* Yet in no instance was it contended that the bankrupt laws of the States were repealed, while those on navigation, commerce, the admiralty jurisdiction, and various others, were at once abandoned without the formality of a repeal. With regard to their bankrupt or insolvent laws, they went on carrying them into effect and abrogating, and re-enacting them, without a doubt of their full and unimpaired power over the subject. Finally, when the bankrupt law of 1800 was enacted, the only power that seemed interested in denying the right to the States, formally pronounced a full and absolute recognition of that right. It is impossible for language to be more full and explicit on the subject, than is the sixth section of this act of Congress. It acknowledges both the validity of existing laws, and the right of passing future laws. The practical construction given by that act to the constitution is precisely this, *that it amounts only to a right to assume the power to legislate on the subject, and, therefore, abrogates or suspends the existing laws, only so far as they may*

*clash with the provisions of the act of Congress.* This con-
struction was universally acquiesced in, for it was that on
which there had previously prevailed but one opinion from
the date of the constitution.

Much alarm has been expressed respecting the inharmo-
nious operation of so many systems, all operating at the
same time. But I must say that I cannot discover any real
ground for these apprehensions. Nothing but a future ope-
ration is here contended for, and nothing is easier than to
avoid those rocks and quicksands which are visible to all.
Most of the dangers are imaginary, for the interests of each
community, its respect for the opinion of mankind, and a
remnant of moral feeling which will not cease to operate in
the worst of times, will always present important barriers
against the gross violation of principle. How is the general
government itself made up, but of the same materials which
separately make up the governments of the States ?

It is a very important fact, and calculated to dissipate the
fears of those who seriously apprehend danger from this
quarter, that the powers assumed and exercised by the
States over this subject, did not compose any part of the
grounds of complaint by Great Britain, when negotiating
with our government on the subject of violations of the
treaty of peace. Nor is it immaterial as an historical fact,
to show the evils against which the constitution really in-
tended to provide a remedy. Indeed, it is a solecism to sup-
pose, that the permanent laws of any government, particu-
larly those which relate to the administration of justice be-
tween individuals, can be radically unequal or even unwise.
It is scarcely ever so in despotic governments ; much less in
those in which the good of the whole is the predominating
principle. The danger to be apprehended, is from tempo-
rary provisions and desultory legislation ; and this seldom
has a view to future contracts.

At all events, whatever be the degree of evil to be pro-
duced by such laws, the limits of its action are necessarily
confined to the territory of those who inflict it. The ulti-
mate object in denying to the States this power, would seem
to be, to give the evil a wider range, if it be one, by extend-
ing the benefit of discharges over the whole of the Union

But it is impossible to suppose, that the framers of the constitution could have regarded the exercise of this power as an evil in the abstract, else they would hardly have engrafted it upon that instrument which was to become the great safeguard of public justice and public morals.

And had they been so jealous of the exercise of this power in the States, it is not credible that they would have left unimpaired those unquestionable powers over the administration of justice which the States do exercise, and which, in their immoral exercise, might leave to the creditor the mere shadow of justice. . The debtor's person, no one doubts, may be exempted from execution. But there is high precedent for exempting his lands; and public feeling would fully sustain an exemption of his slaves. What is to prevent the extension of exemption, until nothing is left but the mere mockery of a judgment, without the means of enforcing its satisfaction?

But it is not only in their execution laws, that the creditor has been left to the justice and honour of the States for his security. Every judiciary in the Union owes its existence to some legislative act; what is to prevent a repeal of that act? and then, what becomes of his remedy, if he has not access to the Courts of the Union? Or what is to prevent the extension of the right to imparl? of the time to plead? of the interval between the sittings of the State Courts? Where is the remedy against all this? and why were not these powers taken also from the States, if they could not be trusted with the subordinate and incidental power here denied them? The truth is, the Convention saw all this, and saw the impossibility of providing an adequate remedy for such mischiefs, if it was not to be found ultimately in the wisdom and virtue of the State rulers, under the salutary control of that republican form of government which it guarantees to every State. For the *foreigner* and the *citizens of other States*, it provides the safeguard of a tribunal which cannot be controlled by State laws in the application of the remedy; and for the protection of all, was interposed that oath which it requires to be administered to all the public functionaries, as well of the States as the United States. It may be called the ruling principle of

1827.

Ogden
v.
Saunders.

the constitution, to interfere as little as possible between the citizen and his own State government; and hence, with a few safeguards of a very general nature, the executive, legislative and judicial functions of the States are left as they were, as to their own citizens, and as to all internal concerns. It is not pretended that this discharge could operate upon the rights of the citizen of any other State, unless his contract was entered into in the State that gave it, or unless he had voluntarily submitted himself to the *lex fori* of the State before the discharge, in both which instances he is subjected to its effects by his own voluntary act.

For these considerations, I pronounce the exclusive power of Congress over the relief of insolvents untenable, and the dangers apprehended from the contrary doctrine unreal.

We will next inquire whether the States are precluded from the exercise of this power by that clause in the constitution, which declares that no State shall "pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

This law of the State of New-York is supposed to have violated the obligation of a contract, by releasing Ogden from a debt which he had not satisfied; and the decision turns upon the question, first, in what consists the obligation of a contract? and, secondly, whether the act of New-York will amount to a violation of that obligation, in the sense of the constitution.

The first of these questions has been so often examined and considered in this and other Courts of the United States, and so little progress has yet been made in fixing the precise meaning of the words "obligation of a contract," that I should turn in despair from the inquiry, were I not convinced that the difficulties the question presents are mostly factitious, and the result of refinement and technicality; or of attempts at definition made in terms defective both in precision and comprehensiveness. Right or wrong, I come to my conclusion on their meaning, as applied to executory contracts, the subject now before us, by a simple and short-handed exposition.

Right and obligation are considered by all ethical writers
VOL. XII. 36

as correlative terms : Whatever I by my contract give another a right to require of me, I by that act lay myself under an obligation to yield or bestow. The obligation of every contract will then consist of that right or power over my will or actions, which I, by my contract, confer on another. And that right and power will be found to be measured neither by moral law alone, nor universal law alone, nor by the laws of society alone, but by a combination of the three,—an operation in which the moral law is explained and applied by the law of nature, and both modified and adapted to the exigencies of society by positive law. The constitution was framed for society, and an advanced state of society, in which I will undertake to say that *all* the contracts of men receive a relative, and not a positive interpretation : for the rights of all must be held and enjoyed in subserviency to the good of the whole. The State construes them, the State applies them, the State controls them, and the State decides how far the social exercise of the rights they give us over each other can be justly asserted. I say the social exercise of these rights, because in a state of nature, they are asserted over a fellow creature, but in a state of society, over a fellow citizen. Yet, it is worthy of observation, how closely the analogy is preserved between the assertion of these rights in a state of nature and a state of society, in their application to the class of contracts under consideration.

Two men, A. and B., having no previous connexion with each other, (we may suppose them even of hostile nations,) are thrown upon a desert island. The first, having had the good fortune to procure food, bestows a part of it upon the other, and he contracts to return an equivalent in kind. It is obvious here, that B. subjects himself to something more than the moral obligation of his contract, and that the law of nature, and the sense of mankind, would justify A. in resorting to any means in his power to compel a compliance with this contract. But if it should appear that B., by sickness, by accident, or circumstances beyond human control, however superinduced, could not possibly comply with his contract, the decision would be otherwise, and the exercise of compulsory power over B. would be followed with the indignation of mankind. He has carried the power con-

ferred on him over the will or actions of another beyond 1827.
their legitimate extent, and done injustice in his turn.
" *Summum jus est summa injuria.*"
Ogden
v.
Saunders.
The progress of parties, from the initiation to the consummation of their rights, is exactly parallel to this in a state of society. With this difference, that in the concoction of their contracts, they are controlled by the laws of the society of which they are members; and for the construction and enforcement of their contracts, they rest upon the functionaries of its government. They can enter into no contract which the laws of that community forbid, and the validity and effect of their contracts is what the existing laws give to them. The remedy is no longer retained in their own hands, but surrendered to the community, to a power competent to do justice, and bound to discharge towards them the acknowledged duties of government to society, according to received principles of equal justice. The public duty, in this respect, is the substitute for that right which they possessed in a state of nature, to enforce the fulfilment of contracts; and if, even in a state of nature, limits were prescribed by the reason and nature of things, to the exercise of individual power in enacting the fulfilment of contracts, much more will they be in a state of society. For it is among the duties of society to enforce the rights of humanity; and both the debtor and the society have their interests in the administration of justice, and in the general good; interests which must not be swallowed up and lost sight of while yielding attention to the claim of the creditor. The debtor may plead the visitations of Providence, and the society has an interest in preserving every member of the community from despondency—in relieving him from a hopeless state of prostration, in which he would be useless to himself, his family, and the community. When that state of things has arrived in which the community has fairly and fully discharged its duties to the creditor, and in which, pursuing the debtor any longer would destroy the one, without benefitting the other, must always be a question to be determined by the common guardian of the rights of both; and in this originates the power exercised by governments in favour of insolvents.

It grows out of the administration of justice, and is a necessary appendage to it.

There was a time when a different idea prevailed, and then it was supposed that the rights of the creditor required the sale of the debtor, and his family. A similar notion now prevails on the coast of Africa, and is often exercised there by brute force. It is worthy only of the country in which it now exists, and of that state of society in which it once originated and prevailed.

" *Lex non cogit ad impossibilia,*" is a maxim applied by law to the contracts of parties in a hundred ways. And where is the objection, in a moral or political view, to applying it to the exercise of the power to relieve insolvents? It is in analogy with this maxim, that the power to relieve them is exercised; and if it never was imagined, that, in other cases, this maxim violated the obligation of contracts, I see no reason why the fair, ordinary, and reasonable exercise of it in this instance, should be subjected to that imputation.

If it be objected to these views of the subject, that they are as applicable to contracts prior to the law, as to those posterior to it, and, therefore, inconsistent with the decision in the case of *Sturges* v. *Crowninshield*, my reply is, that I think this no objection to its correctness. I entertained this opinion then, and have seen no reason to doubt it since. But if applicable to the case of prior debts, *multo fortiori,* will it be so to those contracted subsequent to such a law; the posterior date of the contract removes all doubt of its being in the fair and unexceptionable administration of justice that the discharge is awarded.

I must not be understood here, as reasoning upon the assumption that the remedy is grafted into the contract. I hold the doctrine untenable, and infinitely more restrictive on State power than the doctrine contended for by the opposite party. Since, if the remedy enters into the contract, then the States lose all power to alter their laws for the administration of justice. Yet, I freely admit, that the remedy enters into the views of the parties when contracting; that the constitution pledges the States to every creditor for the full, and fair, and candid exercise of State power to the

ends of justice, according to its ordinary administration, un-influenced by views to lighten, or lessen, or defer the obligation to which each contract fairly and legally subjects the individual who enters into it. Whenever an individual enters into a contract, I think his assent is to be inferred, to abide by those rules in the administration of justice which belong to the jurisprudence of the country of the contract. And when compelled to pursue his debtor in other States, he is equally bound to acquiesce in the law of the forum to which he subjects himself. The law of the contract remains the same every where, and it will be the same in every tribunal; but the remedy necessarily varies, and with it the effect of the constitutional pledge, which can only have relation to the laws of distributive justice known to the policy of each State severally. It is very true, that inconveniences may occasionally grow out of irregularities in the administration of justice by the States. But the citizen of the same State is referred to his influence over his own institutions for his security, and the citizens of the other States have the institutions and powers of the general government to resort to. And this is all the security the constitution ever intended to hold out against the undue exercise of the power of the States over their own contracts, and their own jurisprudence.

But, since a knowledge of the laws, policy, and jurisprudence of a State, is necessarily imputed to every one entering into contracts within its jurisdiction, of what surprise can he complain, or what violation of public faith, who still enters into contracts under that knowledge? It is no reply to urge, that, at the same time knowing of the constitution, he had a right to suppose the discharge void and inoperative, since this would be but speculating on a legal opinion, in which, if he proves mistaken, he has still nothing to complain of but his own temerity, and concerning which, all that come after this decision, at least, cannot complain of being misled by their ignorance or misapprehensions. Their knowledge of the existing laws of the State will henceforward be unqualified, and was so, in the view of the law, before this decision was made.

It is now about twelve or fourteen years since I was called

1827.

Ogden
v.
Saunders.

upon, on my circuit, in the case of *Gell, Canonge & Co.* v. *L. Jacobs*, to review all this doctrine. The cause was ably argued by gentlemen whose talents are well known in this capitol, and the opinions which I then formed, I have seen no reason since to distrust.

It appears to me, that a great part of the difficulties of the cause, arise from not giving sufficient weight to the general intent of this clause in the constitution, and subjecting it to a severe literal construction, which would be better adapted to special pleadings.

By classing bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts together, the general intent becomes very apparent; it is a general provision against arbitrary and tyrannical legislation over existing rights, whether of person or property. It is true, that some confusion has arisen from an opinion, which seems early, and without due examination, to have found its way into this Court; that the phrase "*ex post facto*," was confined to laws affecting criminal acts alone. The fact, upon examination, will be found otherwise; for neither in its signification or uses is it thus restricted. It applies to civil as well as to criminal acts, (1 *Shep. Touch.* 68. 70. 73.) and with this enlarged signification attached to that phrase, the purport of the clause would be, "*that the States shall pass no law, attaching to the acts of individuals other effects or consequences than those attached to them by the laws existing at their date ; and all contracts thus construed, shall be enforced according to their just and reasonable purport.*"

But to assign to contracts, universally, a literal purport, and to exact for them a rigid literal fulfilment, could not have been the intent of the constitution. It is repelled by a hundred examples. Societies exercise a positive control as well over the inception, construction, and fulfilment of contracts, as over the form and measure of the remedy to enforce them.

As instances of the first, take the contract imputed to the drawer of a bill, or endorser of a note, with its modifications ; the deviations of the law from the literal contract of the parties to a penal bond, a mortgage, a policy of insurance, bottomry bond, and various others that might be

enumerated. And for instances of discretion exercised in applying the remedy, take the time for which executors are exempted from suit; the exemption of members of legislatures; of judges; of persons attending Courts, or going to elections; the preferences given in the marshalling of assets; sales on credit for a present debt; shutting of Courts altogether against gaming debts and usurious contracts, and above all, *acts of limitation.* I hold it impossible to maintain the constitutionality of an act of limitation, if the modification of the remedy against debtors, implied in the discharge of insolvents, is unconstitutional. I have seen no distinction between the cases that can bear examination.

It is in vain to say that acts of limitation appertain to the remedy only: both descriptions of laws appertain to the remedy, and exactly in the same way; they put a period to the remedy, and upon the same terms, by what has been called, a *tender of paper money in the form of a plea,* and to the advantage of the insolvent laws, since if the debtor can pay, he has been made to pay. But the door of justice is shut in the face of the creditor in the other instance, without an inquiry on the subject of the debtor's capacity to pay. And it is equally vain to say, that the act of limitation raises a presumption of payment, since it cannot be taken advantage of on the general issue, without provision by statute; and the only legal form of a plea implies an acknowledgment that the debt has not been paid.

Yet so universal is the assent of mankind in favour of limitation acts, that it is the opinion of profound politicians, that no nation could subsist without one.

The right, then, of the creditor, to the aid of the public arm for the recovery of contracts, is not absolute and unlimited, but may be modified by the necessities or policy of societies. And this, together with the contract itself, must be taken by the individual. subject to such restrictions and conditions as are imposed by the laws of the country. The right to pass bankrupt laws is asserted by every civilized nation in the world. And in no writer, I will venture to say, has it ever been suggested, that the power of annulling such contracts, universally exercised under their bankrupt or insolvent systems, involves a violation of the obligation of con-

tracts. In international law, the subject is perfectly understood, and the right generally acquiesced in; and yet the denial of justice is, by the same code, an acknowledged cause of war.

But, it is contended, that if the obligation of a contract has relation at all to the laws which give or modify the remedy, then the obligation of a contract is ambulatory, and uncertain, and will mean a different thing in every State in which it may be necessary to enforce the contract.

There is no question that this effect follows; and yet, after this concession, it will still remain to be shown how any violation of the obligation of the contract can arise from that cause. It is a casualty well known to the creditor when he enters into the contract; and if obliged to prosecute his rights in another State, what more can he claim of that State, than that its Courts shall be open to him on the same terms on which they are open to other individuals? It is only by voluntarily subjecting himself to the *lex fori* of a State, that he can be brought within the provisions of its statutes in favour of debtors, since, in no other instance, does any State pretend to a right to discharge the contracts entered into in another State. He who enters into a pecuniary contract, knowing that he may have to pursue his debtor, if he flees from justice, casts himself, in fact, upon the justice of nations.

It has also been urged, with an earnestness that could only proceed from deep conviction, that insolvent laws were tender laws of the worst description, and that it is impossible to maintain the constitutionality of insolvent laws that have a future operation, without asserting the right of the States to pass tender laws, provided such laws are confined to a future operation.

Yet to all this there appears to be a simple and conclusive answer. The prohibition in the constitution to make any thing but gold or silver coin a tender in payment of debts is express and universal. The framers of the constitution regarded it as an evil to be repelled without modification: they have, therefore, left nothing to be inferred or deduced from construction on this subject. But the contrary is the fact with regard to insolvent laws; it contains no express

prohibition to pass such laws, and we are called upon here to deduce such a prohibition from a clause, which is any thing but explicit, and which already has been judicially declared to embrace a great variety of other subjects. The inquiry, then, is open and indispensable in relation to insolvent laws, prospective or retrospective, whether they do, in the sense of the constitution, violate the obligation of contracts? There would be much in the argument, if there was no express prohibition against passing tender laws; but with such express prohibition, the cases have no analogy. And, independent of the different provisions in the constitution, there is a distinction existing between tender laws and insolvent laws in their object and policy, which sufficiently points out the principle upon which the constitution acts upon them as several and distinct; a tender law supposes a capacity in the debtor to pay and satisfy the debt in some way, but the discharge of an insolvent is founded in his incapacity ever to pay, which incapacity is judicially determined according to the laws of the State that passes it. The one imports a positive violation of the contract, since all contracts to pay, not expressed otherwise, have relation to payment in the current coin of the country; the other imports an impossibility that the creditor ever can fulfil the contract.

If it be urged, that to assume this impossibility is itself an arbitrary act, that parties have in view something more than present possessions, that they look to future acquisitions, that industry, talents and integrity are as confidently trusted as property itself; and, to release them from this liability, impairs the obligation of contracts; plausible as the argument may seem, I think the answer is obvious and incontrovertible.

Why may not the community set bounds to the will of the contracting parties in this as in every other instance? That will is controlled in the instances of gaming debts, usurious contracts, marriage, brokage bonds, and various others; and why may not the community also declare that, " look to what you will, no contract formed within the territory which we govern shall be valid as against future acquisitions;" " we have an interest in the happiness, and services, and families of this community, which shall not be superseded by indi-

1827.

Ogden
v.
Saunders.

vidual views?" Who can doubt the power of the State to prohibit her citizens from running in debt altogether? A measure a thousand times wiser than that impulse to speculation and ruin, which has hitherto been communicated to individuals by our public policy. And if to be prohibited altogether, where is the limit which may not be set both to the acts and the views of the contracting parties?

When considering the first question in this cause, I took occasion to remark on the evidence of contemporaneous exposition deducible from well known facts. Every candid mind will admit that this is a very different thing from contending that the frequent repetition of wrong will create a right. It proceeds upon the presumption, that the cotemporaries of the constitution have claims to our deference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the constitution, and of the sense put upon it by the people when it was adopted by them ; and in this point of view it is obvious that the consideration bears as strongly upon the second point in the cause as on the first. For, had there been any possible ground to think otherwise, who could suppose that such men, and so many of them, acting under the most solemn oath, and generally acting rather under a feeling of jealousy of the power of the general government than otherwise, would universally have acted upon the conviction, that the power to relieve insolvents by a discharge from the debt had not been taken from the States by the article prohibiting the violation of contracts? The whole history of the times, up to a time subsequent to the repeal of the bankrupt law, indicates a settled knowledge of the contrary.

If it be objected to the views which I have taken of this subject, that they imply a departure from the direct and literal meaning of terms, in order to substitute an artificial or complicated exposition ; my reply is, that the error is on the other side ; *qui hæret in literâ, hæret in cortice.* All the notions of society, particularly in their jurisprudence, are more or less artificial ; our constitution no where speaks the language of men in a state of nature; let any one attempt a literal exposition of the phrase which immediately precedes the one un-

der consideration, I mean " *ex post facto*," and he will soon acknowledge a failure. Or let him reflect on the mysteries that hang around the little slip of paper which lawyers know by the title of a bail-piece. The truth is, that even compared with the principles of natural law, scarcely any contract imposes an obligation conformable to the literal meaning of terms. He who enters into a contract to follow the plough for the year, is not held to its literal performance, since many casualties may intervene which would release him from the obligation without actual performance. There is a very striking illustration of this principle to be found in many instances in the books; I mean those cases in which parties are released from their contracts by a declaration of war, or where laws are passed rendering that unlawful, even incidentally, which was lawful at the time of the contract. Now, in both these instances, it is the government that puts an end to the contract, and yet no one ever imagined that it thereby violates the obligation of a contract.

It is, therefore, far from being true, as a general proposition, "that a government necessarily violates the obligation of a contract, which it puts an end to without performance." It is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts.

In the effort to get rid of the universal vote of mankind in favour of limitation acts, and laws against gaming, usury, marriage, brokage, buying and selling of offices, and many of the same description, we have heard it argued, that, as to limitation acts, the creditor has nothing to complain of, because time is allowed him, of which, if he does not avail himself, it is his own neglect; and as to all others, there is no contract violated, because there was none ever incurred. But it is obvious that this mode of answering the argument involves a surrender to us of our whole ground. It admits the right of the government to limit and define the power of contracting, and the extent of the creditor's remedy against his debtor; to regard other rights besides his, and to modify his rights so as not to let them override entirely the general interests of society, the interests of the community itself in the talents and services of the debtor, the regard due to his

1827.

Ogden
v.
Saunders.

happiness, and to the claims of his family upon him and upon the government.

No one questions the duty of the government to protect and enforce the just rights of every individual over all within its control.   What we contend for is no more than this, that it is equally the duty and right of governments to impose limits to the avarice and tyranny of individuals, so as not to suffer oppression to be exercised under the semblance of right and justice.   It is true, that in the exercise of this power, governments themselves may sometimes be the authors of oppression and injustice; but, wherever the constitution could impose limits to such power, it has done so; and if it has not been able to impose effectual and universal restraints, it arises only from the extreme difficulty of regulating the movements of sovereign power; and the absolute necessity, after every effort that can be made to govern effectually, that will, still exist to leave some space for the exercise of discretion, and the influence of justice and wisdom.

Mr. Justice Thompson.   This action is founded on several bills of exchange, bearing date in September, 1806, drawn by J. Jordan, upon Ogden, the plaintiff in error, in favour of Saunders, the defendant in error.   The drawer and payee, at the date of the bills, were citizens of, and resident in, Kentucky.   Ogden was a citizen of, and resident in, New-York, where the bills were presented, and accepted by him, but were not paid when they came to maturity, and are still unpaid.   Ogden sets up, in bar of this action, his discharge under the insolvent law of the State of New-York, passed in April, 1801, as one of the revised laws of that State.   His discharge was duly obtained on the 19th of April, 1808, he having assigned all his property for the benefit of his creditors, and having, in all respects, complied with the laws of New-York for giving relief in cases of insolvency   These proceedings, according to those laws, discharged the insolvent from all debts due at the time of the assignment, or contracted for before that time, though payable afterwards, except in some specified cases, which do not affect the present question.   From this brief statement it appears, that Ogden, being sued upon his acceptances of

the bills in question, *the contract was made, and to be executed within the State of New-York,* and was made *subsequent* to the passage of the law under which he was discharged. Under these circumstances, the general question presented for decision is, whether this discharge can be set up in bar of the present suit. It is not pretended, but that if the law under which the discharge was obtained, is valid, and the discharge is to have its effect according to the provisions of that law, it is an effectual bar to any recovery against Ogden. But, it is alleged, that this law is void under the prohibition in the constitution of the United States, (art. 1. sec. 10.) which declares, that " no State shall pass any law impairing the obligation of contracts." So that the inquiry here is, whether the law of New-York, under which the discharge was obtained, is repugnant to this clause in the constitution ; and, upon the most mature consideration, I have arrived at the conclusion, that the law is not void, and that the discharge set up by the plaintiff in error is an effectual protection against any liability upon the bills in question. In considering this question, I have assumed, that the point now presented is altogether undecided, and entirely open for discussion. Although several cases have been before this Court which may have a bearing upon the question, yet, upon the argument, the particular point now raised has been treated by the counsel as still open for decision, and so considered by the Court by permitting its discussion. Although the law under which Ogden was discharged appears, by the record, to have been passed in the year 1801, yet, it is proper to notice, that this was a mere revision and re-enactment of a law which was in force as early, at least, as from the year 1788, and which has continued in force from that time to the present, (except from the 3d of April, 181 l, until the 14th of February, 1812,) in all its material provisions, which have any bearing upon the present question. To declare a law null and void after such a lapse of time, and thereby prostrate a system which has been in operation for nearly forty years, ought to be called for by some urgent necessity, and founded upon reasons and principles scarcely admitting of doubt. In our complex system of government, we must expect that questions in-

volving the jurisdictional limits between the general and State governments, will frequently arise; and they are always questions of great delicacy, and can never be met without feeling deeply and sensibly impressed with the sentiment, that this is the point upon which the harmony of our system is most exposed to interruption. Whenever such a question is presented for decision, I cannot better express my views of the leading principles which ought to govern this Court, than in the language of the Court itself in the case of *Fletcher* v. *Peck*, (6 *Cranch*, 128.) " The question (says the Court) whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom or ever be decided in the affirmative in a doubtful case. The Court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes. But, it is not on slight implication, and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other." If such be the rule by which the examination of this case is to be governed and tried, (and that it is no one can doubt,) I am certainly not prepared to say, that it is not, at least, a doubtful case, or that I feel a clear conviction that the law in question is incompatible with the constitution of the United States.

In the discussion at the bar, this has rightly been considered a question relating to the division of power between the general and State governments. And in the consideration of all such questions, it cannot be too often repeated, (although universally admitted,) or too deeply impressed on the mind, that all the powers of the general government are derived solely from the constitution ; and that whatever power is not conferred by that charter, is reserved to the States respectively, or to the people. The State of New-York, when the law in question was passed, (for I consider this a mere continuation of the Insolvent Act of 1788,) was

in the due and rightful exercise of its powers as an independent government; and unless this power has been surrendered by the constitution of the United States, it still remains in the State. And in this view, whether the law in question, be called a bankrupt or an insolvent law, is wholly immaterial; it was such a law as a sovereign State had a right to pass; and the simple inquiry is, whether that right has been surrendered. No difficulty arises here out of any inquiry about express or implied powers granted by the constitution. If the States have no authority to pass laws like this, it must be in consequence of the express provision, " that no State shall pass any law impairing the obligation of contracts."

It is admitted, and has so been decided by this Court, that a State law, discharging insolvent debtors from their contracts, entered into *antecedent* to the passing of the law, falls within this clause in the constitution, and is void. In the case now before the Court, the contract was made *subsequent* to the passage of the law; and this, it is believed, forms a solid ground of distinction, whether tested by the letter, or the spirit and policy of the prohibition. It was not denied on the argument, and, I presume, cannot be, but that a law may be void in part and good in part; or, in other words, that it may be void, so far as it has a retrospective application to past contracts, and valid, as applied prospectively to future contracts. The distinction was taken by the Court in the third Circuit, in the case of *Golden* v. *Prince*, (5 *Hall's L. J.* 502.) and which, I believe, was the first case that brought into discussion the validity of a State law analogous to the one now under consideration. It was there held, that the law was unconstitutional in relation to that particular case, because it impaired the obligation of the contract, by discharging the debtor from the payment of his debts, due or contracted for *before* the passage of the law. But it was admitted, that a law, prospective in its operation, under which a contract afterwards made might be avoided *in a way different from that provided by the parties*, would be clearly constitutional. And how is this distinction to be sustained, except on the ground that contracts are deemed to be made in reference to the existing law, and to be go-

1827.

Ogden
v.
Saunders.

1827.

Ogden
v.
Saunders.

verned, regulated, and controlled by its provisions ?   As the
question before the Court was the validity of an insolvent
law, which discharged the debtor from all contracts, the dis-
tinction must have been made in reference to the operation
of the discharge upon contracts made before, and such as
were made after the passage of the law, and is. therefore, a
case bearing directly upon the question now before the
Court.    That the power given by the constitution to Con-
gress, to establish uniform laws on the subject of bankrupt-
cies throughout the United States, does not withdraw the
subject entirely from the States, is settled by the case of
*Sturges* v. *Crowninshield,* (4 *Wheat. Rep.* 191.)   It is there
expressly held, that " until the power to pass *uniform laws*
on the subject of bankruptcies is exercised by Congress, the
States are not forbidden to pass a bankrupt law, provided it
contain no principle which violates the 10th section of the
first article of the constitution of the United States."   And
this case also decides, that the right of the States to pass
bankrupt laws is not *extinguished,* but is only *suspended* by
the enactment of a general bankrupt law by Congress, and
that a repeal of that law removes disability to the exercise
of the power by the States ; so that the question now before
the Court, is narrowed down to the single inquiry, whether
a State bankrupt law, *operating prospectively* upon contracts
made after its enactment, impairs the obligation of such
contract, within the sense and meaning of the constitution
of the United States.

    This clause in the constitution has given rise to much
discussion, and great diversity of opinion has been enter-
tained as to its true interpretation.   Its application to some
cases may be plain and palpable, to others more doubtful.
But, so far as relates to the particular question now under
consideration, the weight of judicial opinions in the State
Courts is altogether in favour of the constitutionality of the
law, so far as my examination has extended.   And, indeed,
I am not aware of a single contrary opinion.   (13 *Mass.
Rep.* 1.   16 *Johns. Rep.* 233.   7 *Johns. Ch. Rep.* 299.
5 *Binn. Rep.* 264.   5 *Hall's L. J.* 520. 6th ed. 475.  *Niles'
Reg.* 15th of September, 1821.  *Townsend* v. *Townsend.*)

    In proceeding to a more particular examination of the

true import of the clause " no State shall pass any law im-
pairing the obligation of contracts," the inquiries which
seem naturally to arise are, what is a contract, what its obli-
gation, and what may be said to impair it.   As to what con-
stitutes a contract, no diversity of opinion exists ; all the
elementary writers on the subject, sanctioned by judicial
decisions, consider it briefly and simply an agreement in
which a competent party undertakes to do, or not to do, a
particular thing ; but all know, that the agreement does not
always, nay, seldom, if ever, upon its face, specify the full
extent of the terms and conditions of the contract ; many
things are necessarily implied, and to be governed by some
rule not contained in the agreement ; and this rule can be
no other than the existing law when the contract is made, or
to be executed.   Take, for example, the familiar case of
an agreement to pay a certain sum of money, with interest.
The amount, or rate of such interest, is to be ascertained
by some standard out of the agreement, and the law pre-
sumes the parties meant the common rate of interest esta-
blished in the country where the contract was to be per-
formed.   This standard is not looked to for the purpose of
removing any doubt or ambiguity arising on the contract it-
self, but to ascertain the extent of its obligation ; or, to put
a case more analogous, suppose a statute should declare ge-
nerally, that all contracts for the payment of money should
bear interest after the day of payment fixed in the contract,
and a note, where such law was in force, should be made
payable in a given number of days after date.   Such note
would surely draw interest from the day it became payable,
although the note upon its face made no provision for inte-
rest ; and the obligation of the contract to pay the interest
would be as complete and binding as to pay the principal ;
but such would not be its operation without looking out of
the instrument itself, to the law which created the obliga-
tion to pay interest.   The same rule applies to contracts of
every description ; and parties must be understood as making
their contracts with reference to existing laws, and impliedly
assenting that such contracts are to be construed, governed,
and controlled, by such laws.   Contracts absolute, and un-

1827.

Ogden
v.
Saunders.

conditional, upon their face, are often considered subject to an implied condition which the law establishes as applicable to such cases. Suppose a State law should declare, that in all conveyances thereafter to be made, of real estate, the land should be held as security for the payment of the consideration money, and liable to be sold, in case default should be made in payment: would such a law be unconstitutional? And yet it would vary the contract from that which was made by the parties, if judged of by the face of the deed alone, and would be making a contract conditional, which the parties had made absolute, and would certainly be impairing such contract, unless it was deemed to have been made subject to the provisions of such law, and with reference thereto, and that the law was impliedly adopted as forming the obligation and terms of the contract. The whole doctrine of the *lex loci* is founded on this principle.

The language of the Court, in the third Circuit, in the case of *Campanque* v. *Burnell*, (1 *Washington C. C. Rep.* 341.) is very strong on this point. Those laws, say the Court, which in any manner affect the contract, whether in its *construction, the mode of discharging it*, or which control the *obligation* which the contract imposes, are essentially incorporated with the contract itself. The contract is a law which the parties impose upon themselves, subject, however, to the paramount law—the law of the country where the contract is made. And when to be enforced by foreign tribunals, such tribunals aim only to give effect to the contracts, according to the laws which gave them validity. So, also, in this Court, in the case of *Renner* v. *the Bank of Columbia*, (9 *Wheat. Rep.* 586.) the language of the Court is to the same effect, and shows that we may look out of the contract, to any known law or custom, with reference to which the parties may be presumed to have contracted, in order to ascertain their intention, and the legal, and binding force, and obligation of their contract. The *Bank of Columbia* v. *Oakley*, (4 *Wheat. Rep.* 235.) is another case recognising the same principle. And in the case of *Dartmouth College* v. *Woodward*, (4 *Wheat. Rep.* 695.) it is well observed by one of the judges of this Court, "that all contracts recognised as valid in any

country, obtain their *obligation* and construction *jure loci contractus*." And this doctrine is universally recognised, both in the English and American Courts.

If contracts are not made with reference to existing laws, and to be governed and regulated by such laws, the agreement of parties, under the extended construction now claimed for this clause in the constitution, may control State laws on the subject of contracts altogether. A parol agreement for the sale of land is a contract, and if the agreement alone makes the contract, and it derives its obligation solely from such agreement, without reference to the existing law, it would seem to follow, that any law which had declared such contract void, or had denied a remedy for breach thereof, would impair its obligation. A construction involving such consequences is certainly inadmissible. Any contract not sanctioned by existing laws creates no civil obligation ; and any contract discharged in the mode and manner provided by the existing law where it was made, cannot, upon any just principles of reasoning, be said to impair such contract.

It will, I believe, be found on examination, that the course of legislation in some of the States between debtor and creditor, which formed the grounds of so much complaint, and which probably gave rise to this prohibition in the constitution, consisted principally, if not entirely, of laws having a retrospective operation upon antecedent debts.

If a contract does not derive its obligation from the positive law of the country where it is made, where is to be found the rule, that such obligation does not attach until the contracting party has attained a certain age ? In what code of natural law, or in what system of universal law, out of which it is said, at the bar, spring the eternal and unalterable principles of right and of justice, will be found a rule, that such obligation does not attach so as to bind a party under the age of twenty-one years ? No one will pretend, that a law exonerating a party from contracts entered into before arriving at such age, would be invalid. And yet, it would impair the obligation of the contract, if such obligation is derived from any other source than the existing law of the place where made. Would it not be within the legi-

1827.

Ogden
v.
Saunders.

timate powers of a State legislature to declare prospectively that no one should be made responsible, upon contracts entered into before arriving at the age of *twenty-five* years. This, I presume, cannot be doubted. But, to apply such a law to past contracts, entered into when *twenty-one* years was the limit, would clearly be a violation of the obligation of the contract. No such distinction, however, could exist, unless the obligation of the contract grows out of the existing law, and with reference to which the contract must be deemed to have been made.

The true import of the term *obligation*, as used in the constitution, may admit of some doubt. That it refers to the civil, or legal, and not moral obligation, is admitted by all. But whether the remedy upon the contract is entirely excluded from the operation of this provision, is a point on which some diversity of opinion has been entertained.

That it is not intended to interfere with or limit State legislation, in relation to the remedy, in the ordinary prosecution of suits, no one can doubt. And, indeed, such a principle is indispensable to facilitate commercial intercourse between the citizens or subjects of different governments, and is sanctioned by all civilized nations; and if, according to the language of these cases, this principle extends to the *obligation*, as well as the construction of contracts, it would seem to follow, as a necessary conclusion, that it must embrace all the consequences growing out of the laws of the country where the contract is made; for it is the law which creates the obligation, and whenever, therefore, the *lex loci* provides for the dissolution of the contract in any prescribed mode, the parties are presumed to have acted subject to such contingency. And hence, in the English Courts, wherever the operation of a foreign discharge under a bankrupt law has been brought under consideration, they have given to it the same effect that it would have had in the country where the contract was made. And the same rule has been recognised and adopted in the Courts of this country almost universally, where the question has arisen. But whether a law might not so change the nature and extent of existing remedies, and thereby so materially impair the right, as to fall within the scope

of this prohibition, if it extended to remedies upon antecedent contracts, is by no means clear. If the law, whatever it may be, relating to the remedy, has a prospective operation only, no objection can arise to it under this clause in the constitution. It is a question that must rest in the sound discretion of the State legislature. But men, when entering into contracts, can hardly be presumed entirely regardless of the remedy which the law provides in case of a breach of the contract; and the means of obtaining satisfaction for such breach enters essentially into consideration in making the contract. If, at the time of making the contract, it be known, that the person only of the debtor, and not his property, or his personal property only, and not his lands, or a certain part of either, is to be resorted to for satisfaction, no ground of complaint can exist, the contract having been made with full knowledge of all these things; but if, at the time the contract is made, not only the person, but all the property, both real and personal, of the debtor, might be resorted to for satisfaction, and a law should be passed, placing beyond the reach of the creditor the whole, or the principal part, of the debtor's property, it would be difficult to sustain the constitutionality of such a law. The statute of limitations is conceded to relate to the remedy. Suppose, when a contract was made, the limitation was six years, and it should be reduced to six months, or any shorter period, and applied to antecedent contracts, would it not be repugnant to the constitution? But if the legislature of a State should choose to adopt, prospectively, six months as the limitation, who could question the authority so to do? And suppose, further, that the unconstitutionality of the law in question is admitted, could the State of New-York pass a law limiting the right of recovery against any insolvent who had been duly discharged according to the provisions of the insolvent act, to ten days from the passage of such law? And yet this would be a statute of limitation, and affect the remedy only. The law now in question is nothing more than taking away all remedy; and whether it be the whole, or some material part thereof, would seem to differ in degree only, and not in principle: and if to have a retrospective opera-

1827.

Ogden
v.
Saunders,

tion, might well be considered as falling within the spirit and policy of the prohibition.

In the case of *Sturges* v. *Crowninshield,* the Court, in explaining the meaning of the terms " obligation of a contract," say, " A contract is an agreement in which a party undertakes to do, or not to do, a particular thing. *The law binds him to perform his undertaking, and this is, of course, the obligation of his contract.*" That is, as I understand it, *the law of the contract forms its obligation;* and if so, the contract is fulfilled, and its obligation discharged by complying with whatever the existing law required in relation to such contract; and it would seem to me to follow, that if the law, looking to the contingency of the debtor's becoming unable to pay the whole debt, should provide for his discharge on payment of a part, this would enter into the law of the contract, and the obligation to pay would, of course, be subject to such contingency.

It is unnecessary, however, on the present occasion, to attempt to draw, with precision, the line between the right and the remedy, or to determine whether the prohibition in the constitution extends to the former, and not to the latter, or whether, to a certain extent, it embraces both; for the law in question strikes at the very root of the cause of action, and takes away both right and remedy, and the question still remains, does the prohibition extend to a State bankrupt or insolvent law, like the one in question, when applied to contracts entered into subsequent to its passage. Whether this is technically a bankrupt or an insolvent law, is of little importance. Its operation, if valid, is to discharge the debtor absolutely from all future liability on surrendering up his property, and, in that respect, is a bankrupt law, according to the universal understanding in England, where a bankrupt system is in operation. It is not, however, limited to *traders,* but extends to every class of citizens; and, in this respect, is more analogous to the English insolvent laws, which only authorize the discharge of the debtor from imprisonment.

If this provision in the constitution was unambiguous, and its meaning entirely free from doubt, there would be no door left open for construction, or any proper ground upon which

the intention of the framers of the constitution could be inquired into : this Court would be bound to give to it its full operation, whatever might be the views entertained of its expediency    But the diversity of opinion entertained of its construction, will fairly justify an inquiry into the intention, as well as the reason and policy of the provision ; all which, in my judgment, will warrant its being confined to laws affecting contracts. made antecedent to the passage of such laws.   Such would appear to be the plain and natural interpretation of the words, " no State shall pass any law impairing the obligation of contracts."

The law must have a present effect upon some contract in existence, to bring it within the plain meaning of the language employed.   There would be no propriety in saying, that a law impaired, or in any manner whatever modified or altered, what did not exist.   The most obvious and natural application of the words themselves, is to laws having a retrospective operation upon existing contracts ; and this construction is fortified by the associate prohibitions, " no State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."   The two first are confessedly restricted to retrospective laws, concerning crimes and penalties affecting the personal security of individuals.   And no good reason is perceived why the last should not be restricted to retrospective laws, relating to private rights growing out of the contracts of parties.   The one provision is intended to protect the person of the citizen from punishment criminally for any act not unlawful when committed ; and the other to protect the rights of property, as secured by contracts sanctioned by existing laws.   No one supposes that a State legislature is under any restriction in declaring, prospectively, any acts criminal which its own wisdom and policy may deem expedient.   And why not apply the same rule of construction and operation to the other provision relating to the rights of property?   Neither provision can strictly be considered as introducing any new principle, but only for greater security and safety to incorporate into this charter provisions admitted by all to be among the first principles of our government.   No State Court would, I presume. sanction and enforce an *ex post facto* law : if no

such prohibition was contained in the constitution of the United States; so, neither would retrospective laws. taking away vested rights, be enforced.   Such laws are repugnant to those fundamental principles. upon which every just system of laws is founded.  It is an elementary principle adopted and sanctioned by the Courts of justice in this country, and in Great Britain, whenever such laws have come under consideration, and yet retrospective laws are clearly within this prohibition.   It is, therefore, no objection to the view I have taken of this clause in the constitution, that the provision was unnecessary. The great principle asserted, no doubt, is, as laid down by the Court in *Sturges* v. *Crowninshield*, *the inviolability* of contracts ; and this principle is fully maintained by confining the prohibition to laws affecting antecedent contracts.   It is the same principle, we find, cotemporaneously, (13th July, 1787, 1 *L. U. S.* 475.) asserted by the old Congress, in an ordinance for the government of the territory of the United States north-west of the river Ohio. By one of the fundamental articles it is provided, that " in the just preservation of *rights and property*, it is understood and declared that no law ought ever to be made, or have force in the territory, that shall in any manner whatever interfere with or affect private contracts or engagements, *bona fide*, and without fraud, *previously* made," thereby pointedly making a distinction between laws affecting contracts antecedently, and subsequently made ; and such a distinction seems to me to be founded upon the soundest principles of justice, if there is any thing in the argument, that contracts are made with reference to, and derive their obligation from the existing law.

That the prohibition upon the States to pass laws impairing the obligation of contracts is applicable to private rights merely, without reference to bankrupt laws, was evidently the understanding of those distinguished commentators on the constitution, who wrote the Federalist.  In the 44th number of that work (p. 281.) it is said, that " bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation.   The two former are expressly prohibited by the declarations pre

fixed to some of the State constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional defences against these dangers ought not to be omitted. Very properly, therefore, have the Convention added this constitutional bulwark in favour of *personal security* and *private rights*." Had it been supposed that this restriction had for its object the taking from the States the right of passing insolvent laws, even when they went to discharge the contract, it is a little surprising that no intimation of its application to that subject should be found in these commentaries upon the constitution. And it is still more surprising, that if it had been thought susceptible of any such interpretation, that no objection should have been made in any of the States to the constitution on this ground, when the ingenuity of man was on the stretch in many States to defeat its adoption ; and particularly in the State of New-York, where the law now in question was in full force at the very time the State Convention was deliberating upon the adoption of the constitution. But if the prohibition is confined to retrospective laws, as it naturally imports, it is not surprising that it should have passed without objection, as it is the assertion of a principle universally approved.

It was pressed upon the Court with great confidence, and, as it struck me at the time, with much force, that if this restriction could not reach laws existing at the time the contract was made, State legislatures might evade the prohibition (immediately preceding) to make any thing but gold and silver a tender in payment of debts, by making the law prospective in its operation, and applicable to contracts thereafter to be made. But on reflection, I think, no such consequences are involved. When we look at the whole clause in which these restrictions are contained, it will be seen, that the subjects embraced therein are evidently to be divided into two classes ; the one of a public and national character, the power over which is entirely taken away from the States; and the other relating to private and personal rights, upon which the States may legislate under the restrictions specified. The former are, " no State shall enter any into treaty, alliance, or confederation, grant

<div style="text-align: right">1827.

Ogden
v.
Saunders.</div>

letters of marque and reprisal, coin money, emit bills of credit." Thus far there can be no question, that they relate to powers of a general and national character. The next in order is, or "make any thing but gold and silver a tender in payment of debts;" this is founded upon the same principles of public and national policy, as the prohibition to coin money and emit bills of credit, and is so considered in the commentary on this clause in the number of the Federalist I have referred to. It is there said, the power to make any thing but gold and silver a tender in payment of debts, is withdrawn from the States, on the same principles with that of issuing a paper currency. All these prohibitions, therefore, relate to powers of a public nature, and are general and universal in their application, and inseparably connected with national policy. The subject matter is entirely withdrawn from State authority and State legislation. But the succeeding prohibitions are of a different character; they relate to personal security and private rights, viz. or " pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." The subject matter of such laws is not withdrawn from the States; but the legislation thereon must be under the restriction therein imposed. States may legislate on the subject of contracts, but the laws must not impair the obligation of such contracts. A tender of payment necessarily refers to the time when the tender is made, and has no relation to the time when the law authorizing it shall be passed, or when the debt was contracted. The prohibition is, therefore, general and unlimited in its application. It has been urged in argument, that this prohibition to the States to pass laws impairing the obligation of contracts, had in view an object of great national policy, connected with the power to regulate commerce ; that the leading purpose was to take from the States the right of passing bankrupt laws. And to illustrate and enforce this position, this clause has been collated with that which gives to Congress the power of passing uniform laws on the subject of bankruptcies; and by transposition of the clause, the constitution is made to read, Congress shall have power to establish uniform laws on the subject of bankruptcies throughout the United States : but no State

shall pass any law impairing the obligation of contracts; and this prohibition is made to mean, no State shall pass any bankrupt law.

No just objection can be made to this collocation, if the grant of the power to Congress, and the prohibition in question to the States, relate to the same subject matter, viz. bankrupt laws. But it appears to me very difficult to maintain this proposition. It is, in the first place, at variance with the decision in *Sturges* v. *Crowninshield,* where it is held, that this power is not taken from the States absolutely, but only in a limited and modified sense. And in the next place, it is not reasonable to suppose, that a denial of this power to the States, would have been couched in such ambiguous terms, if, as has been contended, the giving to Congress the exclusive power to pass bankrupt laws, was the great and leading object of this prohibition, and the preservation of private rights followed only as an incident of minor importance, it is difficult to assign any satisfactory reason, why the denial of the power to the States was not expressed in plain and unambiguous terms, viz. no State shall pass any bankrupt law. This would have been a more natural, and, certainly, a less doubtful form of expression; and, besides, if the object was to take from the States altogether the right of passing bankrupt laws, or insolvent laws having the like operation, why did not the denial of the power extend also to naturalization laws? The grant of the power to Congress on this subject, is contained in the same clause, and substantially in the same words, " To establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States." If the authority of Congress on the subject of naturalization is exclusive, from the nature of the power, why is it not, also, with respect to bankruptcies? And if, in the one case, the denial of the power to the States was necessary, it was equally so in the other. I cannot think, therefore, that the prohibition to pass laws impairing the obligation of contracts, had any reference to a general system of bankrupt or insolvent laws. Such a system, established by the sovereign legislative power of the general, or State governments, cannot, in any just sense, be said to

impair the obligation of contracts. In every government of laws there must be a power somewhere to regulate civil contracts; and where, under our system, is that power vested? It must be either in the general or State governments. There is certainly no such power granted to the general government, and all power not granted is reserved to the States. The whole subject, therefore, of the regulation of contracts must remain with the States, and be governed by their laws respectively; and to deny to them the right of prescribing the terms and conditions upon which persons shall be bound by their contracts thereafter made, is imposing upon the States a limitation, for which I find no authority in the constitution; and no contract can impose a civil obligation beyond that prescribed by the existing law when the contract was made; nor can such obligation be impaired by controlling and discharging the contract according to the provisions of such law. Suppose a contract for the payment of money should contain an express stipulation by the creditor to accept a proportional part, in case the debtor should become insolvent, and to discharge the contract, can there be a doubt that such contract would be enforced? And what is the law in question but such contract, when applied to the undertaking of Ogden by accepting these bills. It is no strained construction of the transaction, to consider the contract and the law inseparable, when judging of the *obligation* imposed upon the debtor; and, if so, the undertaking was conditional, and the holder of the bills agreed to accept a part in case of the inability of the acceptor, by reason of his insolvency, to pay the whole.

The unconstitutionality of this law is said to arise from its exempting the property of the insolvent, acquired after his discharge, from the payment of his antecedent debts. A discharge of the person of the debtor is admitted to be no violation of the contract. If this objection is well founded, it must be on the ground, that the obligation of every contract attaches upon the property of the debtor, and any law exonerating it, violates this obligation. I do not mean that the position implies a lien by way of mortgage, or pledge, on any specific property, but that all the property which a debtor has, when called upon for payment, is liable to be

taken in execution to satisfy the debt, and that a law re-
leasing any portion of it impairs the obligation of the con-
tract.   The force and justice of this position, when applied
to contracts existing at the time the law is passed, is not
now drawn in question.   But its correctness, when applied
to contracts thereafter made, is denied.   The mode, and
manner, and the extent to which property may be taken in
satisfaction of debts, must be left to the sound discretion of
the legislature, and regulated by its views of policy and ex-
pediency, in promoting the general welfare of the commu-
nity, subject to such regulation.   It was the policy of the
common law, under the feudal system, to exempt lands alto-
gether from being seized, and applied in satisfaction of
debts; not even possession could be taken from the tenant.
There can be no natural right growing out of the relation of
debtor and creditor, that will give the latter an unlimited
claim upon the property of the former.   It is a matter en-
tirely for the regulation of civil society ; nor is there any
fundamental principle of justice, growing out of such rela-
tion, that calls upon government to enforce the payment of
debts to the uttermost farthing which the debtor may
possess; and that the modification and extent of such lia-
bility, is a subject within the authority of State legislation,
seems to be admitted by the uninterrupted exercise of it.   I
have not deemed it necessary to look into the statute books
of all the States on this subject, but think it may be safely
affirmed, that in most, if not all the States, some limitation
of the right of the creditor, over the property of the debt-
or, has been established.   In New-York, various articles of
personal property are exempted from execution.   In Rhode
Island, real estate cannot at all be taken on judicial proces:
for satisfaction of a debt, so long as the body of the debtor
is to be found within the State ; and Virginia has adopted
the English process of elegit, and a moiety only of the
debtor's freehold is delivered to the creditor, until, out of
the rents and profits thereof, the debt is paid.   Do these
statute regulations impair the obligation of contracts?   I
presume this will not be contended for ; and yet they would
seem to me to fall within the principle urged on the part of
the defendant in error.

It is no satisfactory answer to say, that such laws relate to the remedy. The principle asserted is, that the creditor has a right to his debtor's property by virtue of the obligation of the contract, to the full satisfaction of the debt; and if so, a law, which in any shape exempts any portion of it, must impair the obligation of the contract. Such a limitation and restriction upon the powers of the State governments cannot, in my judgment, be supported, under the prohibition to pass laws impairing the obligation of contracts.

If the letter of the constitution does not imperiously demand a construction which denies to the States the power of passing insolvent laws like the one in question, policy and expediency require a contrary construction. Although there may be some diversity of opinion as to the policy of establishing a general bankrupt system in the United States, yet it is generally admitted that such laws are useful, if not absolutely necessary, in a commercial community. That it was the opinion of the framers of the constitution, that the power to pass bankrupt laws ought somewhere to exist, is clearly inferrable from the grant of such power to Congress. A contrary conclusion would involve the greatest absurdity. The specific power, however, granted to Congress, never did, nor never could, exist in the State governments. That power is to establish *uniform laws* on the subject of bankruptcies throughout the United States, which could only be done by a government having co-extensive jurisdiction. Congress not having as yet deemed it expedient to exercise the power of re-establishing a uniform system of bankruptcy, affords no well-founded argument against the expediency or necessity of such a system in any particular State. A bankrupt law is most necessary in a commercial community; and as different States in this respect do not stand on the same footing, a system which might be adapted to one, might not suit all, which would naturally present difficulties in forming any uniform system; and Congress may, as heretofore, deem it expedient to leave each State to establish such system as shall best suit its own local circumstances and views of policy, knowing, at the same time, that if any great public inconvenience shall grow out of the different State laws, the evils

may be corrected by establishing a uniform system, according to the provision of the constitution, which will suspend the State laws on the subject. If such should be the views entertained by Congress, and induce them to abstain from the exercise of the power, the importance to the State of New-York, as well as other States, of establishing the validity of laws like the one in question, is greatly increased. The long continuance of it there, clearly manifests the views of the State legislature with respect to the policy and expediency of the law. And I cannot but feel strongly impressed, that the length of time which this law has been in undisputed operation, and the repeated sanction it has received from every department of the government, ought to have great weight when judging of its constitutionality.

The provisions of the 61st section of the bankrupt law of 1800, appear to me to contain a clear expression of the opinion of Congress in favour of the validity of this, and similar laws in other States. It cannot be presumed they were ignorant of the existence of these laws, or their extent and operation. And, indeed, the section expressly assumes the existence of such laws, by declaring that this act shall not repeal or annul the laws of any State now in force, or which may be *thereafter* enacted for the relief of insolvent debtors, except so far as the same may affect *persons within the purview of the bankrupt act;* and even with respect to such persons, it provides that, if the creditors shall not prosecute a commission of bankruptcy within a limited time, they shall be entitled to relief under the State laws for the relief of insolvent debtors. And what relief did such laws give? Was it merely from imprisonment only? Certainly not. The State laws here ratified and sanctioned, or, at least, some of them, were such as had the full effect and operation of a bankrupt law, to wit: to discharge the debtor absolutely from all future responsibility. It is true, if these laws were unconstitutional and void, this section of the bankrupt law could give them no validity. But it is not in this light the argument is used. The reference is only to show the sense of Congress with respect to the validity of such laws; and, if it is fair to presume Congress was acquainted with the extent and operation of these laws, this clause is a direct affirmation of their validi-

ty. For it cannot be presumed that body would have expressly ratified and sanctioned laws which they considered unconstitutional.

In the case of *Sturges* v. *Crowninshield*, as I have before remarked, it is said, that by this prohibition (Art. 1. sec. 10.) in the constitution, the Convention appears to have intended to establish a great principle, " *that contracts should be inviolable.*" This was certainly, though a great, yet not a *new* principle. It is a principle inherent in every sound and just system of laws, independent of express constitutional restraints. And if the assertion of this principle was the object of the clause, (as I think it was,) is it reasonable to conclude, that the framers of the constitution supposed that a bankrupt or insolvent law, like the one in question, would violate this principle? Can it be supposed that the constitution would have reserved the right, and impliedly enjoined the duty upon Congress to pass a bankrupt law, if it had been thought that such law would violate this great principle? If the discharge of a party from the performance of his contracts, when he has, by misfortunes, become incapable of fulfilling them, is a violation of the eternal and unalterable principles of justice, growing out of what has been called at the bar the universal law, can it be, that a power, drawing after it such consequences, has been recognised and reserved in our constitution? Certainly not. And is the discharge of a contract any greater violation of those sacred principles in a State legislature, than in that of the United States? No such distinction will be pretended. But a bankrupt or insolvent law involves no such violation of the great principles of justice, and this is not the light in which it always has been, and ought to be, considered. Such law, in its principle and object, has in view the benefit of both debtor and creditor, and is no more than the just exercise of the sovereign legislative power of the government to relieve a debtor from his contracts, when necessity, and unforeseen misfortunes, have rendered him incapable of performing them; and whether this power is to be exercised by the States individually, or by the United States, can make no difference in principle. In a government like ours. where sovereignty, to a modified extent,

exists both in the States, and in the United States. It was, in the formation of the constitution, a mere question of policy and expediency, where this power should be exercised; and there can be no question, but that, so far as respects a bankrupt law, properly speaking, the power ought to be exercised by the general government. It is naturally connected with commerce, and should be uniform throughout the United States. A bankrupt system deals with commercial men, but this affords no reason why a State should not exercise its sovereign power in relieving the necessities of men who do not fall within the class of traders, and who, from like misfortune, have become incapable of performing their contracts.

1827.

Ogden
v.
Saunders.

Without questioning the constitutional power of Congress to extend a bankrupt law to all classes of debtors, the expediency of such a measure may well be doubted. There is not the same necessity of uniformity of system, as to other classes than traders; their dealings are generally local, and different considerations of policy may influence different States on this subject; and should Congress pass a bankrupt law confined to traders, it would still leave the insolvent law of New-York in force as to other classes of debtors, subject to such alteration as that State shall deem expedient.

Upon the whole, therefore, it having been settled by this Court, that the States have a right to pass bankrupt laws, provided they do not violate the prohibition against impairing the obligation of contracts; and believing, as I do, for the reasons I have given, that the insolvent law in question, by which a debtor obtains a discharge from all future responsibility, upon contracts entered into after the passage of the law, and before his discharge, does not impair the obligation of his contracts; I am of opinion, that the judgment of the Court below ought to be reversed.

Mr. Justice TRIMBLE. The question raised upon the record in this case, and which has been discussed at the bar, may be stated thus: Has a State, since the adoption of the constitution of the United States, authority to pass a bank-

rupt or insolvent law, discharging the bankrupt or insolvent from all contracts made within the State after the passage of the law, upon the bankrupt or insolvent surrendering his effects, and obtaining a certificate of discharge from the constituted authorities of the State?

The counsel for the defendant in error have endeavoured to maintain the negative of the proposition, on two grounds:

First. That the power conferred on Congress by the constitution, " to establish uniform laws on the subject of bankruptcies throughout the United States," is, in its nature, an exclusive power; that, consequently, no State has authority to pass a bankrupt law; and that the law under consideration is a bankrupt law.

Secondly. That it is a law impairing the obligation of contracts, within the meaning of the constitution.

In the case of *Sturges* v. *Crowninshield*, (4 *Wheat. Rep.* 122.) this Court expressly decided, " that since the adoption of the constitution of the United States, a State has authority to pass a bankrupt law, provided such law does not impair the obligation of contracts, within the meaning of the constitution, and provided there be no act of Congress in force to establish a uniform system of bankruptcy conflicting with such law."

This being a direct judgment of the Court, overruling the first position assumed in argument, that judgment ought to prevail, unless it be very clearly shown to be erroneous.

Not having been a member of the Court when that judgment was given, I will content myself with saying, the argument has not convinced me it is erroneous; and that, on the contrary, I think the opinion is fully sustained by a sound construction of the constitution.

There being no act of Congress in force to establish a uniform system of bankruptcy, the first ground of argument must fail.

It is argued, that the law under consideration is a law impairing the obligation of contracts within the meaning of the constitution. The 10th section of the 1st art. of the constitution is in these words: " no State shall enter into any treaty, alliance, or confederation, grant letters of marque and reprisal; coin money; emit bills of credit; make any

thing but gold and silver coin a tender in payment of debts; pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts; or grant any title of nobility."

In the case of *Sturges* v. *Crowninshield,* the defendant in the original suit had been discharged in New York, under an insolvent law of that State, which purported to apply to past as well as future contracts; and being sued on a contract made within the State prior to the passage of the law, he pleaded his certificate of discharge in bar of the action. In answer to the 3d and 4th questions, certified from the Circuit Court to this Court for its final decision, drawing in question the constitutionality of the law, and the sufficiency of the plea in bar founded upon it, this Court certified its opinion, " that the act of New-York, pleaded in this case, so far as it attempts to discharge the contract on which this suit was instituted, is a law impairing the obligation of contracts, within the meaning of the constitution of the United States; and that the plea of the defendant is not a good and sufficient bar of the plaintiff's action."

In the case of *M'Millan* v. *M'Neal,* (4 *Wheat. Rep.* 209.) the defendant in the Court below pleaded a discharge obtained by him in Louisiana, on the 23d of August, 1815, under the insolvent law of that State, passed in 1808, in bar of a suit instituted against him upon a contract made in South Carolina, in the year 1813. This Court decided that the plea was no bar to the action; and affirmed the judgment given below for the plaintiff.

These cases do not decide the case at bar. In the first, the discharge was pleaded in bar to a contract made prior to the passage of the law; and in the second, the discharge in one State under its laws, was pleaded to a contract made in another State. They leave the question open, whether a discharge obtained in a State, under an insolvent law of the State, is a good bar to an action brought on a contract made within the State after the passage of the law.

In presenting this inquiry, it is immaterial whether the law purports to apply to past as well as future contracts, or is wholly prospective in its provisions.

It is not the terms of the law, but its effect, that is inhibited by the constitution.   A law may be in part constitutional, and in part unconstitutional.   It may, when applied to a given case, produce an effect which is prohibited by the constitution; but it may not, when applied to a case differently circumstanced, produce such prohibited effect.   Whether the law under consideration, in its effects and operation upon the contract sued on in this case, be a law impairing the obligation of this contract, is the only necessary inquiry.

In order to come to a just conclusion, we must ascertain, if we can, the sense in which the terms, "obligation of contracts," is used in the constitution.   In attempting to do this, I will premise, that in construing an instrument of so much solemnity and importance, effect should be given, if possible, to every word.   No expression should be regarded as a useless expletive; nor should it be supposed, without the most urgent necessity, that the illustrious framers of that instrument had, from ignorance or inattention, used different words, which are, in effect, merely tautologous.

I understand it to be admitted in argument, and if not admitted, it could not be reasonably contested, that, in the nature of things, there is a difference between a *contract*, and the *obligation* of the contract.   The terms contract, and obligation, although sometimes used loosely as convertible terms do not properly impart the same idea.   The constitution plainly presupposes that a contract and its obligation are different things.   Were they the same thing, and the terms, contract and obligation convertible, the constitution, instead of being read as it now is, " that no State shall pass any law impairing the obligation of contracts," might, with the same meaning, be read, " that no State shall pass any law impairing the *obligation* of *obligations*," or, " the contract of contracts;" and to give to the constitution the same meaning which either of these readings would import, would be ascribing to its framers a useless and palpably absurd tautology.   The illustrious framers of the constitution could not be ignorant that there were, or might be, many contracts without obligation, and many obligations without contracts.  " A contract is defined to be, an agreement in which a par-

ty undertakes to do, or not to do, a particular thing." *Sturges* v. *Crowninshield*, (4 *Wheat. Rep.* 197.)

This definition is sufficient for all the purposes of the present investigation, and its general accuracy is not contested by either side.

From the very terms of the definition, it results incontestibly, that the contract is the sole act of the parties, and depends wholly on their will. The same words, used by the same parties, with the same objects in view, would be the same contract, whether made upon a desert island, in London, Constantinople, or New-York. It would be the *same contract*, whether the law of the place where the contract was made, recognised its validity, and furnished remedies to enforce its performance, or prohibited the contract, and withheld all remedy for its violation.

The language of the constitution plainly supposes that the *obligation* of a contract is something not wholly depending upon the will of the parties. It incontestibly supposes the obligation to be something which attaches to, and lays hold of the contract, and which, by some superior external power, regulates and controls the conduct of the parties in relation to the contract; it evidently supposes that superior external power to rest in the will of the legislature.

What, then, is the obligation of contracts, within the meaning of the constitution? From what source does that obligation arise?

The learned Chief Justice, in delivering the opinion of the Court in *Sturges* v. *Crowninshield*, after having defined a contract to be " an agreement wherein a party undertakes to do, or not to do, a particular thing," proceeds to define the obligation of the contract in these words : " the *law* binds him to perform his engagement, and *this* is, of course, the obligation of the contract."

The *Institutes*, lib. 3. tit. 4. (Cooper's translation,) says, " an obligation is the *chain of the law*, by which we are necessarily bound to make some payment, according to the law of the land."

*Pothier*, in his treatise concerning obligations, in speaking of the obligation of contracts, calls it " *vinculum legis*," the chain of the law. *Paley*, p. 56. says, " to be obliged, is

to be urged by a violent motive, resulting from the command of another." From these authorities, and many more might be cited, it may be fairly concluded, that the obligation of the contract consists in the *power and efficacy* of the law which applies to, and enforces performance of the contracts, or the payment of an equivalent for non-performance. The obligation does not inhere, and subsist in the contract itself, *proprio vigore*, but in the law applicable to the contract. This is the sense, I think, in which the constitution uses the term " obligation."

From what law, and how, is this obligation derived, within the meaning of the constitution? Even if it be admitted that the moral law necessarily attaches to the agreement, that would not bring it within the meaning of the constitution. Moral obligations are those arising from the admonitions of conscience and accountability to the Supreme Being. No human lawgiver can impair them. They are entirely foreign from the purposes of the constitution. The constitution evidently contemplates an obligation which might be impaired by a law of the State, if not prohibited by the constitution.

It is argued, that the obligation of contracts is founded in, and derived from, general and universal law; that, by these laws, the obligation of contracts is co-extensive with the duty of performance, and, indeed, the same thing; that the obligation is not derived from, nor depends upon, the civil or municipal laws of the State; and that this general universal duty, or obligation, is what the constitution intends to guard and protect against the unjust encroachments of State legislation. In support of this doctrine, it is said, that no State, perhaps, ever declared by statute or positive law that contracts shall be obligatory; but that all States, assuming the pre-existence of the obligation of contracts, have only superadded, by municipal law, the means of carrying the pre-existing obligation into effect.

This argument struck me, at first, with great force; but, upon reflection, I am convinced it is more specious than solid. If it were admitted, that, in an enlarged and very general sense, obligations have their foundation in natural, or what is called, in the argument, universal law; that this

natural obligation is, in the general, assumed by States as pre-existing, and, upon this assumption, they have not thought it necessary to pass declaratory laws in affirmance of the principles of universal law : yet nothing favourable to the argument can result from these admissions, unless it be further admitted, or proved, that a State has no authority to regulate, alter, or in any wise control, the operation of this universal law within the State, by its own peculier municipal enactions.    This is not admitted, and, I think, cannot be proved.

I admit that men have, by the laws of nature, the right of acquiring, and possessing property, and the right of contracting engagements.   I admit, that these natural rights have their correspondent natural obligations.   I admit, that in a state of nature, when men have not submitted themselves to the controlling authority of civil government, the natural obligation of contracts is co-extensive with the duty of performance.   This natural obligation is founded solely in the principles of natural or universal law.   What is this natural obligation?   All writers who treat on the subject of obligations, agree, that it consists in the right of the one party, to demand from the other party what is due; and if it be withheld, in his right, and supposed capacity to enforce performance, or to take an equivalent for non-performance, by his own power.   This natural obligation exists among sovereign and independent States and nations, and amongst men, in a State of nature, who have no common superior, and over whom none claim, or can exercise, a controlling legislative authority.

But when men form a social compact, and organize a civil government, they necessarily surrender the regulation and control of these natural rights and obligations into the hands of the government.   Admitting it, then, to be true, that, in general, men derive the right of private property, and of contracting engagements, from the principles of natural, universal law; admitting that these rights are, in the general, not derived from, or created by society, but are brought into it; and that no express, declaratory, municipal law, be necessary for their creation or recognition; yet, it is equally true, that these rights, and the obligations result-

<div align="right">1827.<br>Ogden<br>v.<br>Saunders.</div>

ing from them, are subject to be regulated, modified, and, sometimes, absolutely restrained, by the positive enactions of municipal law. I think it incontestibly true, that the *natural* obligation of *private* contracts between individuals in society, ceases, and is converted into a *civil* obligation, by the very act of surrendering the right and power of enforcing performance into the hands of the government. The right and power of enforcing performance exists, as I think all must admit, only in the law of the land, and the obligation resulting from this condition is a civil obligation.

As, in a state of nature, the natural obligation of a contract consists in the right and potential capacity of the individual to take, or enforce the delivery of the thing due to him by the contract, or its equivalent; so, in the social state, the obligation of a contract consists in the efficacy of the civil law, which attaches to the contract, and enforces its performance, or gives an equivalent in lieu of performance. From these principles it seems to result as a necessary corollary, that the obligation of a contract made within a sovereign State, must be precisely that allowed by the law of the State, and none other. I say *allowed*, because, if there be nothing in the municipal law to the contrary, the civil obligation being, by the very nature of government, substituted for, and put in the place of, natural obligation, would be co-extensive with it; but if by positive enactions, the civil obligation is regulated and modified so as that it does not correspond with the natural obligation, it is plain the extent of the obligation must depend wholly upon the municipal law. If the positive law of the State declares the contract shall have no obligation, it can have no obligation, whatever may be the principles of natural law in relation to such a contract. This doctrine has been held and maintained by all States and nations. The power of controlling, modifying, and even of taking away, all obligation from such contracts as, independent of positive enactions to the contrary, would have been obligatory, has been exercised by all independent sovereigns; and it has been universally held, that the Courts of one sovereign will, upon principles of comity and common justice, enforce contracts made within the dominions of another sovereign, so far as they were obligatory by the

law of the country where made ; but no instance is recol-
lected, and none is believed to exist, where the Courts of
one sovereign have held a contract, made within the domi-
nions of another, obligatory against, or beyond the obliga-
tion assigned to it by the municipal law of its proper coun-
try. As a general proposition of law, it cannot be main-
tained, that the obligation of contracts depends upon, and
is derived from, universal law, independent of, and against,
the civil law of the State in which they are made. In relation
to the States of this Union, I am persuaded, that the position
that the obligation of contracts is derived from universal law,
urged by the learned counsel in argument, with great force,
has been stated by them much too broadly. If true, the
States can have no control over contracts. If it be true
that the " obligation of contracts," within the meaning of
the constitution, is derived solely from general and uni-
versal law, independent of the laws of the State, then it
must follow, that all contracts made in the same or similar
terms, must, whenever, or wherever made, have the same
obligation. If this universal natural obligation is that in-
tended by the constitution, as it is the same, not only every
where, but at all times, it must follow, that every description
of contract which could be enforced, at any time or place,
upon the principles of universal law, must, necessarily, be
enforced at all other times, and in every State, upon the
same principles, in despite of any positive law of the State
to the contrary.

The arguments, based on the notion of the obligation of
universal law, if adopted, would deprive the States of all
power of legislation upon the subject of contracts, other
than merely furnishing the remedies or means of carrying
this obligation of universal law into effect. I cannot be-
lieve that such consequences were intended to be produced
by the constitution.

I conclude, that, so far as relates to private contracts be-
tween individual and individual, it is the civil obligation of
contracts ; that obligation which is recognised by, and re-
sults from, the law of the State in which the contract is
made, which is within the meaning of the constitution. If

1827.

Ogden
v.
Saunders.

so, it follows, that the States have, since the adoption of the constitution, the authority to prescribe and declare, by their laws, prospectively, what shall be the obligation of all contracts made within them.   Such a power seems to be almost indispensable to the very existence of the States, and is necessary to the safety and welfare of the people.   The whole frame and theory of the constitution seems to favour this construction.   The States were in the full enjoyment and exercise of all the powers of legislation on the subject of contracts, before the adoption of the constitution.   The people of the States, in that instrument, transfer to, and vest in the Congress, no portion of this power, except in the single instance of the authority given to pass uniform laws on the subject of bankruptcies throughout the United States; to which may be added, such as results by necessary implication in carrying the granted power into effect.   The whole of this power is left with the States, as the constitution found it, with the single exception, that in the exercise of their general authority they shall pass no law "impairing the obligation of contracts."

The construction insisted upon by those who maintain that prospective laws of the sort now under consideration are unconstitutional, would, as I think, transform a special limitation upon the general powers of the States, into a general restriction.   It would convert, by construction, the exception into a general rule, against the best settled rules of construction.   The people of the States, under every variety of change of circumstances, must remain unalterably, according to this construction, under the dominion of this supposed universal law, and the obligations resulting from it. Upon no acknowledged principle can a special exception, out of a general authority, be extended by construction so as to annihilate or embarrass the exercise of the general authority.   But, to obviate the force of this view of the subject, the learned counsel admit, that the legislature of a State has authority to provide by law what contracts shall not be obligatory, and to declare that no remedy shall exist for the enforcement of such as the legislative wisdom deems injurious.   They say, the obligation of a contract is coeval with its existence; that the moment an agreement is made,

obligation attaches to it; and they endeavour to maintain a distinction between such laws as declare that certain contracts shall not be obligatory at all, and such as declare they shall not be obligatory, or (what is the same thing in effect) shall be discharged, upon the happening of a future event. The former, they say, were no contracts in contemplation of law, were wholly forbidden, and, therefore, never obligatory; the latter were obligatory at their creation, and that *obligation* is protected by the constitution from being impaired by any future operation of the law.

1827.

Ogden
v.
Saunders.

This course of reasoning is ingenious and perplexing; but I am greatly mistaken if it will not be found, upon examination, to be unsatisfactory and inconclusive. If it were admitted, that, generally, the civil obligation of a contract made in a State attaches to it when it is made, and that this obligation, whatever it be, cannot be defeated by any effect or operation of law, which does not attach to it at its creation, the admission would avail nothing. It is as well a maxim of political law, as of reason, that the whole must necessarily contain all the parts; and, consequently, a power competent to declare a contract shall have no obligation, must necessarily be competent to declare it shall have only a conditional or qualified obligation.

If, as the argument admits, a contract never had any obligation, because the pre-existing law of the State, declaring it should have none, attached to it at the moment of its creation, why will not a pre-existing law, declaring it shall have only a qualified obligation, attach to it in like manner at the moment of its creation? A law, declaring that a contract shall not be enforced, upon the happening of a future event, is a law declaring the contract shall have only a qualified or conditional obligation. If such law be passed before the contract is made, does not the same attach to it the moment it is made; and is not the obligation of the contract, whatever may be its terms, qualified from the beginning by force and operation of the existing law? If it is not, then it is absolute in despite of the law, and the obligation does not result from the law of the land, but from some other law.

The passing of a law declaring that a contract shall have *no obligation* or shall have obligation generally but cease to

1827.

Ogden
v.
Saunders.

be obligatory in specified events. is but the exertion of the same power. The difference exists, not in the character of the power, but the degree of its exertion, and the manner of its operation.

In the case at bar, the contract was made in the State, and the law of the State at the time it was made, in effect, provided that the obligation of the contract should not be absolute, but qualified by the condition that the party should be discharged upon his becoming insolvent, and complying with the requisitions of the insolvent law. This qualification attached to the contract, by law, the moment the contract was made, became inseparable from it, and travelled with it through all its stages of existence, until the condition was consummated by the final certificate of discharge.

It is argued that this cannot be so, because the contract would be enforced, and must necessarily be enforced, in other States, where no such insolvent law exists. This argument is founded upon a misapprehension of the nature of the qualification itself. It is in nature of a condition subsequent, annexed by operation of law to the contract at the moment of its creation.

The condition is, that upon the happening of all the events contemplated by the law, and upon their verification, in the manner prescribed by the law itself, by the constituted authorities of the State, the contract shall not thereafter be obligatory. Unless all these take place; unless the discharge is actually obtained within the State, according to its laws, the contingency has not happened, and the contract remains obligatory, both in the State and elsewhere.

It has been often said, that the laws of a State in which a contract is made, enter into, and make part of the contract; and some who have advocated the constitutionality of prospective laws of the character now under consideration, have placed the question on that ground. The advocates of the other side, availing themselves of the infirmity of this argument, have answered triumphantly, "admitting this to be so, the constitution is the supreme law of every State, and must, therefore, upon the same principle, enter into every contract. and overrule the local laws." My answer to this

view of both sides of the question is, that the argument, and the answer to it, are equally destitute of truth.

I have already shown that the contract is nothing but the agreement of the parties; and that if the parties, in making their agreement, use the same words, with the same object in view, where there is no law, or where the law recognises the agreement, and furnishes remedies for its enforcement, or where the law forbids, or withholds all remedy for the enforcement of the agreement, it is the very same contract in all these predicaments. I have endeavoured to show, and I think successfully, that the obligation of contracts, in the sense of the constitution, consists not in the contract itself, but in a superior external force, controlling the conduct of the parties in relation to the contract; and that this superior external force is the law of the State, either tacitly or expressly recognising the contract, and furnishing means whereby it may be enforced. It is this superior external force, existing potentially, or actually applied, "which binds a man to perform his engagements;" which, according to Justinian, is "the chain of the law, by which we are necessarily bound to make some payment—*according to the law of the land;*" and which, according to Paley, being "a violent motive, resulting from the command of another," obliges the party to perform his contract. The law of the State, although it constitutes the obligation of the contract, is no part of the contract itself; nor is the constitution either a part of the contract, or the supreme law of the State, in the sense in which the argument supposes. The constitution is the supreme law of the land upon all subjects upon which it speaks. It is the sovereign will of the whole people. Whatever this sovereign will enjoins, or forbids, must necessarily be supreme, and must counteract the subordinate legislative will of the United States, and of the States.

But on subjects, in relation to which the sovereign will is not declared, or fairly and necessarily implied, the constitution cannot, with any semblance of truth, be said to be the supreme law. It could not, with any semblance of truth, be said that the constitution of the United States is the supreme law of any State in relation to the solemnities requisite for conveying real estate, or the responsibilities or obligations

consequent upon the use of certain words in such convey-
ance. The constitution contains *no law*, no declaration of
the sovereign will, upon these subjects ; and cannot, in the
nature of things, in relation to them, be the supreme law.
Even if it were true, then, that the law of a State in which a
contract is made, is part of the contract, it would not be
true that the constitution would be part of the contract.
The constitution no where professes to give the law of
contracts, or to declare what shall or shall not be the
obligation of contracts. It evidently presupposes the ex-
istence of contracts by the act of the parties, and the exist-
ence of their obligation, not by authority of the constitution,
but by authority of law ; and the pre-existence of both the
contracts and their obligation being thus supposed, the sove-
reign will is announced, that "no State shall pass any law
impairing the obligation of contracts."

If it be once ascertained that a contract existed, and that
an obligation, general or qualified, of whatsoever kind, had
once attached, or belonged to the contract, by law, then, and
not till then, does the supreme law speak; by declaring *that*
obligation shall not be impaired.

It is admitted in argument, that statutes of frauds and
perjuries, statutes of usury, and of limitation, are not
laws impairing the obligation of contracts. They are laws
operating prospectively upon contracts thereafter made.
It is said, however, they do not apply, in principle, to this
case ; because the statutes of frauds and perjuries apply only
to the remedies, and because, in that case, and under the
statutes of usury, the contracts were void from the begin-
ning, were not recognised by law as contracts, and had no
obligation ; and that the statutes of limitation create rules
of evidence only.

Although these observations are true, they do not furnish
the true reason, nor, indeed, any reason, why these laws do
not impair the obligation of contracts. The true and only
reason is, that they operate on contracts made after the pas-
sage of the laws, and not upon existing contracts. And
hence the Chief Justice very properly remarks, of both
usury laws, and laws of limitation, in delivering the opinion
in *Sturges* v. *Crowninshield*, that if they should be made to

operate upon contracts already entered into. they would be unconstitutional and void. If a statute of frauds and perjuries should pass in a State formerly having no such laws, purporting to operate upon existing contracts, as well as upon those made after its passage, could it be doubted, that so far as the law applied to, and operated upon, existing contracts, it would be a law " impairing the obligation of contracts ?" Here, then, we have the true reason and principle of the constitution. The great principle intended to be established by the constitution, was the inviolability of the *obligation* of contracts, as the obligation existed and was recognised by the laws in force at the time the contracts were made. It furnished to the legislatures of the States a simple and obvious rule of justice, which, however theretofore violated, should, by no means, be thereafter violated ; and whilst it leaves them at full liberty to legislate upon the subject of all future contracts, and assign to them either no obligation, or such qualified obligation as, in their opinion, may consist with sound policy, and the good of the people ; it prohibits them from retrospecting upon existing obligations, upon any pretext whatever. Whether the law professes to apply to the contract itself, to fix a rule of evidence, a rule of interpretation, or to regulate the remedy, it is equally within the true meaning of the constitution, if it, in effect, impairs the obligation of existing contracts; and, in my opinion, is out of its true meaning, if the law is made to operate on future contracts only. I do not mean to say. that every alteration of the existing remedies would impair the obligation of contracts ; but I do say, with great confidence, that a law taking away all remedy from existing contracts, would be, manifestly, a law impairing the obligation of contracts. The moral obligation would remain, but the legal, or civil obligation, would be gone, if such a law should be permitted to operate. The natural obligation would be gone, because the laws forbid the party to enforce performance by his own power. On the other hand, a great variety of instances may readily be imagined, in which the legislature of a State might alter, modify, or repeal existing remedies, and enact others in their stead without the slightest ground for a supposition

1827.

Ogden
v.
Saunders.

that the new law impaired the obligation of contracts. If there be intermediate cases of a more doubtful character, it will be time enough to decide them when they arise.

It is argued, that as the clause declaring that " no State shall pass any law impairing the obligation of contracts," is associated in the same section of the constitution with the prohibition to " coin money, emit bills of credit," or " make any thing but gold and silver coin a legal tender in payment of debts ;" and as these all evidently apply to legislation in reference to future, as well as existing contracts, and operate prospectively, to prohibit the action of the law, without regard to the time of its passage, the same construction should be given to the clause under consideration.

This argument admits of several answers. First, as regards the prohibition to coin money, and emit bills of credit. The constitution had already conferred on Congress the whole power of coining money, and regulating the current coin. The grant of this power to Congress, and the prohibitions upon the States, evidently take away from the States all power of legislation and action on the subject, and must, of course, apply to the future action of laws, either then made, or to be made. Indeed, the language plainly indicates, that it is the *act* of " coining money," and the *act* of emitting bills of credit, which is forbidden, without any reference to the time of passing the law, whether before or after the adoption of the constitution. The other prohibition, to " make any thing but gold or silver coin a tender in payment of debts," is but a member of the same subject of currency committed to the general government, and prohibited to the States. And the same remark applies to it already made as to the other two. The prohibition is not, that no State shall *pass* any law ; but that even if a law does exist, the " State shall not make any thing but gold and silver coin a legal tender." The language plainly imports, that the prohited tender shall not be made a *legal* tender, whether a law of the State exists or not. The whole subject of tender, except in gold and silver, is withdrawn from the States. These cases cannot, therefore, furnish a sound rule of interpretation for that clause which prohibits the States from *passing* laws " impairing the obligation of contracts." This

clause relates to a subject confessedly left wholly with the
States, with a single exception; they relate to subjects
wholly withdrawn from the States, with the exception that
they may pass laws on the subject of tender in gold and
silver coin only.

The principle, that the association of one clause with
another of like kind, may aid in its construction, is deemed
sound; but I think it has been misapplied in the argument.
The principle applied to the immediate associates of the
words under consideration, is, I think, decisive of this ques-
tion.    The immediate associates are the prohibitions to pass
bills of attainder, and *ex post facto* laws.    The language
and order of the whole clause is, no State shall " pass any
bill of attainder, *ex post facto* law, or law impairing the
obligation of contracts."    If the maxim *noscitur a sociis*,
be applied to this case, there would seem to be an end of
the question.    The two former members of the clause un-
deniably prohibit retroactive legislation upon the existing
state of things, at the passage of the prohibited laws.    The
associated idea is, that the latter member of the same clause
should have a similar effect upon the subject matter to which
it relates.    I suppose this was the understanding of the
American people when they adopted the constitution.    I
am justified in this supposition by the contemporary con-
struction given to the whole of this clause by that justly
celebrated work, styled the Federalist, written at the time,
for the purpose of recommending the constitution to the
favour and acceptance of the people.    In No. 44. (p. 281.)
commenting upon this very clause, and all its members, the
following observations are made: " Bills of attainder, *ex
post facto* laws, and laws impairing the obligation of con-
tracts, are contrary to the first principles of the social com-
pact, and to every principle of sound legislation.    The two
former are expressly prohibited by the declarations prefixed
to some of the State constitutions, and all of them are pro-
hibited by the spirit and scope of these fundamental char-
ters."

Did the American people believe, could they believe,
these heavy denunciations were levelled against laws which

1827.

Ogden
v.
Saunders.

fairly prescribed, and plainly pointed out, to the people, rules for their *future* conduct; and the rights, duties and obligations, growing out of their future words or actions? They must have understood, that these denunciations were just, as regarded bills of attainder, and *ex post facto* laws, because they were exercises of arbitrary power, perverting the justice and order of existing things by the reflex action of these laws. And would they not naturally and necessarily conclude, the denunciations were equally just as regarded laws passed to impair the obligation of existing contracts, for the same reason?

The writer proceeds: " Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the Convention added this constitutional bulwark in favour of personal security and private rights; and I am much deceived, if they have not, in so doing, as faithfully consulted the genuine sentiments, as the undoubted interests of their constituents. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret, and with indignation, that sudden changes, and legislative interferences, in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators; and snares to the more industrious and less informed part of the community. They have seen, too, that one legislative interference is but the link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding. They very rightly infer, therefore, that some thorough reform is wanting, which will banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society."

I cannot understand this language otherwise than as putting bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, all upon the same footing, and deprecating them all for the same cause. The language shows, clearly, that the whole clause was understood at the time of the adoption of the constitution to have been introduced into the instrument in the very same spirit, and for the very same purpose, namely, for the protection of per-

sonal security and of private rights. The language repels the idea, that the member of the clause immediately under consideration was introduced into the constitution upon any grand principle of national policy, independent of the protection of private rights, so far as such an idea can be repelled, by the total omission to suggest any such independent grand principle of national policy, and by placing it upon totally different ground.

It proves that the sages who formed and recommended the constitution to the favour and adoption of the American people, did not consider the protection of private *rights*, more than the protection of personal security, as too insignificant for their serious regard, as was urged with great earnestness in argument. In my judgment, the language of the authors of the Federalist proves that they, at least, understood, that the protection of personal security, and of private rights, from the despotic and iniquitous operation of retrospective legislation, was, itself, and alone, the grand principle intended to be established. It was a principle of the utmost importance to a free people, about to establish a national government, " to establish justice," and, " to secure to themselves and their posterity the blessings of liberty." This principle is, I think, fully and completely sustained by the construction of the constitution which I have endeavoured to maintain.

In my judgment, the most natural and obvious import of the words themselves, prohibiting the passing of laws " impairing the obligation of contracts ;" the natural association of that member of the clause with the two immediately preceding members of the same clause, forbidding the passing of " bills of attainder," and " *ex post facto* laws ;" the consecutive order of the several members of the clause; the manifest purposes and objects for which the whole clause was introduced into the constitution, and the cotemporary exposition of the whole clause, all warrant the conclusion, that a State has authority, since the adoption of the constitution, to pass a law, whereby a contract made within the State, after the passage of the law, may be discharged, upon the party obtaining a certificate of discharge, as an insolvent, in the manner prescribed by the law of the State.

1827.

Ogden
v.
Saunders.

Mr. Chief Justice Marshall. It is well known that the Court has been divided in opinion on this case. Three Judges, Mr. Justice Duvall, Mr. Justice Story, and myself, do not concur in the judgment which has been pronounced. We have taken a different view of the very interesting question which has been discussed with so much talent, as well as labour, at the bar, and I am directed to state the course of reasoning on which we have formed the opinion that the discharge pleaded by the defendant is no bar to the action.

The single question for consideration, is, whether the act of the State of New-York is consistent with or repugnant to the constitution of the United States?

This Court has so often expressed the sentiments of profound and respectful reverence with which it approaches questions of this character, as to make it unnecessary now to say more than that, if it be right that the power of preserving the constitution from legislative infraction, should reside any where, it cannot be wrong, it must be right, that those whom the delicate and important duty is conferred should perform it according to their best judgment.

Much, too, has been said concerning the principles of construction which ought to be applied to the constitution of the United States.

On this subject, also, the Court has taken such frequent occasion to declare its opinion, as to make it unnecessary, at least, to enter again into an elaborate discussion of it. To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers;—is to repeat what has been already said more at large, and is all that can be necessary.

As preliminary to a more particular investigation of the clause in the constitution, on which the case now under consideration is supposed to depend, it may be proper to in-

quire how far it is affected by the former decisions of this Court.

In *Sturges* v. *Crowninshield*, it was determined, that an act which discharged the debtor from a contract entered into previous to its passage, was repugnant to the constitution. The reasoning which conducted the Court to that conclusion might, perhaps, conduct it farther ; and with that reasoning, (for myself alone this expression is used,) I have never yet seen cause to be dissatisfied. But that decision is not supposed to be a precedent for *Ogden* v. *Saunders*, because the two cases differ from each other in a material fact ; and it is a general rule, expressly recognised by the Court in *Sturges* v. *Crowninshield*, that the positive authority of a decision is co-extensive only with the facts on which it is made. In *Sturges* v. *Crowninshield*, the law acted on a contract which was made before its passage ; in this case, the contract was entered into after the passage of the law

In *M·Neil* v. *M·Millan*, the contract, though subsequent to the passage of the act, was made in a different State, by persons residing in that State, and, consequently, without any view to the law, the benefit of which was claimed by the debtor.

The *Farmers' and Mechanics' Bank of Pennsylvania* v. *Smith* differed from *Sturges* v. *Crowninshield* only in this, that the plaintiff and defendant were both residents of the State in which the law was enacted, and in which it was applied. The Court was of opinion that this difference was unimportant.

It has then been decided, that an act which discharges the debtor from pre-existing contracts is void ; and that an act which operates on future contracts is inapplicable to a contract made in a different State, at whatever time it may have been entered into.

Neither of these decisions comprehends the question now presented to the Court. It is, consequently, open for discussion.

The provision of the constitution is, that " no State shall pass any law" " impairing the obligation of contracts." The plaintiff in error contends that this provision inhibits the passage of retrospective laws only—of such as act on con-

tracts in existence at their passage.   The defendant in er-
ror maintains that it comprehends all future laws, whether
prospective or retrospective, and withdraws every contract
from State legislation; the obligation of which has become
complete.

That there is an essential difference in principle between
laws which act on past, and those which act on future con-
tracts; that those of the first description can seldom be jus-
tified, while those of the last are proper subjects of ordinary
legislative discretion, must be admitted.   A constitutional
restriction, therefore, on the power to pass laws of the one
class, may very well consist with entire legislative freedom
respecting those of the other.   Yet, when we consider
the nature of our Union; that it is intended to make us,
in a great measure, one people, as to commercial ob-
jects; that, so far as respects the intercommunication of
individuals, the lines of separation between States are, in
many respects, obliterated; it would not be matter of sur-
prise, if, on the delicate subject of contracts once formed,
the interference of State legislation should be greatly
abridged, or entirely forbidden.   In the nature of the pro-
vision, then, there seems to be nothing which ought to in-
fluence our construction of the words; and, in making that
construction, the whole clause, which consists of a single
sentence, is to be taken together, and the intention is to be
collected from the whole.

The first paragraph of the tenth section of the first article,
which comprehends the provision under consideration, con-
tains an enumeration of those cases in which the action of
the State legislature is entirely prohibited.   The second
enumerates those in which the prohibition is modified.   The
first paragraph, consisting of total prohibitions, comprehends
two classes of powers.   Those of the first are political and
general in their nature, being an exercise of sovereignty
without affecting the rights of individuals.   These are, the
powers " to enter into any treaty, alliance, or confederation;
grant letters of marque or reprisal, coin money, emit bills
of credit."

The second class of prohibited laws comprehends those
whose operation consists in their action on individuals,

'These are, laws which make any thing but gold and silver coin a tender in payment of debts, bills of attainder, *ex post facto* laws, or laws impairing the obligation of contracts, or which grant any title of nobility.

In all these cases, whether the thing prohibited be the exercise of mere political power, or legislative action on individuals, the prohibition is complete and total. There is no exception from it. Legislation of every description is comprehended within it. A State is as entirely forbidden to pass laws impairing the obligation of contracts, as to make treaties, or coin money. The question recurs, what is a law impairing the obligation of contracts?

In solving this question, all the acumen which controversy can give to the human mind, has been employed in scanning the whole sentence, and every word of it. Arguments have been drawn from the context, and from the particular terms in which the prohibition is expressed, for the purpose, on the one part, of showing its application to all laws which act upon contracts, whether prospectively or retrospectively; and, on the other, of limiting it to laws which act on contracts previously formed.

The first impression which the words make on the mind, would probably be, that the prohibition was intended to be general. A contract is commonly understood to be the agreement of the parties; and, if it be not illegal, to bind them to the extent of their stipulations. It requires reflection, it requires some intellectual effort, to efface this impression, and to come to the conclusion, that the words contract and obligation, as used in the constitution, are not used in this sense. If, however, the result of this mental effort, fairly made, be the correction of this impression, it ought to be corrected.

So much of this prohibition as restrains the power of the States to punish offenders in criminal cases, the prohibition to pass bills of attainder and *ex post facto* laws, is, in its very terms, confined to pre-existing cases. A bill of attainder can be only for crimes already committed; and a law is not *ex post facto*, unless it looks back to an act done before its passage. Language is incapable of expressing, in plainer terms, that the mind of the Convention was directed to re-

troactive legislation.  The thing forbidden is retroaction.
But that part of the clause which relates to the civil trans-
actions of individuals, is expressed in more general terms;
in terms which comprehend, in their ordinary signification,
cases which occur after, as well as those which occur before,
the passage of the act.   It forbids a State to make any
thing but gold and silver coin a tender in payment of debts,
or to pass any law impairing the obligation of contracts.
These prohibitions relate to kindred subjects.   They con-
template legislative interference with private rights, and re-
strain that interference.   In construing that part of the
clause which respects tender laws, a distinction has never
been attempted between debts existing at the time the law
may be passed, and debts afterwards created.   The prohi-
bition has been considered as total; and yet the difference
in principle between making property a tender in payment
of debts, contracted after the passage of the act, and dis-
charging those debts without payment, or by the surrender
of property, between an absolute right to tender in pay-
ment, and a contingent right to tender in payment, or in dis-
charge of the debt, is not clearly discernible.   Nor is the
difference in language so obvious, as to denote plainly a diffe-
rence of intention in the framers of the instrument.    " No
State shall make any thing but gold and silver coin a tender
in payment of debts."  Does the word " debts" mean, gene-
rally, those due when the law applies to the case, or is it
limited to debts due at the passage of the act?   The same
train of reasoning which would confine the subsequent
words to contracts existing at the passage of the law, would
go far in confining these words to debts existing at that time.
Yet, this distinction has never, we believe, occurred to any
person.   How soon it may occur is not for us to determine.
We think it would, unquestionably, defeat the object of the
clause.

   The counsel for the plaintiff insist, that the word " im-
pairing," in the present tense, limits the signification of the
provision to the operation of the act at the time of its pas-
sage; that no law can be accurately said to impair the obli-
gation of contracts, unless the contracts exist at the time.

The law cannot impair what does not exist. It cannot act on nonentities.

There might be weight in this argument, if the prohibited laws were such only as operated of themselves, and immediately on the contract. But insolvent laws are to operate on a future, contingent, unforeseen event. The time to which the word " impairing" applies, is not the time of the passage of the act, but of its action on the contract. That is, the time present in contemplation of the prohibition. The law, at its passage, has no effect whatever on the contract. Thus, if a note be given in New-York for the payment of money, and the debtor removes out of that State into Connecticut, and becomes insolvent, it is not pretended that his debt can be discharged by the law of New-York. Consequently, that law did not operate on the contract at its formation. When, then, does its operation commence? We answer, when it is applied to the contract. Then, if ever, and not till then, it acts on the contract, and becomes a law impairing its obligation. Were its constitutionality, with respect to previous contracts, to be admitted, it would not impair their obligation until an insolvency should take place, and a certificate of discharge be granted. Till these events occur, its impairing faculty is suspended. A law, then, of this description, if it derogates from the obligation of a contract, when applied to it, is, grammatically speaking, as much a law impairing that obligation, though made previous to its formation, as if made subsequently.

A question of more difficulty has been pressed with great earnestness. It is, what is the original obligation of a contract, made after the passage of such an act as the insolvent law of New-York? Is it unconditional to perform the very thing stipulated, or is the condition implied, that, in the event of insolvency, the contract shall be satisfied by the surrender of property? The original obligation, whatever that may be, must be preserved by the constitution. Any law which lessens, must impair it.

All admit, that the constitution refers to, and preserves, the legal, not the moral obligation of a contract. Obliga-

Vol. XII.                    43

tions purely moral, are to be enforced by the operation of internal and invisible agents, not by the agency of human laws. The restraints imposed on States by the constitution, are intended for those objects which would, if not restrained, be the subject of State legislation. What, then, was the original legal obligation of the contract now under the consideration of the Court?

The plaintiff insists, that the law enters into the contract so completely as to become a constituent part of it. That it is to be construed as if it contained an express stipulation to be discharged, should the debtor become insolvent, by the surrender of all his property for the benefit of his creditors, in pursuance of the act of the legislature.

This is, unquestionably, pressing the argument very far; and the establishment of the principle leads inevitably to consequences which would affect society deeply and seriously.

Had an express condition been inserted in the contract, declaring that the debtor might be discharged from it at any time by surrendering all his property to his creditors, this condition would have bound the creditor. It would have constituted the obligation of his contract; and a legislative act annulling the condition would impair the contract. Such an act would, as is admitted by all, be unconstitutional, because it operates on pre-existing agreements. If a law authorizing debtors to discharge themselves from their debts by surrendering their property, enters into the contract, and forms a part of it, if it is equivalent to a stipulation between the parties, no repeal of the law can affect contracts made during its existence. The effort to give it that effect would impair their obligation. The counsel for the plaintiff perceive, and avow this consequence, in effect, when they contend, that to deny the operation of the law on the contract under consideration, is to impair its obligation. Are gentlemen prepared to say, that an insolvent law, once enacted, must, to a considerable extent, be permanent? That the legislature is incapable of varying it so far as respects existing contracts?

So, too, if one of the conditions of an obligation for the payment of money be, that on the insolvency of the obli-

gor, or on any event agreed on by the parties, he should be at liberty to discharge it by the tender of all, or part of his property, no question could exist respecting the validity of the contract, or respecting its security from legislative interference. If it should be determined, that a law authorizing the same tender, on the same contingency, enters into, and forms a part of the contract, then, a tender law, though expressly forbidden, with an obvious view to its prospective, as well as retrospective operation, would, by becoming the contract of the parties, subject all contracts made after its passage to its control. If it be said, that such a law would be obviously unconstitutional and void, and, therefore, could not be a constituent part of the contract, we answer, that if the insolvent law be unconstitutional, it is equally void, and equally incapable of becoming, by mere implication, a part of the contract. The plainness of the repugnancy does not change the question. That may be very clear to one intellect, which is far from being so to another. The law now under consideration is, in the opinion of one party, clearly consistent with the constitution, and, in the opinion of the other, as clearly repugnant to it. We do not admit the correctness of that reasoning which would settle this question by introducing into the contract a stipulation not admitted by the parties.

This idea admits of being pressed still farther. If one law enters into all subsequent contracts, so does every other law which relates to the subject. A legislative act, then, declaring that all contracts should be subject to legislative control, and should be discharged as the legislature might prescribe, would become a component part of every contract, and be one of its conditions. Thus, one of the most important features in the constitution of the United States, one which the state of the times most urgently required, one on which the good and the wise reposed confidently for securing the prosperity and harmony of our citizens, would lie prostrate, and be construed into an inanimate, inoperative, unmeaning clause.

Gentlemen are struck with the enormity of this result, and deny that their principle leads to it. They distinguish, or attempt to distinguish, between the incorporation of a

general law, such as has been stated, and the incorporation of a particular law, such as the insolvent law of New-York, into the contract.    But will reason sustain this distinction ? They say, that men cannot be supposed to agree to so indefinite an article as such a general law would be, but may well be supposed to agree to an article, reasonable in itself, and the full extent of which is understood.

But the principle contended for does not make the insertion of this new term or condition into the contract, to depend upon its reasonableness.    It is inserted because the legislature has so enacted.    If the enactment of the legislature becomes a condition of the contract because it is an enactment, then it is a high prerogative, indeed, to decide, that one enactment shall enter the contract, while another, proceeding from the same authority, shall be excluded from it.

The counsel for the plaintiff illustrates and supports this position by several legal principles, and by some decisions of this Court, which have been relied on as being applicable to it.

The first case put is, interest on a bond payable on demand, which does not stipulate interest.    This, he says, is not a part of the remedy, but a new term in the contract.

Let the correctness of this averment be tried by the course of proceeding in such cases.

The failure to pay, according to stipulation, is a breach of the contract, and the means used to enforce it constitute the remedy which society affords the injured party.    If the obligation contains a penalty, this remedy is universally so regulated that the judgment shall be entered for the penalty, to be discharged by the payment of the principal and interest. But the case on which counsel has reasoned is a single bill. In this case, the party who has broken his contract is liable for damages.    The proceeding to obtain those damages is as much a part of the remedy as the proceeding to obtain the debt.    They are claimed in the same declaration, and as being distinct from each other.    The damages must be assessed by a jury ; whereas, if interest formed a part of the debt, it would be recovered as part of it.    The declaration would claim it as a part of the debt; and yet, if a suitor were to declare on such a bond as containing this new term

for the payment of interest, he would not be permitted to give a bond in evidence in which this supposed term was not written. Any law regulating the proceedings of Courts on this subject, would be a law regulating the remedy.

The liability of the drawer of a bill of exchange, stands upon the same principle with every other implied contract. He has received the money of the person in whose favour the bill is drawn, and promises that it shall be returned by the drawee. If the drawee fail to pay the bill, then the promise of the drawer is broken, and for this breach of contract he is liable. The same principle applies to the endorser. His contract is not written, but his name is evidence of his promise that the bill shall be paid, and of his having received value for it. He is, in effect, a new drawer, and has made a new contract. The law does not require that this contract shall be in writing; and, in determining what evidence shall be sufficient to prove it, does not introduce new conditions not actually made by the parties. The same reasoning applies to the principle which requires notice. The original contract is not written at large. It is founded on the acts of the parties, and its extent is measured by those acts. A. draws on B. in favour of C., for value received. The bill is evidence that he has received value, and has promised that it shall be paid. He has funds in the hands of the drawer, and has a right to expect that his promise will be performed. He has, also, a right to expect notice of its non-performance, because his conduct may be materially influenced by this failure of the drawee. He ought to have notice that *his* bill is disgraced, because this notice enables him to take measures for his own security. It is reasonable that he should stipulate for this notice, and the law presumes that he did stipulate for it.

A great mass of human transactions depends upon implied contracts; upon contracts which are not written, but which grow out of the acts of the parties. In such cases, the parties are supposed to have made those stipulations, which, as honest, fair, and just men, they ought to have made. When the law assumes that they have made these stipulations, it does not vary their contract, or introduce new terms into it, but declares that certain acts, unexplained by compact, im-

pose certain duties, and that the parties had stipulated for their performance. The difference, is obvious between this and the introduction of a new condition into a contract drawn out in writing. in which the parties have expressed every thing that is to be done by either.

The usage of banks, by which days of grace are allowed on notes payable and negotiable in bank, is of the same character. Days of grace, from their very term, originate partly in convenience, and partly in the indulgence of the creditor. By the terms of the note, the debtor has to the last hour of the day on which it becomes payable, to comply with it ; and it would often be inconvenient to take any steps after the close of day. It is often convenient to postpone subsequent proceedings till the next day. Usage has extended this time of grace generally to three days, and in some banks to four. This usage is made a part of the contract, not by the interference of the legislature, but by the act of the parties. The case cited from 9 *Wheat. Rep.* 581. is a note discounted in bank: In all such cases the bank receives, and the maker of the note pays, interest for the days of grace. This would be illegal and usurious, if the money was not lent for these additional days. The extent of the loan, therefore, is regulated by the act of the parties, and this part of the contract is founded on their act. Since, by contract, the maker is not liable for his note until the days of grace are expired, he has not broken his contract until they expire. The duty of giving notice to the endorser of his failure, does not arise, until the failure has taken place ; and, consequently, the promise of the bank to give such notice is performed, if it be given when the event has happened.

The case of the *Bank of Columbia* v. *Oakley*, (4 *Wheat. Rep.* 235.) was one in which the legislature had given a summary remedy to the bank for a broken contract, and had placed that remedy in the hands of the bank itself. The case did not turn on the question whether the law of Maryland was introduced into the contract, but whether a party might not, by his own conduct, renounce his claim to the trial by jury in a particular case. The Court likened it to submissions to arbitration, and to stipulation and forthcoming bonds. The principle settled

in that case is, that a party may renounce a benefit, and that
*Oakley* had exercised this right.

The cases from *Strange* and *East* turn upon a principle, which is generally recognised, but which is entirely distinct from that which they are cited to support. It is, that a man who is discharged by the tribunals of his own country, acting under its laws, may plead that discharge in any other country. The principle is, that laws act upon a contract, not that they enter into it, and become a stipulation of the parties. Society affords a remedy for breaches of contract. If that remedy has been applied, the claim to it is extinguished. The external action of law upon contracts, by administering the remedy for their breach, or otherwise, is, the usual exercise of legislative power. The interference with those contracts, by introducing conditions into them not agreed to by the parties, would be a very unusual and a very extraordinary exercise of the legislative power, which ought not to be gratuitously attributed to laws that do not profess to claim it. If the law becomes a part of the contract, change of place would not expunge the condition. A contract made in New-York would be the same in any other State as in New-York, and would still retain the stipulation originally introduced into it, that the debtor should be discharged by the surrender of his estate.

It is not, we think, true, that contracts are entered into in contemplation of the insolvency of the obligor. They are framed with the expectation that they will be literally performed. Insolvency is undoubtedly a casualty which is possible, but is never expected. In the ordinary course of human transactions, if even suspected, provision is made for it, by taking security against it. When it comes unlooked for, it would be entirely contrary to reason to consider it as a part of the contract.

We have, then, no hesitation in saying that, however law may act upon contracts, it does not enter into them, and become a part of the agreement. The effect of such a principle would be a mischievous abridgment of legislative power over subjects within the proper jurisdiction of States, by arresting their power to repeal or modify such laws with respect to existing contracts.

But, although the argument is not sustainable in this form, it assumes another, in which it is more plausible. Contract, it is said, being the creature of society, derives its obligation from the law; and, although the law may not enter into the agreement so as to form a constituent part of it, still it acts externally upon the contract, and determines how far the principle of coercion shall be applied to it; and this being universally understood, no individual can complain justly of its application to himself, in a case where it was known when the contract was formed.

This argument has been illustrated by references to the statutes of frauds, of usury, and of limitations. The construction of the words in the constitution, respecting contracts, for which the defendants contend, would, it has been said, withdraw all these subjects from State legislation. The acknowledgment, that they remain within it, is urged as an admission, that contract is not withdrawn by the constitution, but remains under State control, subject to this restriction only, that no law shall be passed impairing the obligation of contracts in existence at its passage.

The defendants maintain that an error lies at the very foundation of this argument. It assumes that contract is the mere creature of society, and derives all its obligation from human legislation. That it is not the stipulation an individual makes which binds him, but some declaration of the supreme power of a State to which he belongs, that he shall perform what he has undertaken to perform. That though this original declaration may be lost in remote antiquity, it must be presumed as the origin of the obligation of contracts. This postulate the defendants deny, and, we think, with great reason.

It is an argument of no inconsiderable weight against it, that we find no trace of such an enactment. So far back as human research carries us, we find the judicial power as a part of the executive, administering justice by the application of remedies to violated rights, or broken contracts. We find that power applying these remedies on the idea of a pre-existing obligation on every man to do what he has promised on consideration to do; that the breach of this obligation is an injury for which the injured party has a just claim

1827.

Ogden
v.
Saunders.

to compensation, and that society ought to afford him a remedy for that injury. We find allusions to the mode of acquiring property, but we find no allusion, from the earliest time, to any supposed act of the governing power giving obligation to contracts. On the contrary, the proceedings respecting them of which we know any thing, evince the idea of a pre-existing intrinsic obligation which human law enforces. If, on tracing the right to contract, and the obligations created by contract, to their source, we find them to exist anterior to, and independent of society, we may reasonably conclude that those original and pre-existing principles are, like many other natural rights, brought with man into society; and, although they may be controlled, are not given by human legislation.

In the rudest state of nature a man governs himself, and labours for his own purposes. That which he acquires is his own, at least while in his possession, and he may transfer it to another. This transfer passes his right to that other. Hence the right to barter. One man may have acquired more skins than are necessary for his protection from the cold; another more food than is necessary for his immediate use. They agree each to supply the wants of the other from his surplus. Is this contract without obligation? If one of them, having received and eaten the food he needed, refuses to deliver the skin, may not the other rightfully compel him to deliver it? Or two persons agree to unite their strength and skill to hunt together for their mutual advantage, engaging to divide the animal they shall master. Can one of them rightfully take the whole? or, should he attempt it, may not the other force him to a division? If the answer to these questions must affirm the duty of keeping faith between these parties, and the right to enforce it if violated, the answer admits the obligation of contracts, because, upon that obligation depends the right to enforce them. Superior strength may give the power, but cannot give the right. The rightfulness of coercion must depend on the pre-existing obligation to do that for which compulsion is used. It is no objection to the principle, that the injured party may be the weakest. In society, the

wrong-doer may be too powerful for the law. He may deride its coercive power, yet his contracts are obligatory; and, if society acquire the power of coercion, that power will be applied without previously enacting that his contract is obligatory.

Independent nations are individuals in a state of nature. Whence is derived the obligation of their contracts? They admit the existence of no superior legislative power which is to give them validity, yet their validity is acknowledged by all. If one of these contracts be broken, all admit the right of the injured party to demand reparation for the injury, and to enforce that reparation if it be withheld. He may not have the power to enforce it, but the whole civilized world concurs in saying, that the power, if possessed, is rightfully used.

In a state of nature, these individuals may contract, their contracts are obligatory, and force may rightfully be employed to coerce the party who has broken his engagement.

What is the effect of society upon these rights? When men unite together and form a government, do they surrender their right to contract, as well as their right to enforce the observance of contracts? For what purpose should they make this surrender? Government cannot exercise this power for individuals. It is better that they should exercise it for themselves. For what purpose, then, should the surrender be made? It can only be, that government may give it back again. As we have no evidence of the surrender, or of the restoration of the right; as this operation of surrender and restoration would be an idle and useless ceremony, the rational inference seems to be, that neither has ever been made; that individuals do not derive from government their right to contract, but bring that right with them into society; that obligation is not conferred on contracts by positive law, but is intrinsic, and is conferred by the act of the parties. This results from the right which every man retains to acquire property, to dispose of that property according to his own judgment, and to pledge himself for a future act. These rights are not given by society but are brought into it. The right of coercion is necessa

rily surrendered to government, and this surrender imposes
on government the correlative duty of furnishing a remedy.
The right to regulate contracts, to prescribe rules by which
they shall be evidenced, to prohibit such as may be deemed
mischievous, is unquestionable, and has been universally ex-
ercised. So far as this power has restrained the original
right of individuals to bind themselves by contract, it is re-
strained; but beyond these actual restraints the original
power remains unimpaired.

This reasoning is, undoubtedly, much strengthened by the
authority of those writers on natural and national law,
whose opinions have been viewed with profound respect by,
the wisest men of the present, and of past ages.

Supposing the obligation of the contract to be derived
from the agreement of the parties, we will inquire how far
law acts externally on it, and may control that obligation.
That law may have, on future contracts, all the effect which
the counsel for the plaintiff in error claim, will not be de-
nied. That it is capable of discharging the debtor under
the circumstances, and on the conditions prescribed in the
statute which has been pleaded in this case, will not be con-
troverted. But as this is an operation which was not intended
by the parties, nor contemplated by them, the particular
act can be entitled to this operation only when it has the
full force of law. A law may determine the obligation of a
contract on the happening of a contingency, because it is
the law. If it be not the law, it cannot have this effect.
When its existence as law is denied, that existence cannot
be proved by showing what are the qualities of a law. Law
has been defined by a writer, whose definitions especially
have been the theme of almost universal panegyric, " to be
a rule of civil conduct prescribed by the supreme power in
a State." In our system, the legislature of a State is the
supreme power, in all cases where its action is not restrained
by the constitution of the United States. Where it is so
restrained, the legislature ceases to be the supreme power,
and its acts are not law. It is, then, begging the question
to say, that, because contracts may be discharged by a law
previously enacted, this contract may be discharged by this
act of the legislature of New-York; for the question re-

*(margin)* 1827.

Ogden
v.
Saunders.

turns upon us, is this act a law? Is it consistent with, or repugnant to, the constitution of the United States? This question is to be solved only by the constitution itself.

In examining it, we readily admit, that the whole subject of contracts is under the control of society, and that all the power of society over it resides in the State legislatures, except in those special cases where restraint is imposed by the constitution of the United States. The particular restraint now under consideration is on the power to impair the obligation of contracts. The extent of this restraint cannot be ascertained by showing that the legislature may prescribe the circumstances, on which the original validity of a contract shall be made to depend. If the legislative will be, that certain agreements shall be in writing, that they shall be sealed, that they shall be attested by a certain number of witnesses, that they shall be recorded, or that they shall assume any prescribed form before they become obligatory, all these are regulations which society may rightfully make, and which do not come within the restrictions of the constitution, because they do not *impair* the obligation of the contract. The obligation must exist before it can be impaired; and a prohibition to impair it, when made, does not imply an inability to prescribe those circumstances which shall create its obligation. The statutes of frauds, therefore, which have been enacted in the several States, and which are acknowledged to flow from the proper exercise of State sovereignty, prescribe regulations which must precede the obligation of the contract, and, consequently, cannot impair that obligation. Acts of this description, therefore, are most clearly not within the prohibition of the constitution.

The acts against usury are of the same character. They declare the contract to be void in the beginning. They deny that the instrument ever became a contract. They deny it all original obligation; and cannot impair that which never came into existence.

Acts of limitations approach more nearly to the subject of consideration, but are not identified with it. They defeat a contract once obligatory, and may, therefore, be supposed to partake of the character of laws which impair its

obligation. But a practical view of the subject will show us that the two laws stand upon distinct principles.

In the case of *Sturges* v. *Crowninshield*, it was observed by the Court, that these statutes relate only to the remedies which are furnished in the Courts; and their language is generally confined to the remedy. They do not purport to dispense with the performance of a contract, but proceed on the presumption that a certain length of time, unexplained by circumstances, is reasonable evidence of a performance. It is on this idea alone that it is possible to sustain the decision, that a bare acknowledgment of the debt, unaccompanied with any new promise, shall remove the bar created by the act. It would be a mischief not to be tolerated, if contracts might be set up at any distance of time, when the evidence of payment might be lost, and the estates of the dead, or even of the living, be subjected to these stale obligations. The principle is, without the aid of a statute, adopted by the Courts as a rule of justice. The legislature has enacted no statute of limitations as a bar to suits on sealed instruments. Yet twenty years of unexplained silence on the part of the creditor is evidence of payment. On parol contracts, or on written contracts not under seal, which are considered in a less solemn point of view than sealed instruments, the legislature has supposed that a shorter time might amount to evidence of performance, and has so enacted. All have acquiesced in these enactments, but have never considered them as being of that class of laws which impair the obligation of contracts. In prescribing the evidence which shall be received in its Courts, and the effect of that evidence, the State is exercising its acknowledged powers. It is likewise in the exercise of its legitimate powers, when it is regulating the remedy and mode of proceeding in its Courts.

The counsel for the plaintiff in error insist, that the right to regulate the remedy and to modify the obligation of the contract are the same; that obligation and remedy are identical, that they are synonymous—two words conveying the same idea.

The answer given to this proposition by the defendant's counsel seems to be conclusive. They originate at different times. The obligation to perform is coeval with the

undertaking to perform; it originates with the contract it-self, and operates anterior to the time of performance. The remedy acts upon a broken contract, and enforces a pre-existing obligation.

If there be any thing in the observations made in a pre-ceding part of this opinion respecting the source from which contracts derive their obligation, the proposition we are now considering cannot be true. It was shown, we think, satis-factorily, that the right to contract is the attribute of a free agent, and that he may rightfully coerce performance from another free agent who violates his faith. Contracts have, consequently, an intrinsic obligati    When men come into society, they can no longer exerc e this original and natu-ral right of coercion. It would be incompatible with gene-ral peace, and is, therefore, surrendered. Society prohibits the use of private individual coercion, and gives in its place a more safe and more certain remedy. But the right to contract is not surrendered with the right to coerce perform-ance. It is still incident to that degree of free agency which the laws leave to every individual, and the obligation of the contract is a necessary consequence of the right to make it. Laws regulate this right, but, where not regulated, it is retained in its original extent. Obligation and reme-dy, then, are not identical; they originate at different times, and are derived from different sources.

But, although the identity of obligation and remedy be -disproved, it may be, and has been urged, that they are pre-cisely commensurate with each other, and are such sympa-thetic essences, if the expression may be allowed, that the action of law upon the remedy is immediately felt by the ob-ligation—that they live, languish, and die together. The use made of this argument is to show the absurdity and self-contradiction of the construction which maintains the invio-lability of obligation, while it leaves the remedy to the State governments.

We do not perceive this absurdity or self-contradiction.

Our country exhibits the extraordinary spectacle of dis-tinct, and, in many respects, independent governments ove the same territory and the same people. The local govern-ments are restrained from impairing the obligation of con-

tracts, but they furnish the remedy to enforce them, and administer that remedy in tribunals constituted by themselves. It has been shown that the obligation is distinct from the remedy, and, it would seem to follow, that law might act on the remedy without acting on the obligation. To afford a remedy is certainly the high duty of those who govern to those who are governed. A failure in the performance of this duty subjects the government to the just reproach of the world. But the constitution has not undertaken to enforce its performance. That instrument treats the States with the respect which is due to intelligent beings, understanding their duties, and willing to perform them; not as insane beings, who must be compelled to act for self-preservation. Its language is the language of restraint, not of coercion. It prohibits the States from passing any law impairing the obligation of contracts; it does not enjoin them to enforce contracts. Should a State be sufficiently insane to shut up or abolish its Courts, and thereby withhold all remedy, would this annihilation of remedy annihilate the obligation also of contracts? We know it would not. If the debtor should come within the jurisdiction of any Court of another State, the remedy would be immediately applied, and the inherent obligation of the contract enforced. This cannot be ascribed to a renewal of the obligation; for passing the line of a State cannot re-create an obligation which was extinguished. It must be the original obligation derived from the agreement of the parties, and which exists unimpaired though the remedy was withdrawn.

But, we are told, that the power of the State over the remedy may be used to the destruction of all beneficial results from the right; and hence it is inferred, that the construction which maintains the inviolability of the obligation, must be extended to the power of regulating the remedy.

The difficulty which this view of the subject presents, does not proceed from the identity or connexion of right and remedy, but from the existence of distinct governments acting on kindred subjects. The constitution contemplates restraint as to the obligation of contracts, not as to the application of remedy. If this restraint affects a power which the constitution did not mean to touch, it can

only be when that power is used as an instrument of hosti-lity to invade the inviolability of contract, which is placed beyond its reach. A State may use many of its acknow-ledged powers in such manner as to come in conflict with the provisions of the constitution. Thus the power over its domestic police, the power to regulate commerce purely internal, may be so exercised as to interfere with regulations of commerce with foreign nations, or between the States. In such cases, the power which is supreme must control that which is not supreme, when they come in conflict. But this principle does not involve any self-contradiction, or deny the existence of the several powers in the respec-tive governments. So, if a State shall not merely modify, or withhold a particular remedy, but shall apply it in such manner as to extinguish the obligation without performance, it would be an abuse of power which could scarcely be misunderstood; but which would not prove that remedy could not be regulated without regulating obligation.

The counsel for the plaintiff in error put a case of more difficulty, and urge it as a conclusive argument against the existence of a distinct line dividing obligation from remedy. It is this. The law affords remedy by giving execution against the person, or the property, or both. The same power which can withdraw the remedy against the person, can withdraw that against the property, or that against both, and thus effectually defeat the obligation. The constitu-tion, we are told, deals not with form, but with substance ; and cannot be presumed, if it designed to protect the obli-gation of contracts from State legislation, to have left it thus obviously exposed to destruction.

The answer is, that if the law goes farther, and annuls the obligation without affording the remedy which satisfies it, if its action on the remedy be such as palpably to impair the obligation of the contract, the very case arises which we suppose to be within the constitution. If it leaves the obligation untouched, but withholds the remedy, or affords one which is merely nominal, it is like all other cases of misgovernment, and leaves the debtor still liable to his cre-ditor, should he be found, or should his property be found, where the laws afford a remedy. If that high sense of duty

which men selected for the government of their fellow citizens must be supposed to feel, furnishes no security against a course of legislation which must end in self-destruction; if the solemn oath taken by every member, to support the constitution of the United States, furnishes no security against intentional attempts to violate its spirit while evading its letter;—the question how far the constitution interposes a shield for the protection of an injured individual, who demands from a Court of justice that remedy which every government ought to afford, will depend on the law itself which shall be brought under consideration.   The anticipation of such a case would be unnecessarily disrespectful, and an opinion on it would be, at least, premature.   But, however the question might be decided, should it be even determined that such a law would be a successful evasion of the constitution, it does not follow, that an act which operates directly on the contract after it is made, is not within the restriction imposed on the States by that instrument.   The validity of a law acting directly on the obligation, is not proved by showing that the constitution has provided no means for compelling the States to enforce it.

We perceive, then, no reason for the opinion, that the prohibition " to pass any law impairing the obligation of contracts," is incompatible with the fair exercise of that discretion, which the State legislatures possess in common with all governments, to regulate the remedies afforded by their own Courts.   We think, that obligation and remedy are distinguishable from each other.   That the first is created by the act of the parties, the last is afforded by government.   The words of the restriction we have been considering, countenance, we think, this idea.   No State shall " pass any law impairing the obligation of contracts." These words seems to us to import, that the obligation is intrinsic, that it is created by the contract itself, not that it is dependent on the laws made to enforce it.   When we advert to the course of reading generally pursued by American statesmen in early life, we must suppose, that the framers of our constitution were intimately acquainted with the writings of those wise and learned men, whose treatises on the laws of

nature and nations have guided public opinion on the subjects of obligation and contract. If we turn to those treatises, we find them to concur in the declaration, that contracts possess an original intrinsic obligation, derived from the acts of free agents, and not given by government. We must suppose, that the framers of our constitution took the same view of the subject, and the language they have used confirms this opinion.

The propositions we have endeavoured to maintain, of the truth of which we are ourselves convinced, are these :

That the words of the clause in the constitution which we are considering, taken in their natural and obvious sense, admit of a prospective, as well as of a retrospective. operation.

That an act of the legislature does not enter into the contract, and become one of the conditions stipulated by the parties ; nor does it act externally on the agreement, unless it have the full force of law.

That contracts derive their obligation from the act of the parties, not from the grant of government ; and that the right of government to regulate the manner in which they shall be formed, or to prohibit such as may be against the policy of the State, is entirely consistent with their inviolability after they have been formed.

That the obligation of a contract is not identified with the means which government may furnish to enforce it; and that a prohibition to pass any law impairing it, does not imply a prohibition to vary the remedy ; nor does a power to vary the remedy, imply a power to impair the obligation derived from the act of the parties.

We cannot look back to the history of the times when the august spectacle was exhibited of the assemblage of a whole people by their representatives in Convention, in order to unite thirteen independent sovereignties under one government, so far as might be necessary for the purposes of union, without being sensible of the great importance which was at that time attached to the tenth section of the first article. The power of changing the relative situation of debtor and creditor, of interfering with contracts, a power which comes home to every man, touches the interest of all.

and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, had been used to such an excess by the State legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man. The mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith. To guard against the continuance of the evil was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of the government.

To impose restraints on State legislation as respected this delicate and interesting subject, was thought necessary by all those patriots who could take an enlightened and comprehensive view of our situation; and the principle obtained an early admission into the various schemes of government which were submitted to the Convention. In framing an instrument, which was intended to be perpetual, the presumption is strong, that every important principle introduced into it is intended to be perpetual also; that a principle expressed in terms to operate in all future time, is intended so to operate. But if the construction for which the plaintiff's counsel contend be the true one, the constitution will have imposed a restriction in language indicating perpetuity, which every State in the Union may elude at pleasure. The obligation of contracts in force, at any given time, is but of short duration; and, if the inhibition be of retrospective laws only, a very short lapse of time will remove every subject on which the act is forbidden to operate, and make this provision of the constitution so far useless. Instead of introducing a great principle, prohibiting all laws of this obnoxious character, the constitution will only suspend their operation for a moment, or except from it pre-existing cases. The object would scarcely seem to be of sufficient importance to have found a place in that instrument.

This construction would change the character of the provision, and convert an inhibition to pass laws impairing the obligation of contracts, into an inhibition to pass retrospec

1827.

Ogden
v.
Saunders.

1827.

Ogden
v.
Saunders.

tive laws.    Had this been the intention of the Convention, is it not reasonable to believe that it would have been so expressed ?    Had the intention been to confine the restriction to laws which were retrospective in their operation, language could have been found, and would have been used, to convey this idea.    The very word would have occurred to the framers of the instrument, and we should have probably found it in the clause.    Instead of the general prohibition to pass any " law impairing the obligation of contracts," the prohibition would have been to the passage of any retrospective law.    Or, if the intention had been not to embrace all retrospective laws, but those only which related to contracts, still the word would have been introduced, and the State legislatures would have been forbidden " to pass any *retrospective* law impairing the obligation of contracts," or " to pass any law impairing the obligation of contracts previously made."  Words which directly and plainly express the cardinal intent, always present themselves to those who are preparing an important instrument, and will always be used by them.    Undoubtedly there is an imperfection in human language, which often exposes the same sentence to different constructions.    But it is rare, indeed, for a person of clear and distinct perceptions, intending to convey one principal idea, so to express himself as to leave any doubt respecting that idea. It may be uncertain whether his words comprehend other things not immediately in his mind ; but it can seldom be uncertain whether he intends the particular thing to which his mind is specially directed.  If the mind of the Convention, in framing this prohibition, had been directed, not generally to the operation of laws upon the obligation of contracts, but particularly to their retrospective operation, it is scarcely conceivable that some word would not have been used indicating this idea.    In instruments prepared on great consideration, general terms, comprehending a whole subject, are seldom employed to designate a particular, we might say, a minute portion of that subject. The general language of the clause is such as might be suggested by a general intent to prohibit State legislation on the subject to which that language is applied—the obligation of

contracts; not such as would be suggested by a particular intent to prohibit retrospective legislation.

It is also worthy of consideration, that those laws which had effected all that mischief the constitution intended to prevent, were prospective as well as retrospective, in their operation. They embraced future contracts, as well as those previously formed. There is the less reason for imputing to the Convention an intention, not manifested by their language, to confine a restriction intended to guard against the recurrence of those mischiefs, to retrospective legislation. For these reasons, we are of opinion, that, on this point, the District Court of Louisiana has decided rightly.

Judgment having been entered in favour of the validity of a certificate of discharge under the State laws in those cases, (argued in connexion with *Ogden* v. *Saunders*,) where the contract was made between citizens of the State under whose law the discharge was obtained, and in whose Courts the certificate was pleaded, the cause was further argued by the same counsel, upon the points reserved, as to the effect of such a discharge in respect to a contract made with a citizen of another State, and where the certificate was pleaded in the Courts of another State, or of the United States.

To render the judgment which was finally pronounced in the cause intelligible, it is necessary to state, that in addition to the plea of the certificate of discharge under the insolvent law of the State of New-York, of 1801, the defendant below, Ogden, pleaded the statute of limitations (of New-York,) *non assumpsit infra sex annos.*

To this plea, the plaintiff below, Saunders, replied, that previous to the running of the statute, to wit, in April, 1810, the defendant, Ogden, removed from the State of New-York to New-Orleans, in the State of Louisiana, where he continued to reside until the commencement of this suit.

The jury found the facts of the drawing and acceptance of the bills, of the discharge under the insolvent law of New-York, and of the defendant's removing to Louisiana at the time stated in the plaintiff's replication, in the form

*1827.*

Ogden
v
Saunders.

*March 6th.*

1827.

Ogden
v.
Saunders.

of what was probably intended to be a special verdict, submitting the law to the Court: " If the law be for the plaintiff, then they find for the plaintiff the amount of the several acceptances, with the interest and costs; but if the law on the said facts be for the defendant, then the jury find for the defendant, with costs."

A judgment was rendered by the Court below upon this verdict. And the cause being brought by writ of error before this Court, among the errors assigned was the following: " That the judgment of the Court is for a greater sum than is found by the jury; the whole amount of the bills set forth in the petition being 2,183 dollars, amounting, with interest from the time of the judicial demand, to 2,652 dollars and 34 cents. Whereas the judgment is for the sum of 4,017 dollars, 64 cents, damages," &c.

*March 13th.*     Mr. Justice Johnson.  I am instructed by the majority of the Court finally to dispose of this cause.  The present majority is not the same which determined the general question on the constitutionality of State insolvent laws, with reference to the violation of the obligation of contracts.  I now stand united with the minority on the former question, and, therefore, feel it due to myself and the community to maintain my consistency.

The question now to be considered is, whether a discharge of a debtor under a State insolvent law, would be valid against a creditor or citizen of another State, who has never voluntarily subjected himself to the State laws, otherwise than by the origin of his contract.

As between its own citizens, whatever be the origin of the contract, there is now no question to be made on the effect of such a discharge; nor is it to be questioned, that a discharge not valid under the constitution in the Courts of the United States, is equally invalid in the State Courts. The question to be considered goes to the invalidity of the discharge altogether, and, therefore, steers clear of that provision in the constitution which purports to give validity in every State to the records, judicial proceedings, and so forth, of each State.

The question now to be considered, was anticipated in

the case of *Sturges* v. *Crowninshield,* when the Court, in the close of the opinion delivered, declared, that it means to confine its views to the case then under consideration, and not to commit itself as to those in which the interests and rights of a citizen of another State are implicated.

The question is one partly international, partly constitutional. My opinion on the subject is briefly this: that the provision in the constitution which gives the power to the general government to establish tribunals of its own in every State, in order that the citizens of other States or sovereignties might therein prosecute their rights under the jurisdiction of the United States, had for its object an harmonious distribution of justice throughout the Union; to confine the States, in the exercise of their judicial sovereignty, to cases between their own citizens; to prevent, in fact, the exercise of that very power over the rights of citizens of other States, which the origin of the contract might be supposed to give to each State; and thus, to obviate that *conflictus legum,* which has employed the pens of *Huberus* and various others, and which any one who studies the subject will plainly perceive, it is infinitely more easy to prevent than to adjust.

These conflicts of power and right necessarily arise only after contracts are entered into. Contracts, then, become the appropriate subjects of judicial cognizance; and if the just claims which they give rise to, are violated by arbitrary laws, or if the course of distributive justice be turned aside, or obstructed by legislative interference, it becomes a subject of jealousy, irritation, and national complaint or retaliation.

It is not unimportant to observe, that the constitution was adopted at the very period when the Courts of Great Britain were engaged in adjusting the conflicts of right which arose upon their own bankrupt law, among the subjects of that crown in the several dominions of Scotland, Ireland, and the West Indies. The first case we have on the effect of foreign discharges, that of *Ballantine* v. *Golding,* occurred in 1783, and the law could hardly be held settled before the case of *Hunter* v. *Potts,* which was decided in 1791.

Any one who will take the trouble to investigate the sub-
ject, will, I think, be satisfied, that although the British
Courts profess to decide upon a principle of universal law,
when adjudicating upon the effect of a foreign discharge,
neither the passage in *Vattel*, to which they constantly refer,
nor the practice and doctrines of other nations, will sustain
them in the principle to the extent in which they assert it.
It was all important to a great commercial nation, the cre-
ditors of all the rest of the world, to maintain the doctrine
as one of universal obligation, *that the assignment of the
bankrupt's effects, under a law of the country of the contract,
should carry the interest in his debts, wherever his debtor may
reside; and that no foreign discharge of his debtor should
operate against debts contracted with the bankrupt in his own
country.* But I think it perfectly clear, that in the United
States a different doctrine has been established; and since
the power to discharge the bankrupt is asserted on the same
principle with the power to assign his debts, that the depar-
ture from it in the one instance, carries with it a negation of
the principle altogether.

It is vain to deny that it is now the established doctrine
in England, that the discharge of a bankrupt shall be effec-
tual against contracts of the State that give the discharge,
whatsoever be the allegiance or country of the creditor.
But I think it equally clear, that this is a rule peculiar to her
jurisprudence, and that reciprocity is the general rule of
other countries; that the effect given to such discharge is
so much a matter of comity, that the States of the European
continent, in all cases reserve the right of deciding whether
reciprocity will not operate injuriously upon their own citi-
zens.

*Huberus*, in his third axiom on this subject, puts the ef-
fect of such laws upon the ground of courtesy, and recog-
nises the reservation that I have mentioned; other writers
do the same.

I will now examine the American decisions on this sub-
ject; and, first, in direct hostility with the received doc-
trines of the British Courts, it has been solemnly adjudged
in this Court, and, I believe, in every State Court of the
Union, that, notwithstanding the laws of bankruptcy in

England, a creditor of the bankrupt may levy an attachment on a debt due the bankrupt in this country, and appropriate the proceeds to his own debt.

In the case of *Harrison* v. *Sterry*, (5 *Cranch*, 298. 302.) a case decided in this Court in 1809, upon full argument, and great deliberation, and in which all the English cases were quoted, it is expressly adjudged, " that in the case of a contract made with foreigners in a foreign country, the bankrupt laws of the foreign country are incapable of operating a legal transfer of property in the United States',' and judgment was given in favour of the attaching creditors, against the claim of the foreign assignees.

In that case, also, another important doctrine is established in hostility with the British doctrine. For the United States had interposed a claim against the English assignees, in order to obtain satisfaction from the proceeds of the bankrupt's effects in this country, for a debt contracted in Great Britain. And this Court decreed, accordingly, expressly restricting the power of the country of the contract to its concoction and exposition.

The language of the Court is, " The law of the place where a contract is made, is, generally speaking, the law of the contract ; that is, it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself. It is extrinsic, and is rather a personal privilege, dependent on the laws of the place where the property lies, and where the Court sits which decides the cause.

And, accordingly, the law of the United States was sustained, which gave the debts due the bankrupt here, to satisfy a debt contracted in England, to the prejudice of the law of England, which gave the same debt to the assignees of the bankrupt.

It cannot be necessary to go farther than this case to establish, that, so far as relates to the foreign creditor, this country does not recognise the English doctrine, *that the bankrupt law of the country of the contract is paramount in disposing of the rights of the bankrupt.*

The United States pass a law which asserts the right to

1827.

Ogden
v.
Saunders.

appropriate a debt due a foreign bankrupt, to satisfying a debt due itself, and incurred by that bankrupt in his own country. The assignees of that bankrupt question this right, and claim the debt as legal y vested in them by the law of the country of the contract, and maintain that the debt due the United States, being contracted in Great Britain, was subject to the laws of Great Britain, and, therefore, entitled only to share in common with other creditors in the proceeds of the bankrupt's effects; that the debt so appropriated by the law of the United States to its exclusive benefit was, as to *all the bankrupt's contracts*, or certainly as to *all English* contracts, vested in the assignees, on international principles, principles which gave effect to the English bankrupt laws, so vesting that debt, paramount to the laws of other countries.

In giving effect to the law of the United States, this Court overrules that doctrine; and, in the act of passing that law, this government asserts both the power over the subject, and the right to exercise that power without a violation of national comity; or has at least taken its stand against that comity, and asserted a right to protect its own interests, which, in principle, is equally applicable to the interests of its own citizens.

It has had, in fact, regard to the *lex loci rei sitæ*, as existing in the person and funds of the debtor of the bankrupt, and the rights of self preservation, and duty of protection to its own citizens, and the actual allegiance of the creditor and debtor, not the metaphysical allegiance of the contract, on which the foreign power is asserted.

It would be in vain to assign the decision of this Court in *Harrison* v. *Sterry*, or the passing of the law of the United States, to the general preference, which the government may assert in the payment of its own debt, since that preference can only exist to the prejudice of its own citizens, whereas, the precedence there claimed and conceded operated to the prejudice of British creditors.

The case of *Baker* v. *Wheaton*, adjudged in the Courts of Massachusetts in the time of Chief Justice Parsons, (5 *Mass. Rep.* 509.) is a very strong case upon this subject. That also was argued with great care, and all the British cases

reviewed; the Court took time to deliberate, and the same doctrine was maintained, in the same year and the same month with *Harrison* v. *Sterry*, and certainly without any communication between the two Courts.

The case was this : one *Wheaton* gave a promissory note to one *Chandler*, both being at that time citizens and inhabitants of Rhode Island. *Wheaton* was discharged under the bankrupt laws of Rhode Island, both still continuing citizens and inhabitants of the same State, and the note remaining the property of Chandler. Subsequent to the discharge, Chandler endorses the note to Baker, and Wheaton is arrested in Massachusetts. He pleads the discharge in bar, and the Court, in deciding, expresses itself thus. " When, therefore, the defendant was discharged from that contract, *lege loci*, the promisee was bound by that discharge, *as he was a party to the laws of that State, and assenting to their operation*. But if, when the contract was made, the promisee had not been a citizen of Rhode Island, he would not have been bound *by the laws of it or any other State*, and holding this note at the time of the discharge, he might afterwards maintain an action upon it in the Courts of this State." And again, (page 311.) " if the note had been transferred to the plaintiff, a citizen of this State, whilst it remained due and undischarged by the insolvent laws of Rhode Island, those laws *could not affect his rights in the Courts of law in this State, because he is not bound by them*."

This, it will be observed, regards a contract acknowledged to be of Rhode Island origin.

There is another case reported in the decisions of the same State, (10 vol. p. 337.) which carries this doctrine still farther, and, I apprehend, to a length which cannot be maintained.

This was the case of *Watson* v. *Bourne*, in which Watson, a citizen of Massachusetts, had sued Bourne in a State Court, and obtained judgment. Bourne was discharged under the insolvent laws of that State, and being afterwards found in Massachusetts was arrested on an action of debt upon the judgment. He pleads the discharge; plaintiff replies, *that he, plaintiff, was a citizen of Massachusetts, and, therefore, not precluded by the discharge*. The origin of the

debt does not appear from the report, and the argument, turned wholly on the question, whether by entering judgment in the Court of the State, he had not subjected his rights to the State laws *pro tanto.*

The Court overruled the plea, and recognised the doctrine in *Baker* v. *Wheaton,* by declaring, " that a discharge of that nature can only operate where the law is made by an authority common to the creditor and debtor in all respects, *where both are citizens or subjects.*"

I have little doubt that the Court was wrong in denying the effect of the discharge as against *judgments* rendered in the State Courts, when the party goes voluntarily and unnecessarily into those Courts ; but the decision shows, in other respects, how decidedly the British doctrine is repelled in the Courts of that State.

The British doctrine is also unequivocally repelled in a very learned opinion delivered by Mr. Justice Nott, in the Court of the last resort in South Carolina, and in which the whole Court, consisting of the common law Judges of the State, concurred.   This was in the case of the *Assignees of Topham* v. *Chapman et al.* in which the rights of the attaching creditor were maintained against those of the assignees of the bankrupt ; (1 *Constitutional Reports,* p. 253.) and that the same rule was recognised at an early day in the Court of Pennsylvania, appears from the leading case of *Phillips* v. *Hunter,* (2 *H. Black.* 402.) in which a British creditor, who had recovered of a debtor of the bankrupt in Pennsylvania, was compelled by the British Courts to refund to the assignees in England, as for money had and received to their use.

I think it, then, fully established, that in the United States a creditor of the foreign bankrupt may attach the debt due the foreign bankrupt, and apply the money to the satisfaction of his peculiar debt, to the prejudice of the rights of the assignees or other creditors.

I do not here speak of assignees, or rights created, under the bankrupt's own deed ; those stand on a different ground, and do not affect this question.   I confine myself to assignments, or transfers, resting on the operation of the laws of the country, independent of the bankrupt's deed ; to, the

1827.

Ogden
v.
Saunders.

rights and liabilities of debtor, creditor, bankrupt, and assignees, as created by law.

What is the actual bearing of this right to attach, so generally recognised by our decisions?

It imports a general abandonment of the British principles; for, according to their laws, the assignee alone has the power to release the debtor. But the right to attach necessarily implies the right to release the debtor, and that right is here asserted under the laws of a State which is not the State of the contract.

So, also, the creditor of the bankrupt is, by the laws of his country, entitled to no more than a ratable participation in the bankrupt's effects. But the right to attach imports a right to exclusive satisfaction, if the effects so attached should prove adequate to make satisfaction.

The right to attach also imports the right to sue the bankrupt; and who would impute to the bankrupt law of another country, the power to restrain the citizens of these States in the exercise of their right to go into the tribunals of their own country for the recovery of debts, wherever they may have originated? Yet, universally, after the law takes the bankrupt into its own hands, his creditors are prohibited from suing.

Thus much for the law of this case in an international view. I will consider it with reference to the provisions of the constitution.

I have said above, that I had no doubt, the erection of a distinct tribunal for the resort of citizens of other States, was introduced, *ex industria,* into the constitution, to prevent, among other evils, the assertion of a power over the rights of the citizens of other States, upon the metaphysical ideas of the British Courts on the subject of jurisdiction over contracts. And there was good reason for it; for, upon that principle it is, that a power is asserted over the rights of creditors which involves a mere mockery of justice.

Thus, in the case of *Burrows* v. *Jemino*, (reported in 2 *Strange*, and better reported in *Moseley,* and some other books,) the creditor, residing in England, was cited, probably, by a placard on a door-post in Leghorn, to appear there to

1827.

Ogden
v.
Saunders.

answer to his debtor; and his debt passed upon by the Court, perhaps, without his having ever heard of the institution of legal process to destroy it.

The Scotch, if I remember correctly, attach the summons on the flag-staff, or in the market place, at the shore of Leith; and the civil law process by proclamation, or *viis et modis*, is not much better, as the means of subjecting the rights of foreign creditors to their tribunals.

All this mockery of justice, and the jealousies, recriminations, and, perhaps, retaliations, which might grow out of it, are avoided, if the power of the States over contracts, after they become the subject exclusively of judicial cognizance, is limited to the controversies of their own citizens.

And it does appear to me almost incontrovertible, that the States cannot proceed one step farther without exercising a power incompatible with the acknowledged powers of other States, or of the United States, and with the rights of the citizens of other States.

Every bankrupt or insolvent system in the world, must partake of the character of a judicial investigation. Parties whose rights are to be affected, are entitled to a hearing. Hence every system, in common with the particular system now before us, professes to summon the creditors before some tribunal, to show cause against granting a discharge to the bankrupt.

But on what principle can a citizen of another State be forced into the Courts of a State for this investigation? The judgment to be passed is to prostrate his rights; and on the subject of these rights the constitution exempts him from the jurisdiction of the State tribunals, without regard to the place where the contract may originate. In the only tribunal to which he owes allegiance, the State insolvent, or bankrupt laws, cannot be carried into effect; they have a law of their own on the subject;[a] and a certificate of discharge under any other law would not be acknowledged as valid even in the Courts of the State in which the Court of the United States that grants it, is held. Where is the reciprocity? Where the reason upon which the State Courts

[a] Act of Congress of January 6th, 1800. ch. 4. (vol. 3. p. 391.)

can thus exercise a power over the suitors of that Court, when that Court possesses no such power over the suitors of the State Courts ?

In fact, the constitution takes away the only ground upon which this eminent dominion over particular contracts can be claimed, which is that of sovereignty. For the constitutional suitors in the Courts of the U ted States, are not only exempted from the necessity of resorting to the State tribunals, but actually cannot be forced into them. If, then, the law of the English Courts had ever been practically adopted in this country in the State tribunals, the constitution has produced such a radical modification of State power over even their own contracts, in the hands of individuals not subject to their jurisdiction, as to furnish ground for excepting the rights of such individuals from the power which the States unquestionably possess over their own contracts, and their own citizens.

Follow out the contrary doctrine in its consequences, and see the absurdity it will produce.

The constitution has constituted Courts professedly independent of State power in their judicial course; and yet the judgments of those Courts are to be vacated, and their prisoners set at large, under the power of the State Courts, or of the State laws, without the possibility of protecting themselves from its exercise.

I cannot acquiesce in an incompatibility so obvious.

No one has ever imagined, that a prisoner, in confinement under process from the Courts of the United States, could avail himself of the insolvent laws of the State in which the Court sits. And the reason is, that those laws are municipal and peculiar, and appertaining exclusively to the exercise of State power in that sphere in which it is sovereign, that is, between its own citizens, between suitors subjected to State power exclusively, in their controversies between themselves.

In the Courts of the United States, no higher power is asserted than that of discharging the individual in confinement under its own process. This affects not to interfere with the rights of creditors in the State Courts, against the same individual. Perfect reciprocity would seem to indi-

cate, that no greater power should be exercised under State authority over the rights of suitors who belong to the United States jurisdiction. Even although the principle asserted in the British Courts, of supreme and exclusive power over their own contracts, had obtained in the Courts of the United States, I must think that power has undergone a radical modification by the judicial powers granted to the United States.

I, therefore, consider the discharge under a State law, as incompetent to discharge a debt due a citizen of another State ; and, it follows, that the plea of a discharge here set up, is insufficient to bar the rights of the plaintiff.

It becomes necessary, therefore, to consider the other errors assigned in behalf of the defendant; and, first, as to the plea of the act of limitations.

The statute pleaded here is not the act of Louisiana, but that of New-York ; and the question is not raised by the facts or averments, whether he could avail himself of that law if the full time had run out before his departure from New-York, as was supposed in argument. The plea is obviously founded on the idea, that the statute of the State of the contract, was generally pleadable in any other State, a doctrine that will not bear argument.

The remaining error assigned has regard to the sum for which the judgment is entered, it being for a greater amount than the nominal amount of the bills of exchange on which the suit was brought, and which are found by the verdict.

There has been a defect of explanation on this subject ; but; from the best information afforded us, we consider the amount for which judgment is entered, as made up of principal, interest, and damages, and the latter as being legally incident to the finding of the bills of exchange, and their non-payment, and assessed by the Court under a local practice consonant with that by which the amount of written contracts is determined, by reference to the prothonotary, in many other of our Courts. We, therefore, see no error in it. The judgment below will, therefore, be affirmed.

And the purport of this adjudication, as I understand it, is, that as between citizens of the same State, a discharge of a bankrupt by the laws of that State, is valid as it affects pos-

terior contracts; that as against creditors, citizens of other States, it is invalid as to all contracts.

The propositions which I have endeavoured to maintain in the opinion which I have delivered are these :

1st. That the power given to the United States to pass bankrupt laws is not exclusive.

2d. That the fair and ordinary exercise of that power by the States does not necessarily involve a violation of the obligation of contracts, *multo fortiori* of posterior contracts.

3d. But when, in the exercise of that power, the States pass beyond their own limits, and the rights of their own citizens, and act upon the rights of citizens of other States, there arises a conflict of sovereign power, and a collision with the judicial powers granted to the United States, which renders the exercise of such a power incompatible with the rights of other States, and with the constitution of the United States.

Mr. Justice WASHINGTON, Mr. Justice THOMPSON, and Mr. Justice TRIMBLE, dissented.

Mr. Chief Justice MARSHALL, Mr. Justice DUVALL, and Mr. Justice STORY, assented to the judgment, which was entered for the defendant in error.

Judgment affirmed.[a]

a In the case of *Shaw* v. *Robbins*, the judgment below was reversed. This was an action on several bills of exchange, drawn by the plaintiff on the defendant, payable to plaintiff's order, and by the defendant duly accepted. At the time of the transaction, the plaintiff was a citizen of Massachusetts, resident in that State, and the defendant a citizen of New-York, and there resident. The action was brought in a State Court, in Ohio, and the defendant relied on a discharge, obtained in New-York, under the provisions of the insolvent laws of that State. The highest Court of law in Ohio gave judgment for the defendant; and the cause was brought before this Court by a writ of error.

Mr. Justice JOHNSON. This is a contract between a citizen of New-York and a citizen of Massachusetts. It only differs from *Ogden* v. *Saunders* in this particular, that the action was brought in a State Court; not the Court of New-York, but the Court of another State. We think the decision in the case of *Ogden* v. *Saunders* applies to this, and must govern its decision. The judgment below, therefore, must be reversed, and the cause remanded for such further proceedings as the law may require.